## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA.,

        Plaintiff,

    v.

BECTON, DICKINSON AND COMPANY,

        Defendant.

Case No. 2:14-cv-4318-CCC-JBC

Hon. Claire C. Cecchi, U.S.D.J.
Hon. James B. Clark, III, U.S.M.J.

Return Date: April 6, 2015

---

## BRIEF IN SUPPORT OF MOTION
## FOR JUDGMENT ON THE PLEADINGS

---

Mark D. Sheridan
Mark.Sheridan@squirepb.com
Attorney ID: 039961999
Mark C. Errico
Mark.Errico@squirepb.com
Attorney ID: 033631998
SQUIRE PATTON BOGGS (US) LLP
One Riverfront Plaza
Newark, New Jersey 07102
Telephone: 973-848-5600
Facsimile: 973-848-5601

Attorneys for Plaintiff
National Union Fire Insurance
Company of Pittsburgh, Pa.

# **TABLE OF CONTENTS**

INTRODUCTION ......................................................................................................... 1

STATEMENT OF FACTS ........................................................................................... 3

    A.    The RTI Action ................................................................................ 3

    B.    The Policies ..................................................................................... 3

        1.    The 1994 And 1997 Policies ................................................ 4

        2.    The 1999 Policy ..................................................................... 5

    C.    BD's Tender And The Instant Action ............................................. 6

LEGAL STANDARD .................................................................................................. 7

ARGUMENT ............................................................................................................... 8

I.    NATIONAL UNION HAS NO OBLIGATION TO INDEMNIFY BD FOR THE SETTLEMENT OF THE RTI ACTION BECAUSE BD CANNOT ESTABLISH THAT IT IS ENTITLED TO COVERAGE UNDER THE INSURING AGREEMENTS OF THE POLICIES. ................................................................ 8

II.    BD VITIATED COVERAGE BY VIOLATING THE VOLUNTARY PAYMENT CONDITIONS OF THE POLICIES. .......................................... 11

III.    BD VITIATED COVERAGE BY VIOLATING THE NOTICE CONDITIONS OF THE POLICIES. ................................................................................... 15

        A.    BD's Sixteen-Year Failure To Notify Alone Vitiates Coverage. ............ 15

        B.    BD's Sixteen-Year Failure To Notify Establishes The Absence Of Good Faith. ................................................................................. 18

        C.    BD's Egregious Breaches Constitute Appreciable Prejudice. .................. 20

IV.    THE "KNOWLEDGE OF OCCURRENCE OR CLAIM" ENDORSEMENTS DO NOT EXCUSE BD'S GROSS BREACHES UNDER THE POLICIES. .................. 24

V.    NATIONAL UNION HAS NO OBLIGATION TO REIMBURSE ANY OF BD's DEFENSE COSTS IN CONNECTION WITH THE RTI ACTION ................................ 25

VI.    BD'S COUNTERCLAIM FOR BAD FAITH MUST BE DISMISSED. ........................ 26

CONCLUSION ........................................................................................................... 30

i

# TABLE OF AUTHORITIES

**Page(s)**

Cᴀꜱᴇꜱ

Allstate Ins. Co. v. Kepchar,
  592 N.E.2d 694 (Ind. App. 1992) ...........................................................................22

Am. Centennial Ins. Co. v. Warner-Lambert Co.,
  293 N.J. Super. 567 (Law Div. 1995) ................................................................16, 20

Associated Metals & Minerals v. Dixon Chems. & Research, Inc.,
  68 N.J. Super. 305 (Ch. Div. 1961) ........................................................................22

Atlanta Intern. Ins. Co. v. Yellow Cab Co.,
  972 F.2d 751 (7th Cir. 1992) ...................................................................................21

Bacon v. Am. Ins. Co.,
  131 N.J. Super. 450 (Law Div. 1974) ...................................................................9, 11

Baughman v. U.S. Liab. Ins. Co.,
  662 F. Supp. 2d 386 (D.N.J. 2009) ...........................................................................8

Berkley Reg'l Ins. Co. v. Phila. Indem. Ins. Co.,
  690 F.3d 342 (5th Cir. 2012) ..............................................................................20, 22

Cay Divers, Inc. v. Raven,
  812 F.2d 866 (3d Cir. 1987)....................................................................................28

Chem. Leaman Tank Lines, Inc. v. Aetna Caus. & Sur. Co.,
  817 F. Supp. 1136 (D.N.J. 1993) ............................................................................25

Cooper v. Gov't Employees Ins. Co.,
  51 N.J. 86 (1968) ....................................................................................................16

Demasi v. Lexington Ins. Co.,
  2010 N.J. Super. Unpub. LEXIS 1762 (App. Div. July 23, 2010) .............................14, 18, 20

Detroit Water Team Joint Venture v. Agric. Ins. Co.,
  371 F.3d 336 (6th Cir. 2004) ...................................................................................10

Ethicon, Inc. v. Aetna Cas. and Sur. Co.,
  805 F. Supp. 203 (S.D.N.Y. 1992).............................................................................17

Fuscellaro v. Combined Ins. Group, Ltd.,
  2011 U.S. Dist. LEXIS 111470 (D.N.J. Sept. 29, 2011) .........................................29

Gazis v. Miller,
    186 N.J. 224 (2006) ...........................................................................14, 16, 17

Griggs v. Bertram,
    88 N.J. 347 (1982) .........................................................................................12

Hager v. Gonsalves,
    398 N.J. Super. 529 (App. Div. 2008) ...............................................14, 16, 17, 18

Herman Bros., Inc. v. Great West Cas. Co.,
    582 N.W.2d 328 (Neb. 1998)...........................................................................22

Hospitality Pac, Inc. v. First Occupational Center of New Jersey,
    2006 U.S. Dist. LEXIS 1152 (D.N.J. Jan. 13, 2006) ....................................26

Hudson Universal v. Aetna Ins. Co.,
    987 F. Supp. 337 (D.N.J. 1997) ...............................................................26, 27

In re Bayside Prison Litig.,
    190 F. Supp. 2d 755 (D.N.J. 2002) .................................................................8

Kerr v. Ill. Cent. R.R. Co.,
    670 N.E.2d 759 (Ill. App. 1996) ....................................................................22

Lincoln Nat'l Life Ins. Co. v. Schwartz,
    2011 U.S. Dist. LEXIS 62031 (D.N.J. June 9, 2011) .............................................28

M&M Elec., Inc. v. Comm'l Union Ins. Co.,
    670 N.Y.S.2d 909 (2d Dep't 1998) ..........................................................10, 11

Martin v. Fireman's Fund Ins. Co.,
    2011 N.J. Super. Unpub. LEXIS 1041 (App. Div. March 16, 2011)......................20

New Jersey Eye Ctr. v. Princeton Ins. Co.,
    394 N.J. Super. 557 (App. Div. 2007) ...............................................12, 13, 20, 23

New Jersey Title Ins. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh,
    2011 U.S. Dist. LEXIS 149162 (D.N.J. Dec. 27, 2011)....................................27, 29

Ohaus v. Cont'l Cas. Ins. Co.,
    292 N.J. Super. 501 (App. Div. 1996) ............................................................14

OneBeacon Am. Ins. Co. v. Catholic Diocese,
    2011 U.S. Dist. LEXIS 99414 (S.D. Ga. Sept. 2, 2011)....................................10

Pension Benefit Guar. Corp. v. White Consol. Indus.,
    998 F.2d 1192 (3d Cir. 1993).....................................................................8, 25

Perini/Tompkins Joint Venture v. Ace Am. Ins. Co.,
   738 F.3d 95 (4th Cir. 2013) .................................................................20, 21

Permasteelisa CS Corp. v. Columbia Cas. Co.,
   377 F. App'x 260 (3d Cir. Apr. 27, 2010) ..............................................10

Peskin v. Liberty Mut. Co.,
   219 N.J. Super. 479 (App. Div. 1987) ....................................................18

Pickett v. Lloyd's,
   131 N.J. 457 (1993) ................................................................................26

