NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA.,**

Plaintiff,

v.

**BECTON, DICKINSON AND COMPANY,**

Defendant.

Civil Action No. 14-4318 (CCC)

**OPINION**

**FALK, U.S.M.J.**

Before the Court is a motion by Plaintiff -- National Union Fire Insurance Company of Pittsburgh PA -- to compel discovery. Defendant -- Becton, Dickinson and Company -- opposes the motion. Oral argument was held on April 12, 2019. For the reasons stated herein, Plaintiff's motion is **GRANTED**, subject to the parameters expressed herein.

**BACKGROUND[1]**

This case involves a dispute over insurance coverage. Its background is grounded in a series of prior underlying lawsuits.

**The RTI Action**

In the late 1980s, engineer Thomas Shaw invented and patented a retractable

---

[1] The Background section is largely undisputed and is taken from the parties' papers and the transcript of oral argument; direct citations are omitted.

needle, designed to avoid accidental needle sticks, which he later named "VanishPoint." In 1994, Shaw incorporated Retractable Technologies, Inc. ("RTI"), and in 1997, RTI began selling VanishPoint. In 1998, RTI filed suit against Becton – a global company involved in the development, manufacturing, and sales of medical equipment – in Texas state court, alleging violations of state antitrust law (the "RTI Action"). In January 2001, after a voluntary dismissal in state court, the RTI Action was re-filed in the United States District Court for the Eastern District of Texas. On July 2, 2004, Becton settled the case by agreeing to pay RTI $100 million. In addition, Becton claimed to have spent $72 million defending the RTI Action.

**The Class Actions**

Following settlement of the RTI Action, between 2005 and 2007, direct and indirect purchasers of Becton's products filed several putative class actions in this Court, alleging that they had been overcharged by Becton and that Becton had violated the Sherman Act. The various actions were consolidated before the Honorable Jose L. Linares, C.U.S.D.J. In 2009, Becton settled the direct purchaser actions for $45 million and the indirect purchaser claims for $22 million; it also claimed to have paid more than $30 million to defend the lawsuits.

**Request for Coverage & Filing of Suit**

From 1985 through 2003, Becton had primary insurance through a number of different carriers, including Travelers Casualty and Surety Company (and/or various of its affiliates). Becton had excess insurance through National Union. (*See* Plaintiff's Oral Argument Exhibit: "Becton Dickinson Coverage Chart" ("Exhibit 1")).

By letter dated June 13, 2014, Becton demanded that National Union pay its defense and indemnity costs arising from the RTI Action.  On July 9, 2014, National Union filed the Complaint in this case seeking a declaratory judgment that it had no duty to defend or indemnify Becton for the $100 million paid to settle the RTI Action or for the $72 million incurred in defending the case (*National Union v. Becton, Dickinson & Company*, 14-4318 ("*Becton I*")).

At around the same time in June 2014, Becton demanded coverage from National Union for the $67 million paid to settle the Class Actions, as well as the $30 million to defend them.  On January 30, 2017, National Union filed its second Complaint in this court, seeking a declaration that it has no obligation to indemnify Becton for the monies paid to settle the Class Actions, or the defense costs associated with them (*National Union v. Becton Dickinson & Company*, 17-691 ("*Becton II*")).

On June 4, 2018, the Honorable Claire C. Cecchi, U.S.D.J., consolidated *Becton I* and *Becton II* for all purposes under Civil Action 14-4318.

**The Travelers Action**

From 1985 to 1999, Travelers was Becton's primary insurer – the insurer directly below Becton's excess carrier, National Union, in terms of coverage responsibility.  (*See* Exhibit 1.)   In December 2013, Becton sought coverage from Travelers for the Class Actions; in June 2014, it did the same for the RTI Action.  In response, on July 18, 2014, Travelers sued Becton in this Court seeking a declaratory judgment that it owed no coverage for either action.  *See Travelers Cas. & Surety Co., et al. v. Becton, Dickinson and Co.*, 14-CV-4410 (JMV) (D.N.J. 2014).  On or about June 13, 2018, the parties

entered into a settlement agreement resolving the case. (*See id*. at ECF No. 155.)