Prince George's County v. Local Government Ins. Trust,
   879 A.2d 81 (Md. 2005) ..........................................................................21

Sauer v. Preserve Ins. Co. of Am.,
   A-6134-08T1, 2010 N.J. Super...............................................................20

Selective Ins. Co. of Am. v. Hudson E. Pain Mgmt. Osteopathic Med. & Physical
   Therapy, 416 N.J. Super. 418 (App. Div. 2010).....................................13

Skirica v. Nationwide Ins. Co.,
   416 F.3d 214 (3d Cir. 2005)...................................................................7, 8

SL Indus., Inc. v. Am. Motorists Ins. Co.,
   128 N.J. 188 (1992) ................................................................................25

Solvents Recovery Serv. of New England v. Midland Ins. Co.,
   218 N.J. Super. 49 (App. Div. 1987) ..........................................14, 18, 19

Twp. Of Irvington v. Coregis Ins. Co.,
   2010 N.J. Super. Unpub. LEXIS 725 (App. Div. Apr. 7, 2010)...............17

Universal-Rundle Corp. v. Commercial Union Ins. Co.,
   319 N.J. Super. 223 (App. Div. 1999) ....................................................28

**STATUTES**

N.Y. Ins. Law § 3420(C)(2)(B) (2014)........................................................20

**OTHER AUTHORITIES**

Federal Rule of Civil Procedure 12(c) ..........................................7, 19, 25, 29

## <u>INTRODUCTION</u>

National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union") is entitled to judgment on the pleadings because it has no obligation under the applicable commercial umbrella liability policies to reimburse Defendant Becton, Dickinson and Company ("BD") for defense and indemnity costs incurred in connection with several related antitrust lawsuits filed against BD nearly sixteen years ago and settled for $100 million nearly ten years ago without National Union's knowledge or consent.

BD has provided no explanation as to why it kept its insurer in the dark for sixteen years while it investigated, defended, and settled a claim which it had every reason to know implicated sums potentially available under the policies.  Even when this Court draws all reasonable inferences in BD's favor, this case represents a complete and an utter failure by BD to satisfy its burden under the insuring agreements and honor any conditions precedent to coverage.  Thus, as demonstrated below, National Union is entitled to judgment on the pleadings on several grounds.

First, pursuant to the applicable policies' insuring agreements, National Union is obligated to indemnify BD only for those sums that it was "legally obligated to pay" by means of a court's determination of liability or a settlement to which National Union consents.  Because no court adjudicated BD's liability and National Union did not—indeed, could not—consent to the settlement (of which it was not aware until recently), BD cannot meet its burden under the insuring agreement.  This failure is an absolute bar to coverage.

Second, even if BD could somehow establish that it met the requirements of the policies' insuring agreements, BD vitiated coverage by violating the voluntary payment and notice conditions of the policies.  Because BD admittedly settled the antitrust suit without National Union's knowledge, participation, or consent, BD breached the condition prohibiting it from

1

"voluntarily mak[ing] a payment, assum[ing] any obligation, or incur[ring] any expense . . . without [the insurer's] consent."  As such, BD is not entitled to coverage under the applicable policies because it undisputedly violated the relevant voluntary payment provisions.  In addition, BD's admitted sixteen-year failure to provide notice of the antitrust suit to National Union and ten-year failure to notify of the settlement also constitutes late notice as a matter of law because it represents a fundamental breach of BD's obligations to National Union.  BD's extraordinary, unexplained delay prevented National Union from doing *any* investigation or defense of the case, as well as *any* ability to join in the insured's settlement negotiations regarding the case. Therefore, coverage is barred regardless of whether National Union must demonstrate appreciable prejudice as a result of BD's epic breaches under the policies.

Third, National Union is not obligated to reimburse BD for any defense costs incurred in connection with the antitrust lawsuits because under New Jersey law, an insurer is not liable for defense costs incurred by the insured before the insurer was notified of the lawsuit.  Because BD incurred all of the defense costs in question *before* it notified National Union of the antitrust lawsuits, judgment on the pleadings is appropriate on this independent ground.

Finally, BD's counterclaim alleging that National Union acted in bad faith by filing this action fails as well.  Under New Jersey law, where, as here, an insurer possesses "fairly debatable" reasons for denying coverage, an insurer cannot be liable for bad faith.  At the very least, BD's gross breaches of the policies' insuring agreements and conditions precedent to coverage as described herein provided National Union with a "fairly debatable" reason to commence this declaratory judgment action and decline coverage for BD's belated claim.  Thus, BD's counterclaim for bad faith should be dismissed as a matter of law.

## STATEMENT OF FACTS

### A.    The RTI Action

On August 3, 1998, Retractable Technologies Inc. ("RTI") commenced an antitrust lawsuit in Texas state court against BD, several Texas hospitals, and others.  (Dkt. 1, ¶¶ 9-11.) RTI dismissed the action on February 5, 2001 to pursue the action in federal court, which was filed several days earlier on January 31, 2001 in the United States District Court for the Eastern District of Texas and captioned Retractable Technologies Inc. v. Becton, Dickinson & Company, et al., Civil Action No. 5:01-cv-00036 (collectively, the "RTI Action").  (Dkt. 1, ¶¶ 14-16.)  RTI alleged that defendants "conspired to eliminate . . . competition . . . and maintain monopoly power among hospitals and healthcare providers," "tortiously interfered with [RTI's] existing prospective business relationships and contracts," and "used disparaging words against [RTI] and its products."  (Id. ¶ 16.)  RTI asserted claims for violation of federal and state antitrust laws, conspiracy, tortious interference, and business disparagement.  (Id. ¶ 17.)

On July 2, 2004, without notifying National Union of its existence, BD settled the RTI Action for a payment of $100 million.  (Id. ¶ 19-20; Dkt. 7, ¶¶ 19-20.)

### B.    The Policies

National Union issued to BD the following commercial umbrella liability insurance policies: Policy No. BE 309-14-79, originally effective from October 1, 1994 to October 1, 1996 and subsequently extended by endorsement to October 1, 1997 (the "1994 Policy"); Policy No. BE 932-81-55, originally effective from October 1, 1997 to October 1, 2000 but subsequently cancelled by endorsement effective October 1, 1999 (the "1997 Policy"); and Policy No. BE 357-42-59, effective from October 1, 1999 to October 1, 2002 (the "1999 Policy") (collectively, the "Policies").  (See Declaration of Mark Sheridan in Support of the Motion for Judgment on the Pleadings, dated Mar. 13, 2015 ("Sheridan Decl."), Exs. A – C.).

3

### 1.      The 1994 And 1997 Policies

The 1994 and 1997 Policies apply only to "those sums in excess of the Retained Limit that the **Insured** becomes legally obligated to pay by reason of liability imposed by law or assumed by the **Insured** under an **Insured Contract** because of **Bodily Injury**, **Property Damage**, **Personal Injury** or **Advertising Injury** that takes place during the Policy Period and is caused by an **Occurrence** happening anywhere in the world."   (Sheridan Decl., Ex. A, NU000291, Ex. B, NU000332.)

With respect to the insured's duties in the event of an occurrence, claim, or suit, the 1994 and 1997 Policies provide that the insured "must see to it that we are notified as soon as practicable of an **Occurrence** which may result in a claim under this policy" and that "[i]f a claim is made or **suit** is brought against any **Insured** that is reasonably likely to involve this policy you must notify us in writing as soon as practicable."   (Id. Ex. A, NU000303, Ex. B, NU000344.)  They provide that the insured must "immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or **suit**."   (Id.)  They further provide that "[n]o **Insureds** will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense . . . without our consent."   (Id.)  By endorsement entitled "Knowledge of an Occurrence," they were amended to add the following:

> Knowledge of an Occurrence: It is understood and agreed that knowledge of an occurrence, claim or suit by any agent, servant or employee of the insured shall not constitute knowledge by the **Insured** unless notice of such occurrence, claim or suit is received by the Director of Risk Management at corporate headquarters as stated in Item 1. of the Declarations Page.[1]  (Id. Ex. A, NU000282, Ex. B. NU000327.)