## **CURRENT DISPUTE**

The parties' dispute relates to document discovery. National Union has served three sets of document demands. The papers reflect that most were answered, some were disputed, and the parties met-and-conferred on the rest in accordance with Local Civil Rule 37.1. What remains is Becton's refusal to produce documents in response to 9 of National Union's Third Set of Document Requests. The parties agree the 9 requests can be arranged into three categories: (1) the Travelers Settlement Agreement and any related written communications (Requests 42-43); (2) the sworn interrogatory responses served by Becton and Travelers in the Travelers Action (Requests 36, 38); and (3) documents relating to whether Becton provided notice to, or received payment from, any other insurer for the RTI Action and the Class Actions (Requests 51-55).

National Union claims these demands seek critically relevant information, particularly the Travelers Settlement Agreement. National Union further claims that the language of the specific policies it issued to Becton requires an understanding of how and on what terms the Travelers Settlement Agreement was paid. In its view, if certain triggering language in the policies was not met through Travelers' settlement of the underlying claims, then there is no coverage under the National Union policies. Stated another way, National Union claims that if there was no coverage from Travelers, then National Union's excess coverage is not triggered. National Union makes clear this is not a voyeuristic journey to satisfy curiosity of the underlying settlement terms, but a true merits issue in this case – going to the very essence of whether there is coverage.

4

Similarly, National Union claims that how much and how defense costs were paid and allocated in the underlying settlement is directly relevant to whether there is coverage for same – hence, the merits of the case.  Finally, National Union claims that the requests relating to the interrogatory responses and payments from other insurers will likely disclose relevant information regarding positions Becton has taken with respect to the underlying lawsuits and its interpretations of the Travelers' (and National Union) policy provisions at issue.

Becton opposes any discovery of the type.  Becton contends that an excess insurer, like National Union, only needs to know that underlying coverage was exhausted -- not on what specific terms and how -- because National Union is not bound by the coverage determinations below.  Becton claims that National Union is only entitled to a "credit" equal to the underlying Travelers policy amount and does not need to see the specific terms of the settlement agreement.  Becton also raises certain procedural complaints about the timing and scheduling of discovery, chiefly that certain demands were served late in the discovery period.

## **DISCOVERY STANDARD**

Federal Rule of Civil Procedure 26(b)(1) provides that a party may obtain discovery regarding "any nonprivileged material that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its

5

likely benefit." *Id.* It is "well recognized that the federal rules allow broad and liberal discovery." *Pacini v. Macy's*, 193 F.3d 766, 777-78 (3d Cir. 1999). Relevance is a broader inquiry at the discovery stage than at the trial stage, *see Nestle Food Corp. v. Aetna Cos. & Surety Co.*, 135 F.R.D. 101, 103 (D.N.J.1990), and "relevant information need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." *Pearson v. Miller*, 211 F.3d 57, 65 (3d Cir. 2000). While relevant information need not be admissible, the burden remains on the party seeking discovery to "show that the information sought is relevant to the subject matter of the action and may lead to admissible evidence." *Caver v. City of Trenton*, 192 F.R.D. 154, 159 (D.N.J. 2000). A party resisting discovery on the grounds of burden or expense "bears the burden of showing specifically how the request is burdensome." *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 2010 WL 4922701, at *3 (W.D. Pa. Nov. 29, 2010).

## DECISION

### A. The Travelers Settlement Agreement

When establishing the parameters of discovery relevance, it is the claims and defenses of the parties, in the Complaint and other pleadings, which set the guardrails for discoverable information. The question is what is pleaded and how is it being defended? Anything generally within those bounds and not unreasonable or disproportional is discoverable. Here, Becton does not materially argue that there would be prohibitive burden or expense associated with discovery; thus, the question is relevance.

National Union was Becton's excess insurance carrier dating back to the 1990s, a

time period that covers the RTI claims and the Class Actions. An excess carrier has a specific role – it is not involved until certain conditions precedent to coverage are met and/or exhausted. It is for this reason that the premiums collected by excess insurers are generally less than those collected by a primary insurer -- with greater premium value comes higher risk of involvement in front line coverage. Here, National Union's claims and defenses involve, among other things, a position that no coverage is owed unless and until certain underlying events occur.[2] These "underlying events" all involve whether the underlying claims were covered by Travelers and how they were paid. This point was made repeatedly in National Union's papers and at oral argument:

- "There are key issues as to how they interpret their own policy that relate to whether or not there's even possible coverage under National Union. For example, Becton seeks coverage under the personal injury provision, product disparagement provision of the National Union policies. That coverage is explicitly excluded from the National Union policies and there's only coverage to the extent the underlying policy, the Travelers policy, not only has that coverage in its form, it does, but that it provide – it provided coverage for the very claims under that provision." (Transcript of Oral Argument, April 12, 2019 ("Tr."), 11:5-14.)