---

[1]  The 1994 Policy includes an additional endorsement that is identical in all respects to the "Knowledge of an Occurrence" endorsements included on the 1994 and 1997 Policies, except that it replaces "Director of Risk Management" with "Risk Manager" in the text.

The 1994 and 1997 Policies further provide that "[t]here will be no right of action against us under this insurance unless: 1. You have complied with all the terms of this policy; and 2. The amount you owe has been determined with our consent or by actual trial and final judgment. This insurance does not give anyone the right to add us as a defendant in an action against you to determine your liability." (Id. Ex. A, NU000303, Ex. B, NU000344.)

### 2.      The 1999 Policy

Coverage A of the 1999 Policy applies only to "those sums in excess of the total applicable limits of **Scheduled Underlying Insurance** that the **Insured** becomes legally obligated to pay as damages provided the damages would be covered by **Scheduled Underlying Insurance**, except for exhaustion of the total applicable limits of **Scheduled Underlying Insurance** by the payment of **Loss**." (Sheridan Decl., Ex. C, NU000376.) Coverage B of the 1999 Policy applies only to "those sums in excess of the **Self-Insured Retention** that the **Insured** becomes legally obligated to pay as damages by reason of liability imposed by law or assumed by the **Insured** under an **Insured Contract** because of **Bodily Injury, Property Damage, Personal Injury** or **Advertising Injury** not covered by **Scheduled Underlying Insurance**, provided that: 1. the **Bodily Injury** or **Property Damage** is caused by an **Occurrence** happening anywhere, and the **Bodily Injury** or **Property Damage** occurs during the **Policy Period**. 2. the **Personal Injury** or **Advertising Injury** is caused by an **Occurrence** happening anywhere, and the **Occurrence** takes place during the **Policy Period**." (Id.)

With respect to the insured's duties in the event of an occurrence, claim, or suit, the 1999 Policy provides that "[y]ou must see to it that we are notified as soon as practicable of an **Occurrence** that may result in a claim or **Suit** under this policy" and that "[i]f a claim is made or **Suit** is brought against any **Insured** which is reasonably likely to involve this policy, you must notify us in writing: a. under Coverage A, as soon as practicable and in accordance with the

reporting provisions of **Scheduled Underlying Insurance.** b. under Coverage B, as soon as practicable." (Id. Ex. C., NU000392.)  It provides that the insured must "immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or **Suit**." (Id.)  It further provides that "[n]o **Insureds** will**,** except at their own cost, voluntarily make a payment, assume any obligation or incur any expense . . . without our consent." (Id. Ex. C., NU000393.)

By endorsement entitled "Knowledge of Occurrence or Claim Applicable to Coverage A and B," the condition relating to those individuals from whom knowledge could be imputed to the insured was deleted in its entirety under the 1999 Policy and replaced with the following:

> Knowledge of an **Occurrence**, claim or **Suit** by your agent, servant or employee shall not in itself constitute knowledge by you, unless the individual(s) designated in the schedule below has received notice of such **Occurrence**, claim or **Suit** from said agent, servant or employee. (Id. Ex. C., NU000365.)[2]

The 1999 Policy also provides that "[t]here will be no right of action against us under this insurance unless: 1. you have complied with all the terms of this policy; and 2. the amount you owe has been determined with our consent or by . . . final judgment." (Id. Ex. C., NU000393.)

**C.     BD's Tender And The Instant Action**

By letter dated June 13, 2014, nearly sixteen years after its commencement, and nearly ten years after the settlement of the RTI Action, BD first tendered the RTI Action to National Union. (Dkt. 1, ¶¶ 32-33; Dkt. 7, ¶¶ 32.)  The two-paragraph letter simply demanded that National Union provide coverage for BD's defense and indemnity costs arising from the RTI Action. Id.  The letter contained no explanation for BD's failure to notify National Union of the RTI Action or of the corresponding $100 million settlement. Id.  According to BD, because the

---

[2]  The endorsement does not identify or designate any specific individuals.

RTI Action "allege[d] claims potentially covered by [the] Policies" and BD "settled these claims for a payment of $100 million," National Union "must pay BD's defense and settlement costs arising from the [RTI Action]."  (Id.)  Before the June 13, 2014 letter, BD had neither notified National Union of, nor sought coverage for, the RTI Action.  (Dkt. 1, ¶ 34; Dkt. 7, ¶ 34.)

On July 9, 2014, National Union commenced this declaratory judgment action, seeking a declaration under the Policies that it had no duty to defend or indemnify BD in connection with the RTI Action.  (Dkt. 1.)  On August 19, 2014, BD filed an Answer and Counterclaims against National Union, asserting claims for breach of contract and breach of the duty of good faith and fair dealing.  (Dkt. 7, ¶¶ 25-34.)  Incredibly, in Count III of its counterclaim, BD alleges that National Union acted in bad faith by commencing this declaratory judgment action before responding to BD's belated tender and by allegedly "failing to conduct an objectively reasonable investigation of the [RTI Action]."  (Id. ¶¶ 30-44.)

At the Scheduling Conference on October 17, 2014, National Union sought leave to file a dispositive motion, but was denied.  Following a status conference and National Union's request by letter dated February 4, 2015 (Dkt. 21), this Court granted National Union leave to file this motion for judgment on the pleadings pursuant to Rule 12(c).  (Dkt. 22).

## LEGAL STANDARD

In a motion for judgment on the pleadings pursuant to Rule 12(c), the court reviews the "facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party."  Skirica v. Nationwide Ins. Co., 416 F.3d 214, 220 (3d Cir. 2005).  A court also may consider: (1) matters attached to the complaint; (2) matters incorporated into the pleadings by reference; (3) matter of public record; and (4) matters integral to or upon which plaintiff's claim is based.  Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993); In re Bayside Prison Litig., 190 F. Supp. 2d 755, 760 (D.N.J. 2002).

Judgment will be granted if the movant establishes "no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law."  <u>Skirica</u>, 416 F.3d at 220.

Because this is a diversity case, this Court's interpretation of the Policies is governed by principles of state contract law.  <u>See</u> <u>Baughman v. United States Liab. Ins. Co.</u>, 662 F. Supp. 2d 386, 393 n.2 (D.N.J. 2009).  There is no dispute that New Jersey law governs this matter.

## ARGUMENT

## I.     NATIONAL UNION HAS NO OBLIGATION TO INDEMNIFY BD FOR THE SETTLEMENT OF THE RTI ACTION BECAUSE BD CANNOT ESTABLISH THAT IT IS ENTITLED TO COVERAGE UNDER THE INSURING AGREEMENTS OF THE POLICIES.

Under the insuring agreements of the Policies, National Union is obligated to indemnify BD only for those sums that BD becomes "legally obligated to pay" by means of a court's determination of liability or a settlement to which National Union consents.  Because no court determined BD's liability, and because it is undisputed that BD failed to obtain National Union's consent, much less to provide any opportunity for National Union's involvement before settling the RTI Action in 2004, National Union has no obligation to indemnify BD in connection with the RTI Action.  National Union, therefore, is entitled to judgment on the pleadings.

The Policies make clear that BD only becomes "legally obligated to pay" after a court's determination of liability or a settlement to which National Union consents.  (Sheridan Decl., Ex. A, NU000291, 303, Ex. B, NU000332, 344, Ex. C, NU000376, 393.)  Significantly, even if the RTI Action could be construed to fall within the scope of coverage afforded by the Policies, they apply only to certain sums the insured becomes "*legally obligated to pay*."   (<u>Id.</u>) (emphasis added).   The Policies further provide that the insured will have no right of action against National Union unless "you have complied with all the terms of this policy; and . . . the amount you owe has been determined with our consent or by actual trial and final judgment."  (<u>Id.</u>, Ex.

A, NU000303, Ex. B, NU000344, Ex. C, NU000393.)  Finally, the Policies provide that "[n]o insured will, except at the insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense . . . without [National Union's] consent."  (Id.)  The insuring agreement and the foregoing clauses govern the insured's potential right to coverage under the Policies and are intended to limit National Union's liability to third party damages, prevent collusion between a claimant and the insured, and to allow National Union to participate in the legal proceedings, settlement negotiations, and other aspects of the case.