- THE COURT: "Are you saying that if the Travelers policy didn't cover for what the claim is then there would be no excess coverage for that?
. . .
PLAINTIFF'S COUNSEL: -- it's our position that there is no, based on the wording of the policy, that there is absolutely no coverage in the excess policy . . . if in fact the underlying policy coverage is not afforded under that provision." (Tr. 12:8-18.)

- "So while the mere fact that Travelers may have paid under that provision doesn't mean we have to. It is a condition to the coverage in our policy under the personal injury provision that Travelers provides it, in a general

---

[2] Of course, the parties' other claims and defenses, including issues relating to notice, which are mentioned in the papers and were tangentially discussed at argument, are fully preserved and have nothing to do with the issues discussed herein.

7

sense, and that they actually paid for coverage under that provision." (Tr. 13:5-8.)

- "If [Travelers] paid a dime it doesn't mean we have to. Follow form coverage means we have all of the provisions of our policy still at our disposal but we don't pay unless, it doesn't even start the process unless [Travelers] paid underlying under that provision. So, we need to know whether or not Travelers has paid under its personal injury provision.
. . .
So, if Kemper hasn't paid and exhausted its limits, if Travelers in a given year hasn't paid and exhausted its limits . . . we don't think they're entitled to defense costs . . . .
. . .
. . . [B]ut we are entitled to know, and its certainly relevant, they can disagree with my argument, but disagreements don't structure relevance or else we wouldn't get any discovery, but we need to know whether Travelers, the underlying, paid an amount in a given year under the personal injury provision or whether they exhausted any year because we can never be liable for defense costs until Travelers exhausts its limits through payment. (Tr. 27:7-28:10.)

This is an important merits issue for National Union; it goes to its claims or defenses. National Union claims it cannot be responsible for any coverage or defense costs unless and until certain *payments*, based on certain conditions, were made by Travelers. Therefore, the settlement agreement *terms* -- not simply the amount of money paid or any allowable credit -- may be relevant to the claims and defenses in the case because it may implicate whether the National Union policies are triggered.

Becton retorts that the settlement agreement is not relevant because National Union is not bound by how Travelers allocated or paid money. While it may be true that National Union is not bound, that misses the point. If Travelers did not make payment, then National Union would take the position it could be case dispositive under the terms of their policy – whether this would be successful or not. If Travelers did make a

8

payment, then National Union would be free to pursue other avenues relating to their claims or defenses. The election would be National Union's; and provided the information sought is relevant, there is no reason they are not entitled to the underlying information to make their choice. This is so whether the information in dispute is admissible, valuable, or even ultimately used in the case. The fact is, the inquiry is relevant to claims or defenses and is proportional to the needs of the case. Therefore, it is plainly discoverable. Despite this, Becton claims the Agreement should not be produced for two main reasons. However, neither is persuasive.

First, Becton relies on *UMC/Stamford, Inc. v. Allianz Underwriters Ins. Co.*, to argue that New Jersey law effectively prohibits production of settlement agreements in the context of insurance disputes. 276 N.J. Super. 52 (Law Div. 1994). The Court disagrees that *UMC* applies that way in this case.

The *UMC* case involved an environmental insurance coverage dispute. 276 N.J. Super. at 56. The plaintiff settled with several primary insurers, and a non-settling excess insurer sought disclosure of the settlement terms. *Id.* at 68. The court held that the excess insurance company was not entitled to learn the settlement terms because it was unnecessary; instead, it found that a non-settling excess insurer is entitled to a "credit" for the full value of the primary carrier's coverage "before it is required to pay any cleanup expense." *Id.* at 69-70. Concluding that the amount of the credit was equal to the policy amount and "has nothing to do with the details of the settlement between UMC and the other insurers . . . the excess carrier has no need to know the terms of the settlement

9

between plaintiff and a settling primary insurer." *Id.*[3] *UMC*, therefore, is really an opinion about whether a non-settling insurer is entitled to a credit in the amount of what was actually paid in an underlying settlement or for the limits of the primary insurers' underlying policy.