New Jersey law recognizes the effect of the "legally obligated to pay" language.  Bacon v. Am. Ins. Co., 131 N.J. Super. 450, 456 (Law Div. 1974), aff'd, 138 N.J. Super. 550 (App. Div. 1976).  In Bacon, for example, the court noted that the inclusion of policy language requiring judgment or consensual settlement is "[t]o prevent suit against the carrier by the injured person *or the insured* until the damages have been fixed by final judgment after trial of that action or by proper [settlement] agreement."  131 N.J. Super. at 459.  (Emphasis added).  For that reason, the court held that prior to seeking coverage from its insurer, "the insured must have in hand a final judgment of damages or a settlement agreement of 'proper' form, that is, one involving the insurer as well as the claimant."  Id.  Where the insured does not have either a judgment or insurer-consented settlement and nevertheless seeks coverage, the insurer will have an "absolute defense" to coverage due to the insured's noncompliance with the policy's insuring agreement and related terms.  Id. at 460.

Likewise, in Permasteelisa CS Corp. v. Columbia Cas. Co., the Third Circuit, applying New Jersey law, held that coverage for an insured's unilateral decision to incur expenses related to fixing a construction defect allegedly caused by its work without its insurer's approval was barred because the insured was not legally obligated to pay damages.  377 F. App'x 260, 264-65

(3d Cir. Apr. 27, 2010).  The Third Circuit stated that "[a]bsent the presentation of proofs in a court of competent jurisdiction and a finding by the court or jury of liability, it cannot be said that the seller is 'legally obligated' to pay damages."  Id.  The Court thus accepted the insurer's complete defense and held that because of "the absence of a final judgment, [the insured] was not 'legally obligated to pay' for the remediation."  Id. at 267; see also Detroit Water Team Joint Venture v. Agric. Ins. Co., 371 F.3d 336, 339 (6th Cir. 2004) ("[T]he term 'legal obligation' requires either a judicial determination of liability or a settlement between the insurer, insured, and the claimant."); OneBeacon Am. Ins. Co. v. Catholic Diocese, 2011 U.S. Dist. LEXIS 99414 (S.D. Ga. Sept. 2, 2011) ("[A] voluntary payment by an insured, such as one reached in settlement, does not constitute a legal obligation under the applicable insurance policy.").

To hold otherwise, as some courts have recognized, "would be to nullify the important right that the liability insurer has to control the litigation, which is contemplated, by the express terms of the policy, as a precondition to any duty to indemnify."  M&M Elec., Inc. v. Comm'l Union Ins. Co., 670 N.Y.S.2d 909, 911 (2d Dep't 1998).  Requiring an insurer to pay under the terms of a liability policy even where it was otherwise prevented from participating in the investigation, defense, and settlement of the underlying suit, would force insurers to indemnify matters where they have been deprived of their contractual rights.  Id.

Here, it is beyond dispute that BD was not "legally obligated to pay" in connection with the RTI Action.  No court or jury adjudicated BD's liability in the RTI Action.  More importantly, National Union never consented to any settlement (nor could it) because BD never provided any opportunity for National Union to participate in the defense and settlement of the RTI Action.  (Dkt. 1, ¶¶ 33-34, Dkt. 7, ¶¶ 33-34.)  Instead, BD demanded indemnification from

National Union only after it wholly deprived National Union of its contractual rights and any opportunity to participate in the RTI Action or the $100 million settlement.  (Id.)

The Policies simply do not require National Union to indemnify where there are such material violations of the insuring agreement.  To be sure, the Policies contemplate that only a judgment or a settlement to which National Union consents would trigger National Union's obligations, if any, under the Policies.  Because there has been no adjudication and no settlement to which National Union consented, BD cannot be, pursuant to the terms of the Policies, "legally obligated to pay" any of the amounts it seeks.  Therefore, under New Jersey law, National Union has an "absolute defense" to BD's claim and is entitled to judgment on the pleadings as a matter of law.  Bacon, 131 N.J. Super. 460.

## II.     BD VITIATED COVERAGE BY VIOLATING THE VOLUNTARY PAYMENT CONDITIONS OF THE POLICIES.

Even if BD meets the requirements of the Policies' insuring agreements, BD vitiated coverage by violating the voluntary payment conditions of the Policies.  The Policies expressly provide that "[n]o Insured will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense . . . without [the insurer's] consent."  (Sheridan Decl., Ex. A, NU000303, Ex. B, NU000344, Ex. C., NU000393.)  Because BD admittedly settled the RTI Action without National Union's consent, BD breached its obligation to refrain from voluntarily making payments, assuming obligations, or incurring any expenses without National Union's consent.  Thus, National Union has no obligations with respect to the RTI Action as a result of BD's outright violation of the Policies' voluntary payment clause.  Accordingly, National Union is entitled to judgment on the pleadings on this independent ground as well.

Under New Jersey law, the terms of the voluntary payment provision are "essential" conditions precedent to coverage under the Policies.  Griggs v. Bertram, 88 N.J. 347, 360 (1982).

11

New Jersey courts, therefore, recognize that "an insured cannot take any meaningful steps toward an early settlement of the claim without risking loss of coverage pursuant to the provision prohibiting it from voluntarily compromising liability or independently settling the claim." Id. For example, in New Jersey Eye Ctr. v. Princeton Ins. Co., 394 N.J. Super. 557, 570 (App. Div. 2007), the Appellate Division denied coverage to an insured who settled lawsuits against it without the insurer's consent. There, a doctor facing thirteen malpractice lawsuits engaged in settlement negotiations with plaintiffs who ultimately agreed to release the doctor and his optometry practice from liability in exchange for an assignment of the practice's rights under its insurance policy. Id. at 561-64. Although the insurer objected to the settlement, in part, because the doctor had violated the policy's voluntary payments provision by excluding the insurer from the settlement negotiations, the trial court ruled that the plaintiffs could recover against the insurer as assignees under the policy. Id. at 564-65. The Appellate Division, however, reversed, holding that the "settlement represented . . . a fundamental breach of the insured's obligations to [the insurer]." Id. at 570-71. Ignoring the parties' arguments directed at the appropriateness of the settlement negotiations and the reasonableness of the settlement agreement itself, the court reasoned that, although the settlement may "have been 'a reasonable business decision' from [the doctor's] perspective, . . .[it was] in complete derogation of [the doctor's] obligations as the principle of [the insured] under its policy with [the insurer]." Id.

The New Jersey Eye Ctr. court reasoned that the insured's failure represented such a fundamental breach of its obligations under the policy that no other facts needed to be considered. The court explained: "we do not find it necessary to even consider whether the findings of the judge below, that the procedure adopted was not the product of bad faith or collusion and the damages were reasonable in amount, are supported by the record." 394 N.J.

Super. at 570.  In the court's judgment, those considerations were "simply immaterial because the purported settlement represented such a fundamental breach of the insured's obligations to [the insurer]."  Id.  The Court therefore did not examine whether the insurer suffered appreciable prejudice or whether the insured acted in good faith.  Id.  The court simply concluded the insured's breach of the voluntary payments condition constituted a complete bar to coverage.  Id.