Here, we have a different set of facts and considerations. If National Union is liable for coverage, it is entitled to the settlement credit for the full amount of the Travelers policy. That's the *UMC* decision; it's undisputed. However, National Union claims that the credit issue is of little importance since it claims there is no coverage. National Union can certainly have a credit for the value of Travelers underlying policy – *but it doesn't need or want a credit if there is no coverage to provide in the first instance*. And National Union credibly contends how Becton's claims were treated and paid by Travelers in that agreement is a fact issue that bears on the specific question of coverage. The settlement amount vs. the full value of the policy -- the *UMC* issue -- is not the question in this case; rather, it's how the settlement was paid and allocated that matters to National Union's claims or defenses. Therefore, even accepting *UMC* as the law, which we must (*see* footnote 3, *supra*), it simply does not resolve the discovery issue in this case.[4] This result is further underscored by the fact that *UMC* did not touch on the issue

---

[3] *UMC* is a Law Division opinion. In 1999, the Third Circuit adopted *UMC's* reasoning as an accurate prediction of how the New Jersey Supreme Court would decide the issue of settlement credit vs. disclosure of the actual settlement amount. *See Chemical Leaman Tank Lines v. Aetna Cas. & Surety Co.*, 177 F.3d 210 (3d Cir. 1999). The Third Circuit's prediction proved accurate. *See Carpenter Technology Corp. v. Admiral Ins. Co.*, 172 N.J. 504, 517 (2002).

[4] The same is true for the Third Circuit's *Chemical Leaman* decision, which does not

of defense costs, which is a large issue in this case and an unassailable basis for the requested discovery.

Second, Becton also claims that production of settlement agreements requires a "heightened" showing of relevance, and that New Jersey's strong preference for resolution of cases through settlement means that the Travelers agreement should remain confidential.

It is true that some non-binding decisions have required a heightened showing of relevance before ordering the production of settlement agreements and materials. *See, e.g.*, *Lesal Interiors, Inc. v. Resolution Trust Corp.*, 153 F.R.D. 552, 562 (D.N.J. 1994). But even assuming that is the applicable standard, it is met here: National Union's position is that potentially case/coverage dispositive information may be in the settlement agreement. *See, e,g.*, Tr. 12:8-18 ("it's our position that there is no, based on the wording of the policy, that there is absolutely no coverage in the excess policy . . . if in fact the underlying policy coverage is not afforded under that provision."). Thus, even if a heightened showing were required, it has been made.

As for confidentiality, of course the Court agrees with *UMC* and many other authorities that confidentiality is often an important part of settlement. But, at the same time, it is clear that the State of New Jersey does not have a blanket prohibition on the production of settlement agreements in the context of insurance cases.[5] Instead, in New

---

address or deal with discovery at all, let alone production of a settlement agreement.

[5] National Union notes that Becton sought and obtained, over objection, settlement agreement information in the RTI Action, but has now switched positions. This is noted

Jersey, like most other jurisdictions, courts must balance confidentiality and relevance when it comes to the production of settlement agreements. As one post-*UMC* New Jersey case explains:

> … [I]n *UMC/Stanford* . . . the court denied disclosure to a non-settling defendant/insurer of the terms of a confidential settlement agreement entered into between plaintiff and several of plaintiff's other liability insurers. The court noted that confidentiality was a "key component" to settlement negotiations, and that ordering disclosure of settlements already reached in this case would not only jeopardize those settlements but would chill and deter other parties from entering into confidential discussions to settle their disputes without a lengthy trial.
> 
> As noted by [Defendant], there exists a strong public policy in New Jersey endorsing the settlement of litigation. *See Nolan v. Lee Ho.*, 120 N.J. 464, 472 (1990). Defendant contends that 'that policy would be compromised if parties were unable to settle for fear that the fact of the settlement would later be used as proof of liability.' However, this broad assertion is unsubstantiated by any specific showing of potential harm or prejudice to the settling parties.
> 
> It is unlikely that limited disclosure of the confidential settlement agreement pursuant to a protective order will undermine 'the social goal of encouraging settlements.' *Czuj v. Toresco Enters.*, 239 N.J. Super. 123 (Law Div. 1989). As one commentator has indicated, even if the use of confidential settlement agreements was prohibited, such prohibition would not be a major deterrent to settlement: 'Plaintiffs would still want their money as soon as they could get it and without risk of loss at trial. Defendants would still want to avoid trial in order to limit dissemination of bad publicity as much as possible.' Jack H. Friedenthal, *Secrecy in Civil Litigation: Discovery and Party Agreements*, 9 L.J. & Pol'y 67, 95-96 (2000). Thus, in most cases, settlements result from a mutual desire for certainty and a mutual desire to avoid the risks inherent in a jury trial.