Here, it is undisputed that BD settled the RTI Action in 2004 for $100 million without ever: (a) notifying National Union of its pendency and (b) obtaining (or even seeking) National Union's consent.  In fact, BD admits that prior to June 13, 2014—nearly ten years after executing the settlement in 2004—it "had neither notified National Union of, nor requested coverage for, the [RTI] Actions."  (Dkt. 1 ¶ 34; Dkt. 7 ¶ 34.)  By failing to timely advise National Union of the existence of the RTI Action, and by failing to obtain National Union's consent before entering into the settlement of the RTI Action in 2004, BD fundamentally breached the Policies' voluntary payment provisions.  Therefore, National Union has no obligations to BD with respect to the RTI Action and is entitled to judgment on the pleadings.[3]

Moreover, under New Jersey law, National Union is not required to establish "appreciable prejudice" in order to vitiate coverage based on a violation of the voluntary payment provision.  In accordance with New Jersey Eye Ctr., where, as here, the insured's actions represent such a fundamental breach of the terms of the policy, appreciable prejudice to

---

[3]   Intertwined with the notification and voluntary payments provisions of the Policies is the condition that BD "cooperate with [National Union] in the investigation, settlement or defense of the claim or suit."  BD's duty to cooperate, like its other obligations under the Policies, "is a condition precedent to recovery of policy benefits."  Selective Ins. Co. of Am. v. Hudson E. Pain Mgmt. Osteopathic Med. & Physical Therapy, 416 N.J. Super. 418, 425 (App. Div. 2010), aff'd, 210 N.J. 597 (2012).  Thus, in delaying more than a decade to notify National Union of the RTI Action and in failing to seek National Union's consent prior to settlement, BD also violated its duty to cooperate, thereby vitiating coverage under the Policies.

the insured is irrelevant.  Indeed, an insured's "good faith" is "a precondition of obtaining the benefit of the . . . 'appreciable prejudice' rule."  Hager v. Gonsalves, 398 N.J. Super. 529, 538 (App. Div. 2008); Demasi v. Lexington Ins. Co., No. A-3206-08T3, 2010 N.J. Super. Unpub. LEXIS 1762, at *25 (App. Div. July 23, 2010) (same).  Further, the New Jersey Supreme Court has recognized that "appreciable prejudice" is not a mandatory rule that should be applied in all situations.  Gazis v. Miller, 186 N.J. 224, 232-33 (2006).

The cases applying the appreciable prejudice standard to the voluntary payment condition are distinguishable from the instant matter.  Unlike the present matter, those cases applying appreciable prejudice most often involve instances where insureds were determined to have acted in good faith in settling environmental-contamination lawsuits for which liability under applicable federal statutes was clear.  See, e.g., Ohaus v. Cont'l Cas. Ins. Co., 292 N.J. Super. 501, 510-11 (App. Div. 1996) (noting that the insured could not refuse, under federal law, to assume liability for monitoring and testing contaminated sites, and holding that "where the insured has acted in good faith, an exclusion barring coverage for the insured's voluntary assumption of an obligation only applies where the insurer can establish 'appreciable prejudice'"); Solvents Recovery Serv. of New England v. Midland Ins. Co., 218 N.J. Super. 49, 53, 55 (App. Div. 1987) (holding that, where an insured, along with 245 other alleged polluters, acted in good faith by settling suits filed by the Environmental Protection Agency, a forfeiture of coverage could not result "absent a showing of appreciable prejudice").

Unlike in Ohaus and Solvents, BD was not subject to strict liability under federal environmental laws, but rather settled its claims in order to avoid any determination of culpability, similar to the insured in New Jersey Eye Ctr.  Moreover, in light of BD's undisputed failure to notify National Union of the RTI Action or involve National Union in the settlement

14

negotiations, it cannot be said to have acted with the good faith required to obtain the benefit of requiring National Union to prove "appreciable prejudice."  Although BD's settlement may have served its business interests, it represents a fundamental violation of the Policies that cannot be condoned by requiring National Union to clear additional hurdles to disclaim coverage.[4]

## III.    BD VITIATED COVERAGE BY VIOLATING THE NOTICE CONDITIONS OF THE POLICIES.

Even if BD meets the requirements of the Policies' insuring agreements, BD vitiated coverage by violating the notice conditions of the Policies.  The Policies require that BD "must see to it that [National Union] [is] notified as soon as practicable of an **Occurrence** that may result in a claim or **Suit** under this policy."  (Sheridan Decl., Ex. A, NU000303, Ex. B, NU000344, Ex. C., NU000392.)  The Policies further require that BD "must notify us in writing as soon as practicable" if a "claim is made or **suit** is brought against any **Insured** that is reasonably likely to involve this policy."  (Id.)  The Policies also require that BD "immediately send [National Union] copies of any demands, notices, summonses or legal papers received in connection with the claim or **Suit**."  (Id.)  Clearly, BD failed to honor these conditions.  The only *reasonable* inference one can draw from the undisputed facts is that because BD failed to notify National Union of its claim and settlement until a decade later, National Union irretrievably lost all of its rights under the Policies, including its right to participate in the investigation, defense, and settlement of the RTI Action.  Judgment is appropriate on this independent ground too.

### A.    BD's Sixteen-Year Failure To Notify Alone Vitiates Coverage.

Under New Jersey law, where an insured fails to provide timely notice, it forfeits coverage under the policy if "there is a likelihood the insurer suffered appreciable prejudice."

---

[4]  Even if this Court determines that BD is entitled to the benefit of the "appreciable prejudice" standard, as explained in Section III below, appreciable prejudice exists here as a matter of law.

Am. Centennial Ins. Co. v. Warner-Lambert Co., 293 N.J. Super. 567, 573 (Law Div. 1995). The "appreciable prejudice" standard, however, is not a blanket rule applied in all late notice scenarios. Gazis v. Miller, 186 N.J. 224, 232-33 (2006) (noting that not "every notice provision can be disregarded in favor of an 'appreciable prejudice' requirement"). Rather, it is a requirement best understood in the context of the common law policy goal for which it was originally created—situations concerning the compensation of tort victims in automobile accidents. Id.; Cooper v. Gov't Employees Ins. Co., 51 N.J. 86, 94 (1968).

When the New Jersey Supreme Court first employed appreciable prejudice, the Court noted the importance of being "mindful" that compensation for "the victims of accidental events [is important] in deciding whether a forfeiture [of coverage] should be upheld." Cooper, 51 N.J. at 94. Subsequent courts have been equally mindful of the underlying policy rationale before requiring appreciable prejudice. Gazis, 186 N.J. at 233; Hager v. Gonsalves, 398 N.J. Super. 529, 537 (App. Div. 2008). In Gazis, the New Jersey Supreme Court stated that the circumstances must be "close enough to those in Cooper to justify" application of appreciable prejudice because the correctness of the prejudice rule is clearest "when recompense for an accident's victim's injuries is in the balance." 186 N.J. at 231, 233. Likewise, in Hager, the Appellate Division stated that because "[t]he 'public interest' in providing compensation to 'victims of negligence' was an essential component of the rationale for adopting the 'appreciable prejudice' rule in Cooper," a showing of appreciable prejudice depends on the party pursuing the claim for coverage. 398 N.J. Super. at 538. Thus, under New Jersey law, the application of the appreciable prejudice standard depends on the circumstances of the case, including whether the case involves potentially uncompensated tort victims. Id.; Gazis, 186 N.J. at 233.

Appreciable prejudice should not be required here because unlike the circumstances presented in Cooper and Gazis, this case does not involve compensation for tort victims in automobile accidents.  In the RTI Action, the import of the allegations is that BD engaged in intentional, anticompetitive behavior to drive RTI out of the market for certain medical products. (Dkt. 1, ¶¶ 9, 11; Dkt. 7, ¶¶ 9, 11.)  These allegations are entirely unlike the allegations related to uncompensated victims of common law negligence in Cooper and Gazis.  In fact, RTI already has been compensated by BD, having resolved the matter in 2004.  (Dkt. 1, ¶ 3, Dkt. 7, ¶ 3.)  If the Court finds that BD's gross violations of the Policy's notice conditions vitiated any insurance coverage otherwise available, RTI will not be left empty-handed.  Simply stated, this case does not present the important public policy concerns present in Cooper and Gazis which resulted in the adoption of the appreciable prejudice rule in the context of the late notice condition.