*LLerena v. J.B. Hanauer & Co.*, 368 N.J. Super. 256, 266-67 (Law Div. 2002).

In short, there is no blanket prohibition on the production of settlement agreements based on confidentiality concerns. There is always a balancing of

---

for the mere fact that seeking production of settlement agreements is not uncommon and certainly not strictly prohibited.

competing interests that must be considered. And here, as in many cases, there is a Discovery Confidentiality Order in place that can protect and limit dissemination of the agreement. (*See* ECF No. 19.) When balancing the relevance arguments made and the presence of a confidentiality order to protect dissemination of the settlement agreement, production becomes a relatively simple call.

Based on the above, National Union has shown that the Travelers settlement agreement is relevant. However, before ordering the production of the agreement unencumbered, the Undersigned will preliminarily review the document *in camera* to ensure that settlement details are not being haphazardly and unnecessarily produced. The parties are advised, however, that, barring something unforeseen, it expects to turn the settlement agreement over to National Union's counsel expeditiously.[6]

**B.**     **Interrogatory Responses**

National Union's second category is the interrogatory responses from the Travelers litigation. (*See* Requests 36, 38.) National Union claims that interrogatory responses are easily located and can be produced without any burden, and that the responses may reflect Becton's sworn positions with respect to the policies at issue. Further, it contends that Travelers' interrogatory responses are posted on the Court's

---

[6] The papers also refer to additional settlement materials and communications. Oral Argument was focused almost exclusively on the Travelers agreement itself. What exactly this additional material entails and the scope of the request remains somewhat unclear. For that reason, the Undersigned will defer the request for production of "all communications" and other settlement materials pending further proceedings in the case. If, after proceeding with depositions on the Travelers settlement agreement and other subjects, there remains a need for this information, it can be further investigated.

electronic docket and have already been obtained, and that there is no reason not to provide Becton's responses as well.

Becton's primary opposition seems to producing interrogatory responses seems to be procedural. It claims that discovery in the '14 case was essentially over at the time it was consolidated into the '17 case, and that National Union delayed in seeking this discovery, rendering it untimely.

The interrogatory responses should be produced. National Union has articulated a reasonable basis for seeking this information. It makes sense why National Union would want to see this information – interrogatory responses are sworn by the client, *see* Fed. R. Civ. P. 33, and could show what position Becton took with respect to these specific policy provisions, some of which are asserted to be the same as, or similar to, provisions in the National Union policies. Moreover, the Travelers litigation was public, and certain interrogatory responses are already publicly available.

The objection based on the scheduling order and the timing of discovery is without merit. The timing and conduct of discovery are highly discretionary matters. *See In re Fine Paper Antitrust Litig.*, 685 F.2d 810, 817 (3d Cir. 1982). Discovery remains open, and in fact, Becton continues to produce discovery of its own. Also, a recent, jointly-proposed discovery extension is outstanding. (*See* ECF No. 197.) There is no basis to withhold the interrogatory responses.

C. **Communications/Payments from Other Insurers**

Following oral argument, it appears this issue is resolved. Becton's opposition papers state no payments were received from any other insurers. (Opp'n Br. 19.) This

14

was repeated in open court, with Becton offering to re-state the information in a sworn interrogatory answer and National Union apparently accepting it. (*See* Tr. 18:12-18; 25:20-24 ("[J]ust put it in the interrogatory response so I have it sworn, it's evidentiary, and I can cross-examine someone on it. This one seems pretty easy."). If this issue remains following Becton's service of an interrogatory response, it can be raised with the Undersigned and will be addressed in an expedited way.

## CONCLUSION

For the reasons stated above, the discovery sought is relevant within the meaning and contemplation of Rule 26. Therefore, National Union's motion to compel is **GRANTED**. An appropriate order will be entered.

                                       s/Mark Falk_____
                                       **MARK FALK**
                                       **United States Magistrate Judge**

**DATED: April 23, 2019**