Without consideration of appreciable prejudice, BD cannot even survive the question presented on the issue of whether its sixteen-year failure to notify National Union of the existence of the RTI Action and nearly ten-year failure to notify of the $100 million settlement violated the Policies' notice provisions.  (Dkt. 1, ¶¶ 3, 32-34; Dkt. 7, ¶¶ 3, 32-34.)  BD's complete failure to comply with the Policies' notice provisions should result in a forfeiture of coverage which may have been otherwise afforded by the Policies.  See, e.g., Ethicon, Inc. v. Aetna Cas. and Sur. Co., 805 F. Supp. 203, 205-06 (S.D.N.Y. 1992) (notice provision breached where underlying suit tendered sixteen years after complaint and verdict); Twp. Of Irvington v. Coregis Ins. Co., A-2434-08T3, 2010 N.J. Super. Unpub. LEXIS 725, at *8 (App. Div. Apr. 7, 2010) (finding conclusion that insured breached condition is "virtually unassailable" because insurer "was kept in the dark about the existence, and precarious status, of the [] case until much

too late in the litigation"); Peskin v. Liberty Mut. Co., 219 N.J. Super. 479, 481 (App. Div. 1987) (finding notice untimely where given eleven years after occurrence and 21 months after suit).

BD's sixteen-year failure to notify National Union of the existence of the RTI Action and nearly ten-year failure to notify National Union of the settlement of the RTI Action constitutes a complete breach of the Policies' notice provisions. Thus, National Union can have no obligation to BD with respect to the RTI Action and is entitled to judgment on the pleadings.

**B.      BD's Sixteen-Year Failure To Notify Establishes The Absence Of Good Faith.**

Even if this Court concludes that this case presents circumstances supporting the rationale for the adoption of the "appreciable prejudice" rule articulated in Cooper and Gazis, BD must demonstrate that it acted in "good faith" as a precondition of obtaining the benefit of the "appreciable prejudice" rule. To be sure, even BD's own pleadings demonstrate that it did not act in "good faith" as a matter of law.

New Jersey law requires that an insured act in "good faith" as a prerequisite to application of the appreciable prejudice rule. Demasi, 2010 N.J. Super. Unpub. LEXIS 1762, at *25; see also Hager, 398 N.J. Super. at 538 (stating that "an insured's 'good faith' should be a precondition of obtaining the benefit of the Cooper 'appreciable prejudice' rule"); Solvents, 218 N.J. Super. 49, 55 (App. Div. 1987) (recognizing that appreciable prejudice applies "where the insured has acted in good faith"). In Demasi, for example, the court considered whether an insured suspected of arson breached his homeowners' insurance policy's cooperation condition by refusing to grant his insurer access to documents potentially relevant to whether he had a motive for arson. 2010 N.J. Super. Unpub. LEXIS 1762, at *24-*25. The court began by noting that an insured's good faith is a "precondition to application of the appreciable prejudice rule." Id. at *25. The court then found that because the insured "offered no reason why he could not

have complied with a [cooperation] request that required such minimal effort on his part, . . . the absence of good faith by [the insured] render[ed] it unnecessary . . . to apply the 'appreciable prejudice' rule." Id. at *26.[5]

The undisputed facts here demonstrate that BD has not acted in good faith as a matter of law. BD failed to notify National Union for sixteen years after commencement of the RTI Action and nearly ten years following its $100 million settlement. (Dkt. 1, ¶¶ 3, 32-34; Dkt. 7, ¶¶ 3, 32-34.) Those undisputed acts alone (which abrogated any rights that National Union shared with BD under the Policies) cannot support a finding of good faith as a matter of law pursuant to the decisions in Demasi, Hager, and Solvents. Moreover, BD has provided no explanation for why it kept its insurer in the dark while it investigated, defended, and settled a claim which it had every reason to know implicated sums potentially available under the Policies. (Dkt. 1, ¶¶32-34; Dkt. 7, ¶¶ 1-56.) Surely, if BD had any explanation for its conduct, it would have provided its purported excuse—a fact in its exclusive possession—in its answer or some other document properly before this Court on this Rule 12(c) motion. BD's egregious conduct and flagrant disregard for its obligations under the Policies cannot—under any circumstances—be considered good faith. Thus, for this additional reason, the appreciable prejudice rule has no application here, and BD's gross violations of the Policies' notice provisions should result in a forfeiture of coverage under the Policies.

---

[5]   Before concluding that the insured forfeited coverage, the court nevertheless conducted a prejudice analysis because the express policy language required that "the issue of prejudice must be addressed." Id. Absent policy language, however, the court reasoned that the insurer's lack of good faith would have obviated any obligation to conduct a prejudice analysis. Id.

C.     __BD's Egregious Breaches Constitute Appreciable Prejudice.__

Even if appreciable prejudice were required to be shown here (which it is not), BD's breaches of the Policies' conditions are so egregious that this Court should conclude that appreciable prejudice exists as a matter of law under these circumstances.

There are certain instances where, as here, violations of the conditions of the policy are so egregious that the underlying factual circumstances are "simply immaterial because the purported settlement represented such a fundamental breach of the insured's obligations to the [insurer]."  New Jersey Eye Ctr. v. Princeton Ins. Co., 394 N.J. Super. 557, 570 (App. Div. 2007); see also N.Y. Ins. Law § 3420(C)(2)(B) (2014) ("[A]n irrebuttable presumption of prejudice shall apply if, prior to notice, the insured's liability has been determined by a court of competent jurisdiction or by binding arbitration; or if the insured has resolved the claim or suit by settlement or other compromise."); Perini/Tompkins Joint Venture v. Ace Am. Ins. Co., 738 F.3d 95, 104-105 (4th Cir. 2013) (finding prejudice as a matter of law "wherein the insured actually paid a settlement, thereby cutting off the insurer's right to 'investigate, defend, control, or settle' a suit"); Berkley Reg'l Ins. Co. v. Phila. Indem. Ins. Co., 690 F.3d 342, 350 (5th Cir. 2012) ("[W]holly lacking notice, as opposed to merely late notice, supports a finding of prejudice as a matter of law.")

Several New Jersey decisions find prejudice as a matter of course where the insurer has irretrievably lost its ability to participate in any meaningful way in the underlying action. Demasi, 2010 WL 3075674, at *10; Am. Centennial, 293 N.J. Super. at 573; Martin v. Fireman's Fund Ins. Co., A-4206-09T1, 2011 N.J. Super. Unpub. LEXIS 1041, at *4-*5 (N.J. App. Div. March 16, 2011); Sauer v. Preserve Ins. Co. of Am., A-6134-08T1, 2010 N.J. Super. Unpub. LEXIS 1181, *3 (N.J. Super. Ct. App. Div. May 27, 2010).  In Demasi, the Appellate Division found that appreciable prejudice existed after concluding the insured's failure to give his insurer

20

pertinent documents precluded the insurer "from venturing beyond speculation to demonstrate precisely what course of action it would have pursued."  2010 N.J. Super. Unpub. LEXIS 1762, at *26.  Similarly, in <u>Martin</u>, the Appellate Division concluded that the insured's failure to notify his insurer of the underlying auto accident or subsequent lawsuit until after a default judgment had been entered constituted appreciable prejudice because the insurer "los[t] the opportunity" to intervene or otherwise participate in the underlying lawsuit.  2011 N.J. Super. Unpub. LEXIS 1041, at *5.  And, in <u>Sauer</u>, the court found the insured's failure to notify his insurer of a lawsuit resulting in a default judgment until two years after commencement constituted appreciable prejudice based simply "on the passage of nearly two years between the filing of the complaint and [the insurer] being made aware of the action."  2010 N.J. Super. Unpub. LEXIS 1181, *3.

New Jersey courts, along with numerous other jurisdictions recognize that, when an insured's notice is not simply late, but wholly absent until years or decades after an adverse judgment or settlement without the insurer's consent, there can be no dispute that the insurer suffered irreparable prejudice because it lost the ability to do *any* investigation or defense of the case, as well as *any* ability to join in the insured's negotiations regarding the case.  <u>See, e.g.</u>, <u>Perini/Tompkins Joint Venture</u>, 738 F.3d at 104-105 (finding prejudice as a matter of law "wherein the insured actually paid a settlement, thereby cutting off the insurer's right to 'investigate, defend, control, or settle' a suit"); <u>Prince George's County v. Local Government Ins. Trust</u>, 879 A.2d 81, 100-01 (Md. 2005) (holding that excess insurer was prejudiced as a matter of law when the insured failed to notify the insurer of the incident, claim, and lawsuit until after an adverse judgment was entered); <u>Atlanta Intern. Ins. Co. v. Yellow Cab Co.</u>, 972 F.2d 751, 752 (7th Cir. 1992) (holding that excess insurer was prejudiced as a matter of law when the insured did not notify insurer until after the jury had returned a verdict triggering the

excess coverage and reasoning that delay in notice "depriv[ed] the excess insurer of any opportunity to conduct its own investigation and, perhaps, settle for a lower amount"); Allstate Ins. Co. v. Kepchar, 592 N.E.2d 694, 699 (Ind. App. 1992) (holding that excess insurer was prejudiced as a matter of law when it was not notified until after trial because excess insurer was denied "opportunity to associate with the defense and control of the case, attempt to negotiate a settlement in cooperation with the underlying insurer, or take an appeal."); Herman Bros., Inc. v. Great West Cas. Co., 582 N.W.2d 328, 336 (Neb. 1998) (holding that an excess carrier was prejudiced as a matter of law when it was not informed of the suit until after the insured reached a tentative settlement because the excess insurer "was not given a meaningful opportunity to investigate, defend, or participate in any of the decisions regarding the claim"); Kerr v. Ill. Cent. R.R. Co., 670 N.E.2d 759, 765 (Ill. App. 1996) (stating that "[a]n excess insurer should not be forced to rely on its insured or the primary insurer to protect its interests where timely notice would provide the excess insurer with an opportunity to pursue its own investigation").

Most importantly, such decisions recognize that prejudice must be found as a matter of law where notice was provided after the verdict or settlement because no court, insured, or insurer can fully know what effect, if any, the insurer's participation would have had on the underlying action once such a significant amount of time has passed after an adverse judgment or settlement has occurred.  See Berkley Reg'l Ins. Co., 690 F.3d at 350 ("[W]holly lacking notice, as opposed to merely late notice, supports a finding of prejudice as a matter of law.").  Indeed, in such egregious situations, the purpose of the notice of loss provisions in insurance policies, which is to afford the insurer an opportunity to form an intelligent estimate of its liabilities, to investigate the claim while witnesses and facts are still available, and to prevent fraud, is entirely absent and lost, making the existence of prejudice a foregone conclusion.  See, e.g., Associated

Metals & Minerals v. Dixon Chems. & Research, Inc., 68 N.J. Super. 305, 318 (Ch. Div. 1961),
modified and aff'd 82 N.J. Super. 281 (App. Div. 1964).

It is difficult to imagine a case presenting a better opportunity for a court to find
"appreciable prejudice" as a matter of law than this case "because the purported settlement
represented such a fundamental breach of the [BD]'s obligations to the [National Union]." New
Jersey Eye Ctr., 394 N.J. Super. at 570-71.  National Union irretrievably lost, among other rights,
its right: (i) to participate in the defense of the RTI Action to ensure that the case was well-
prepared for trial and all available defenses were asserted; (ii) to participate in settlement
discussions with underlying parties and insurers and evaluate the proposed terms of the
settlement; (iii) to communicate directly with any other insurers regarding the handling and
resolution of the RTI Action; and (iv) to consider the RTI Action in the underwriting process,
including the setting of insurance premiums or whether to issue any future policy at all in light of
the pending litigation.  Further, because BD's claim is so old and so far from an inadvertent late
notice situation of a few weeks or months, and because the RTI Action is far removed from the
simple factual circumstances of the automobile accident in Cooper for which the appreciable
prejudice rule was originally created, it may be impossible that anyone can fully know what
effect National Union's participation would have brought.

To require National Union to attempt to re-create what could have or would have
happened some sixteen years ago through no fault of its own, does not support any rationale
envisioned by the New Jersey courts when adopting the appreciable prejudice rule.  Under these
circumstances, National Union is entitled to judgment on the pleadings as a matter of law
because BD vitiated coverage as a result of its gross breaches of the Policies' conditions.

IV.    THE "KNOWLEDGE OF OCCURRENCE OR CLAIM" ENDORSEMENTS DO
        NOT EXCUSE BD'S GROSS BREACHES UNDER THE POLICIES.

The Policies require that BD "must see to it that [National Union is] notified as soon as

practicable of an **Occurrence** which may result in a claim under this policy" and "must notify

[National Union] in writing as soon as practicable" if a "claim is made or suit is brought against

any **Insured** that is reasonably likely to involve this policy."   (Sheridan Decl., Ex. A,

NU000303, Ex. B, NU000344, Ex. C., NU000392.)   The Policies also require that BD

"cooperate with [National Union] in the investigation, settlement or defense of the claim or suit"

and refrain from making a payment, assuming an obligation, or incurring any expenses without

National Union's consent.  (Id. Ex. A, NU000303, Ex. B, NU000344, Ex. C., NU000392-393.)

The Policies also require that BD "immediately send [National Union] copies of any demands,

notices, summonses, or legal papers received in connection with the claim or suit."  (Id.)  BD

cannot credibly argue that it complied with any of those provisions.  (See, e.g., Dkt. 7, ¶ 34.)

The endorsements entitled "Knowledge of an Occurrence" in the 1994 and 1997 Policies,

and "Knowledge of Occurrence or Claim Applicable to Coverage A and B" in the 1999 Policy

do not alter the conclusion that BD breached its obligations under the Policies.  (Sheridan Decl.,

Ex. A, NU000282, Ex. B. NU000327, Ex. C, NU000365.)  First, the endorsements do not—

indeed, cannot—alter the insuring agreement requirement that National Union's indemnity

obligations can arise only after a court's determination of liability or a settlement to which

National Union consents.  (Id., Ex. A, NU000291, 303, Ex. B, NU000332, 344, Ex. C,

NU000376, 393.)   Second, the endorsements do not modify the conditions relating to

cooperation, voluntary payments, and BD's obligations to "notify [National Union] in writing as

soon as practicable" if a "claim is made or suit is brought against any Insured that is reasonably

likely to involve this policy" or to "immediately send [National Union] copies of any demands,

24

notices, summonses, or legal papers received in connection with the claim or suit." (Id.)  Third, the sole purpose of the endorsements is to identify the individuals at BD from whom knowledge of an occurrence could be imputed to the company.

Here, BD cannot argue with any credibility that it was unaware of the RTI Action in 1998 or the $100 million settlement in 2004.  In fact, even if BD were to make that dubious representation, the public records demonstrate that BD was aware of the RTI Action in 1998 and the $100 million settlement in 2004.  (See BD Form 10-K 1998 through 2004, Sheridan Decl., Exs. D – J.).[6]  Thus, because BD itself was aware of the RTI Action, these endorsements do not excuse BD's failure to notify National Union of the RTI Action and the $100 million settlement.

## V.    NATIONAL UNION HAS NO OBLIGATION TO REIMBURSE ANY OF BD's DEFENSE COSTS IN CONNECTION WITH THE RTI ACTION.

National Union has no obligation to reimburse BD for defense costs incurred in connection with the RTI Action.  Leaving aside for now whether BD could ever establish entitlement to a defense under the terms of the Policies, BD would not be entitled to reimbursement of its defense costs under New Jersey law.

In New Jersey, it is well-established that an insurer is not responsible for any defense costs incurred by the insured before the time it was informed of facts purportedly triggering the duty to defend.  New Jersey law requires notice be given to the insurer to trigger the duty to defend.  "[T]he insured being sued is responsible for promptly conveying to its insurance company the information that it believes will trigger cover-age . . . . [I]f the insured does not properly forward the information to the insurance company, the insured cannot demand reimbursement from the insurer for defense costs the insurer had no opportunity to control."  SL Indus., Inc. v. Am. Motorists Ins. Co., 128 N.J. 188, 200 (1992); Chem. Leaman Tank Lines, Inc.

---

[6]  Matters of public record may be considered by this Court in Rule 12(c) motions.  See Pension Ben. Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993).

v. Aetna Caus. & Sur. Co., 817 F. Supp. 1136, 1158, 1161 (D.N.J. 1993) (finding insured cannot recover defense costs predating notice to in-surer).

Because there is no dispute that BD first tendered the RTI Action to National Union in June of 2014, and the RTI Action was settled in 2004, there is simply no basis under which BD is entitled to seek reimbursement of defense costs.  Simply put, all of BD's defense costs were incurred before its late tender of its claim to National Union.  Therefore, regardless of this Court's rulings on National Union's other requests for judgment, at a minimum, National Union is entitled to judgment on the pleadings that it can have no obligation to reimburse BD for defense costs incurred in connection with the RTI Action.

## VI.   BD'S COUNTERCLAIM FOR BAD FAITH MUST BE DISMISSED.

BD failed to notify National Union of the existence of the RTI Action for sixteen years and failed to seek National Union's participation in (or approval of) a $100 million settlement that it agreed to nearly ten years before it tendered the claim to National Union.  Despite these remarkable violations of the insuring agreements and voluntary payment and notice provisions, BD alleges that it was National Union that acted in bad faith in its handling of BD's claim.  Not only is the claim absurd under the circumstances, it also fails as a matter of law.

Initially, BD's counterclaim cannot be sustained and should be dismissed in its entirety because, as established above, National Union is entitled to judgment on the pleadings.[7]  But, even in the event this Court decides that BD is entitled to coverage, its claim for bad faith alleged in Count III of its counterclaim still fails on other grounds.

---

[7]  See Hudson Universal v. Aetna Ins. Co., 987 F. Supp. 337, 342 n.3 (D.N.J. 1997) ("It is clear that the determination of whether an insurance company has acted in bad faith requires, as a predicate, a determination that coverage exists for the loss claimed by the insured."); Hospitality Pac, Inc. v. First Occupational Center of New Jersey, No. 04-4562, 2006 U.S. Dist. LEXIS 1152, at *18 (D.N.J. Jan. 13, 2006) (same); Pickett v. Lloyd's, 131 N.J. 457, 473 (1993) (same).

New Jersey courts have established a high burden to maintain a claim of third-party bad faith for denial of insurance coverage.  Hudson Universal v. Aetna Ins. Co., 987 F. Supp. 337, 341 (D.N.J. 1997).  BD must prove that: (1) National Union lacked a "fairly debatable" reason for its failure to pay a claim, and (2) that it knew or recklessly disregarded the lack of a reasonable basis for denying the claim.  Id.  The "'fairly debatable' standard is premised on the idea that when an insurer denies coverage with a reasonable basis to believe that no coverage exists, it is not guilty of bad faith even if the insurer is later held to have been wrong."  Hudson, 987 F. Supp. at 341.  Indeed, New Jersey courts intentionally created such a high standard to allow insurers to dismiss such claims as a matter of law in order to eliminate an insured's inclusion of a bad-faith claim for "in terrorem" effect.  Id.  In New Jersey, an insurer has the right to litigate a claim without facing liability for bad faith "when it feels there is a question of law or fact which needs to be decided before it in good faith is required to pay the claimant."  Id. Thus, in order to impose liability for bad faith, BD "must demonstrate that no debatable reasons existed for denial of the benefits available under the policy," which BD could never do here.

BD concedes in its answer that before its tender on June 13, 2014—nearly ten years after executing the settlement in 2004—it "had neither notified National Union of, nor requested coverage for, the [RTI Actions]."  (Dkt. 1 ¶ 34; Dkt. 7 ¶ 34.)  BD also does not dispute that it voluntarily settled the RTI Action for $100 million without ever involving National Union.  (Dkt. 1, ¶¶ 3, 32-34, Dkt. 7, ¶¶ 3, 32-34.)  Nor can BD dispute that after its tender, but before it filed its answer and counterclaim, it was in possession of this lawsuit and declination letter which detailed why BD is not entitled to coverage for the RTI Action.  New Jersey Title Ins. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, No. 11-cv-0630, 2011 U.S. Dist. LEXIS 149162, at *22 (D.N.J. Dec. 27, 2011) (dismissing bad faith counterclaim because "Defendant's denial of

coverage, as evidenced in the denial letter dated September 23, 2009, provided an extensive explanation as to why Plaintiff's claim did not fall within the coverage . . . . Such explanation provides plausible reasons for the denial of coverage and demonstrate that there is, at the very least, genuine questions regarding whether Plaintiff's claims fall within the coverage provided.").

BD attempts to create the specter of a claim for bad faith by making arguments that not only fail to address any of National Union's several bases for denying coverage, but also lack legal or factual support as a matter of law.  BD claims that National Union acted in bad faith because it could not have conducted "an objectively reasonable investigation" since it filed this declaratory judgment action before otherwise responding to BD's tender."  (Dkt. 7 ¶¶ 32, 34.) However, an insurer's decision to seek judicial determination as to its rights and obligations under an insurance policy cannot give rise to a claim for bad faith.  See Cay Divers, Inc. v. Raven, 812 F.2d 866, 871 (3d Cir. 1987) ("In general, an insurer's seeking of a declaratory judgment on potential coverage and on the duty to defend . . . does not support a charge of bad faith."); Lincoln Nat'l Life Ins. Co. v. Schwartz, No. 09-03361, 2011 U.S. Dist. LEXIS 62031, at *19 (D.N.J. June 9, 2011) ("Plaintiff's decision to petition this Court for a declaration of its rights and obligations regarding the Policies does not give rise to a bad faith claim.").

Moreover, National Union possessed all of the information it needed to disclaim coverage for BD's stale claim in the form of BD's untimely tender letter, along with the corresponding underlying complaints and settlement agreement in the RTI Action, and the Policies.  See Universal-Rundle Corp. v. Commercial Union Ins. Co., 319 N.J. Super. 223, 249 (App. Div. 1999) (dismissing insured's bad faith claim based on inadequate investigation because insurer possessed all information regarding "the critical issue in [the] case" and noting that "[n]othing in the record indicates that had [the insurer] undertaken a lengthier or more in-

depth investigation, it manifestly would have come to the conclusion that coverage was triggered and this suit would have been avoided").  Accordingly, this case presents the exact situation where New Jersey courts dismiss a bad faith counterclaim as a matter of law.  <u>New Jersey Title Ins. Co.</u>, 2011 U.S. Dist. LEXIS 149162, at *21 (dismissing bad faith claim on motion to dismiss because "as a matter of law, a claim of bad faith must fail if there is an issue of material fact as to the underlying claim regarding [insured's] entitlement to insurance benefits"); <u>Fuscellaro v. Combined Ins. Group, Ltd.</u>, 2011 U.S. Dist. LEXIS 111470, at *5 (D.N.J. Sept. 29, 2011) (dismissing bad faith claim on a motion to dismiss where insurer's reason for refusing to pay, as alleged in the complaint, presented disputed issues of material fact as to the underlying substantive claim).  Thus, regardless of this Court's rulings on National Union's other requests for judgment, National Union is entitled to judgment on the pleadings on the independent ground that BD's claim for bad faith should be dismissed as a matter of law.

## <u>CONCLUSION</u>

For the foregoing reasons, National Union is entitled to judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure because it has no obligation under the Policies to reimburse BD for defense and indemnity costs incurred by BD in connection with the RTI Action.  In addition, National Union is entitled to a dismissal of BD's counterclaim in its entirety with prejudice.   In the alternative, this Court should dismiss Count III of BD's counterclaim for breach of the duty of good faith and fair dealing with prejudice.

Respectfully submitted,

SQUIRE PATTON BOGGS (US) LLP

By:_____/s/ Mark Sheridan_____
Mark D. Sheridan
Mark.Sheridan@squirepb.com
Attorney ID: 039961999
Mark C. Errico
Mark.Errico@squirepb.com
Attorney ID: 033631998
One Riverfront Plaza
Newark, New Jersey 07102
Telephone: 973-848-5600
Facsimile: 973-848-5601

Dated: March 13, 2015

Attorneys for Plaintiff
National Union Fire Insurance
Company of Pittsburgh, Pa.