# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA.,

*Plaintiff*,

v.

BECTON, DICKINSON AND
COMPANY,

*Defendant.*

Civil Action No. 2:14-cv-04318
(CCC-MF)

*Filed Electronically*
*Confidential – Filed Under Seal*

**PLAINTIFF NATIONAL UNION FIRE INSURANCE COMPANY
OF PITTSBURGH, PA.'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ...................................................................................iv

PRELIMINARY STATEMENT ............................................................................. 1

BACKGROUND ................................................................................................... 3

I.     THE RTI ACTION. ...................................................................................... 3

       A.     Retractable Technologies, Inc. .......................................................... 3

       B.     RTI Sues BD. ..................................................................................... 4

       C.     BD Determined It Had No Insurance Coverage For The RTI
              Action. ............................................................................................... 5

              1.     What is the RTI case in Texas about? ...................................... 7

              2.     *Do we have insurance for this?* .............................................. 7

       D.     BD's Settlement Of The RTI Action. ............................................... 7

II.    THE CLASS ACTIONS ............................................................................... 8

       A.     The Class Action Lawsuits. ............................................................... 8

       B.     BD's Settlement Of The Class Action Lawsuits. .............................. 8

       C.     BD Determined It Had No Insurance For The Class Actions. ........... 9

III.   BD'S BELATED DEMAND FOR INSURANCE COVERAGE ................... 9

       A.     A Law360 Article Triggers BD's Demand For Coverage. ................. 9

       B.     BD's Initial Demands For Coverage. .............................................. 10

       C.     BD Demands Coverage From Travelers. ......................................... 11

       D.     BD Demands Coverage From National Union. ............................... 12

IV.    THE CURRENT PROCEEDING. ............................................................... 13

ARGUMENT ....................................................................................................... 13

I.      BD CANNOT ESTABLISH THAT IT IS ENTITLED TO
        COVERAGE UNDER THE ADVERTISING LIABILITY
        PROVISION IN THE 1993 POLICIES FOR THE AMOUNTS IT
        PAID TO SETTLE THE ANTITRUST CLAIMS IN THE
        UNDERLYING ACTIONS...........................................................................14

        A.      The Advertising Liability Provision In The 1993 Policies Is The
                Only Coverage Provision Still At Issue. ..............................................14

        B.      Discovery Established That BD Seeks Coverage For Its
                Settlement Of The Antitrust Claims In The Underlying Actions. ......15

        C.      The "Unfair Competition" Language In The Advertising
                Liability Provision Does Not Provide Coverage For Antitrust
                Claims...................................................................................................16

        D.      The "Conduct" BD Identified Also Does Not Trigger Coverage
                Under  The Advertising Liability Provision In The 1993
                Policies. ...............................................................................................20

                1.      After Two Years, BD Finally And Begrudgingly Identified
                        The "Conduct" It Asserts Triggers Coverage Under The
                        1993 Policies. ...........................................................................20

                2.      BD Cannot Establish That The "Conduct" It Identified
                        Amounts To Unfair Competition, In An Advertisement, As
                        Part Of BD's Advertising Activities, During The Policy
                        Periods Of The 1993 Policies. ..................................................27

II.     BD CANNOT ESTABLISH IT IS ENTITLED TO COVERAGE
        UNDER THE ADVERTISING INJURY PROVISION IN THE 1994,
        1997 AND 1999 POLICIES, OR THE PERSONAL INJURY
        PROVISION IN ANY OF THE POLICIES. .................................................30

III.    BD ALSO IS NOT ENTITLED TO COVERAGE BECAUSE IT
        VIOLATED KEY CONDITIONS OF THE POLICIES..............................35

        A.      BD Violated The Notice Provisions Of The Policies. ........................35

        B.      BD's Violation Of The Voluntary Payments Provisions Is Also
                An Absolute Bar To Coverage............................................................37

IV.    BD IS NOT ENTITLED TO RECOVER ITS DEFENSE COSTS FROM THE UNDERLYING ACTIONS. ......................................................38

V.    BD'S COUNTERCLAIMS FOR BAD FAITH ARE WHOLLY WITHOUT MERIT. .......................................................................39

CONCLUSION ........................................................................................40

# TABLE OF AUTHORITIES

**Cases**                                                                                   **Page(s)**

*Abouzaid v. Mansard Gardens Assocs., LLC*,
  200 N.J. 67 (2011) ...................................................................................39

*Aetrex Worldwide, Inc. v. Sourcing for You, Ltd.*,
  No. 13-1943 (DMC)(MF), 2013 WL 1680258 (D.N.J. Apr. 16, 2013),
  *aff'd*, 555 F. App'x 153 (3d Cir. 2014)..............................................................18

*Albion Eng'g Co v. Hartford Fire Ins. Co.*,
  779 F. App'x 85 (3d Cir. 2019) ..........................................................................32

*Arcelormittal Plate, LLC v. Joule Tech. Servs., Inc.*,
  558 F. App'x 205 (3d Cir. 2014) .......................................................................39

*Astro Pak Corp. v. Fireman's Fund Ins. Co.*,
  284 N.J. Super. 491 (App. Div. 1995) ..............................................................35

*Bacon v. Am. Ins. Co.*,
  131 N.J. Super. 450 (Law. Div. 1974),
  *aff'd,* 138 N.J. Super. 550 (App. Div. 1976) .........................................14, 34, 38

*Baer v. Chase*,
  392 F.3d 609 (3d Cir. 2004) ..............................................................................18

*Bello v. Hurley Limousines, Inc.*,
  249 N.J. Super 31 (App. Div. 1991) ..................................................................20

*Building Materials Corp. of Am. v. Allstate Ins. Co.*,
  424 N.J. Super. 448 (App. Div. 2012) ...............................................................16

*Chem. Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co.*,
  817 F. Supp. 1136 (D.N.J. 1993),
  *aff'd in part and remanded,* 89 F.3d 976 (3d Cir. 1996)....................................38

*Cypress Point Condo. Ass'n, Inc. v. Adria Towers, LLC*,
  226 N.J. 403 (2016) ...........................................................................................17

*Ethicon, Inc. v. Aetna Cas. & Sur. Co.*,
  805 F. Supp. 203 (S.D.N.Y. 1992) ....................................................................35

*Forbes Inc. v. Granada Biosciences, Inc.*,
  124 S.W.3d 167 (Tex. 2003) ...............................................................................32

*Gil v. Clara Maass Med. Ctr.*,
  450 N.J. Super. 368 (App. Div. 2017) ................................................................19

*Great Am. Ins. Co. v. Riso, Inc.*,
  479 F.3d 158 (1st Cir. 2007)...............................................................................33

*Herman Bros., Inc. v. Great West Cas. Co.*,
  582 N.W.2d 328 (Neb. 1998) ..............................................................................36

*Hudson Universal, Ltd. v. Aetna Ins. Co.*,
  987 F. Supp. 337 (D.N.J. 1997) ..........................................................................39

*Info. Spectrum, Inc. v. Hartford*,
  364 N.J. Super. 54 (App. Div. 2003), *aff'd*, 182 N.J. 34 (2004) ........................33

*Klehr v. A.O. Smith Corp.*,
  521 U.S. 179 (1997)....................................................................................... 28-29

*New Jersey Eye Ctr. P.A. v. Princeton Ins. Co.*,
  394 N.J. Super. 557 (App. Div. 2007) .................................................................38

*Open Software Found., Inc. v. U.S. Fid. & Guar. Co.*,
  307 F.3d 11 (1st Cir. 2002)..................................................................................18

*Perini/Tompkins Joint Venture v. Ace Am. Ins. Co.*,
  738 F.3d 95 (4th Cir. 2013) .................................................................................36

*Peskin v. Liberty Mut. Ins. Co.*,
  219 N.J. Super. 479 (App. Div. 1987) .................................................................35

*Pickett v. Lloyd's*,
  131 N.J. 457 (1993) .............................................................................................39

*Retractable Techs., Inc. v. Becton Dickinson & Co.*,
  842 F.3d 883 (5th Cir. 2016) ...............................................................................29

*Rose Acre Farms, Inc. v. Columbia Cas. Co*,
  662 F.3d 765 (7th Cir. 2011) ...............................................................................19

*Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.*,
   401 F.3d 123 (3d Cir. 2005) ...............................................................30

*Sears Roebuck and Co. v. National Union Fire Ins. Co. of Pittsburgh, Pa.*,
   340 N.J. Super. 223 (App. Div. 2001), *certif. denied* 169 N.J. 608 (2001) .......13

*Shaler ex rel. Shaler v. Toms River Obstetrics & Gynecology Assocs.*,
   383 N.J. Super. 650 (App. Div. 2006)................................................13

*SL Indus., Inc. v. Am. Motorists Ins. Co.*,
   128 N.J. 188 (1992) ...........................................................37, 38

*Standard Fire Ins. Co. v. Peoples Church of Fresno*,
   985 F.2d 446 (9th Cir. 1993) ...............................................................18

*State Nat'l Ins. Co. v. Cnty. of Camden*,
   10 F. Supp. 3d 568 (D.N.J. 2014)......................................................38

*Sussex Commons Outlets, L.L.C. v. Chelsea Prop. Grp., Inc.*,
   No. A-3714-07T1, 2010 WL 3772543 (N.J. Super. Ct. App. Div. Sept.
   23, 2010) .......................................................................18

*Travelers Cas. & Sur. Co., et al. v. Becton, Dickinson & Co.*,
   No. 14-cv-4410-JMV-JBC (D.N.J. 2014) ............................................11

*USX Corp. v. Adriatic Ins. Co.*,
   99 F. Supp. 2d 593 (W.D. Pa. 2000), *aff'd*, 345 F.3d 190 (3d Cir. 2003)..........19

*Zacarias v. Allstate Ins. Co.*,
   168 N.J. 590 (2001) .....................................................................17

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
   401 U.S. 321 (1971)......................................................................29

## Statutes

15 U.S.C. § 15b....................................................................................29

20-129 Appleman on Insurance Law & Practice Archive § 129.2 (2nd 2011) . 34-35

*N.J.S.A.* 2C:21–21 ...............................................................................18

Plaintiff National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union") submits the following Memorandum of Law in Support of its Motion For Summary Judgment on its claims for declaratory relief and all counterclaims asserted by Defendant Becton Dickinson and Company ("BD").

## PRELIMINARY STATEMENT

In 1998, a competitor sued BD in Texas state court for violations of the Texas antitrust statutes.  In 2001, the case was re-filed in federal court and included claims for violations of the Sherman Act.  Because BD's Director of Risk Management, Head of Litigation, and outside counsel all agreed that BD had no possible insurance coverage for those claims, BD neither notified its insurers nor sought their consent when it settled the claims for $100 million in 2004.

Beginning in 2005, after public disclosure of BD's $100 million settlement, multiple putative class action lawsuits were filed against BD asserting a massive conspiracy that violated the Sherman and Clayton Acts and resulted in BD reaping billions of dollars in overcharges.  Again, because BD and its counsel agreed that BD had no possible insurance coverage for those claims, BD neither notified its insurers nor sought their consent when it settled those claims for $67 million.

 That all changed in 2014, when BD's outside coverage counsel contacted BD after reading an article about one of the settlements.  Despite BD's prior determination that it had no insurance coverage for the claims, BD decided to

- 1 -

reverse course and pursue coverage for the amounts it paid to defend and settle allegations that it had entered into an illegal conspiracy that violated U.S. antitrust laws.  As a result, BD's counsel sent letters demanding coverage to essentially every insurer that had sold BD a liability policy over the last four decades.

In June 2014, BD for the first time sought coverage from National Union for those long-settled antitrust claims.  National Union issued excess liability coverage to BD, which generally applies to accidental conduct that causes bodily injury or property damage, from 1985-2002.  National Union denied BD's request for coverage and sought a declaration from the Court confirming its decision.

Following a familiar script, BD reflexively counterclaimed, asserting that National Union's denial was in bad faith even though BD had violated the clear terms of the policies by not requesting National Union's consent to settle and waiting as long as a decade after settling to first request coverage, and previously had determined – multiple times – that it had no coverage for those claims, all while represented by several of the most sophisticated law firms in the country.

BD's position only worsened as this action progressed.  Both the undisputed facts and settled case law confirm that neither the "unfair competition" language in the Advertising Liability provision in National Union's 1993 policies nor the Advertising Injury or Personal Injury provision in any other National Union policy – which cover loss resulting from libel, slander, and disparagement – provide

- 2 -

coverage for the amounts BD paid to settle the allegations that it violated federal antitrust laws and received billions of dollars in overcharges as a result.

Set forth below is an overview of the background of this matter; a discussion of the many reasons why BD is owed no coverage under any National Union policy; the reasons why BD's breach of conditions in National Union's insurance policies is an absolute bar to coverage in any event; and the reasons why BD's counterclaim for bad faith is wholly without merit.

## BACKGROUND[1]

### I.   THE RTI ACTION.

A.   Retractable Technologies, Inc.

In the late 1980s, Thomas Shaw, an engineer, ████████████████

████████████████████████████  (Ex. 6, Transcript of Deposition of Thomas Shaw ("Shaw Tr.") at 126:3-128:21)[2]  In response, Shaw invented and patented a retractable "safety" needle that he named the "VanishPoint."  (Id. at 124:13-125:4; Ex. 30 at 1.)  Shaw incorporated Retractable Technologies, Inc. ("RTI") in May 1994 and entered into an agreement with RTI

---

[1]   While the factual overview in the Background section provides useful context for the arguments set forth below, this motion is based solely on the facts set forth in National Union's Statement Of Undisputed Material Facts ("SUMF").

[2]   References to "Ex. __" are to the documents and testimony attached to the Declaration of Lynnette Cortes Mhatre, Esq. In Support Of Plaintiff's Motion For Summary Judgment, dated December 2, 2020.

that permitted RTI to manufacture and sell VanishPoint needles.  (*Id.*)  Sales of the

first VanishPoint needle did not begin, however, until the spring of 1997.  (*Id.*)

     B.    <u>RTI Sues BD.</u>

In August 1998, RTI brought an action against BD in Texas state court (the

"RTI State Action").  (Ex.12.)  BD is a global company engaged in, among other

things, the development, manufacture, and sale of a variety of medical supplies,

including hypodermic needles.  (Ex. 24 at BD_RTI0152730.)  RTI alleged that BD

violated Texas law by "participat[ing] in an antitrust conspiracy and other illegal

conduct," and had "contracted [with others] … to exclude RTI from selling" the

VanishPoint.  (Ex. 12 ¶¶ 9, 11.)

In January 2001, after dismissing the RTI State Action, RTI sued BD and

others in federal court in Texas, alleging violations of Section 1 of the Sherman

Act and state court claims, including a claim for disparagement (the "RTI

Action").  (*See* Ex. 13 at NU000148-152.)  As RTI explained, ████████

████████████████████████████████████████████████

████████████████████████████████████████

████████  (Ex. 16 at BD_RTI 2810.)

C.     BD Determined It Had No Insurance Coverage For The RTI Action.

In 1998, BD's Head of Litigation, Roy Weber, who was "overseeing … the RTI litigation," determined that BD had no insurance coverage for that action:

> Q.     Sir, Mr. Weber made a determination as head of litigation that there was no coverage under the company's policies –
>
> A.     Correct.
>
> Q.      – for the RTI Action; correct?
>
> A.     Correct.

(Ex. 10, Transcript of Deposition of BD ("BD Tr.") at 135:2-8, 246:20-25.)

In 2001, when RTI filed its action in federal court, Bruce Hector, Associate General Counsel at BD (and later Head of Litigation), was BD's most senior litigator.  (*See* Ex. 9, Transcript of Deposition of Bruce Hector ("Hector Tr.") at 34:17-35:3.)  Mr. Hector also did not believe BD had insurance coverage for the RTI Action:  "[BD] just didn't have the feeling that antitrust claims in general were covered by our [insurance] policy."  (*Id.* at 147:6-8; *see also id.* at 19:9-14.)

BD's Corporate Risk Management Department, however, had the final say regarding whether to provide notice of the RTI Action to BD's insurers.  (*Id.* at 28:5-24.)  BD's Director of Risk Management, David Young, who was responsible for purchasing BD's liability insurance, testified that he had reviewed BD's policies "to get an understanding of what the terms and conditions were" and "to

- 5 -

understand what they covered and what they did not." (Ex. 8, Transcript of

Deposition of David Young ("Young Tr.") at 87:13-22.)

Mr. Young explained that BD did not provide notice to its insurers because

he too believed BD had no insurance coverage for the RTI Action:

Q.   What you saw in that first [RTI] complaint was antitrust
claims?

A.   Yeah.

Q.   And you, knowing the coverage, could determine from seeing
they were antitrust claims that there wasn't going to be
coverage in those National Union liability policies; correct?

A.   That would be my assumption.

Q.   Okay.  That assumption was based in part on – at that point, 20
years, two decades of experience as a risk manager; correct?

A.   *And based on the fact that we didn't buy that type of insurance*.

(Ex. 8, Young Tr. at 165:4-23 (emphasis added); *see also id.* at 83:19-25 ("Q.…

[Y]ou were aware the company did not have insurance coverage for antitrust

claims; correct?  A. That was my understanding.").)

BD also confirmed in writing that it had no insurance coverage for the RTI

Action.  For example, in a May 1999 interrogatory response, BD stated:

INTERROGATORY NO. 5:  Identify each policy of insurance by or
through which you [BD] were or are insured … with respect to any of
the claims, causes of action, injuries or damages alleged ….

ANSWER:  … *Becton is investigating the question of coverage but
has not yet identified any such policy of insurance* ….

(Ex. 23, at BD04918 (emphasis added).)

In 2001, after the filing of the RTI Action, BD's Corporate Law Group prepared materials for its CEO to use at a shareholders meeting that contained the following "Possible Questions" and proposed answers:



(Ex. 25 at BDAF-00314465 (emphasis added).)  Finally, in May 2002, in response to RTI's document requests, BD again confirmed its position:  "*[BD] has no insurance policy that covers this case*."  (Ex. 26 at BD06260 (emphasis added).)

D.    BD's Settlement Of The RTI Action.

RTI's antitrust claims concerned BD.  As Mr. Hector testified, "we never had an antitrust lawsuit before.  And the kind of damages [RTI] was talking about … presented an existential threat to the company …."  (Ex. 9, Hector Tr. at 95:4-9.)  As a result, on July 2, 2004, after purportedly spending more than $70 million in defense costs (*i.e.*, roughly $1.7 million per month for 41 months straight), BD agreed to pay $100 million to settle the RTI Action.  (*See* Ex. 28.)  Because BD did not have insurance coverage for the RTI Action, it did not seek consent to settle from National Union or any other insurer.  (Ex. 10, BD Tr. at 350:6-12.)

## II.    THE CLASS ACTIONS.

### A.    The Class Action Lawsuits.

Mr. Hector was concerned that the public disclosure of the $100 million

settlement of the RTI Action (*see* Ex. 29) would lead to more lawsuits:  "[It is]

always a concern when you have a relatively large settlement amount in any type

of lawsuit that it's going to be portrayed as blood in the water and other plaintiffs'

counsel are going to try and capitalize on it."  (Ex. 9, Hector Tr. at 129:15-23.)  His

concerns were prescient.

On March 23, 2005, the Louisiana Wholesale Drug Company sued BD in

the District of New Jersey for alleged violations of the Sherman and Clayton Acts.

(*See* Ex. 17.)  Numerous additional putative class actions (the "Class Actions" and,

with the RTI Action, the "Underlying Actions") followed:



(Ex. 32 at BD_CA00022085; *see also* Ex. 9, Hector Tr. at 147:15-21.)  As BD

explained, "[t]he crux" of the Class Actions was "that Becton's contracts and

discount pricing programs ...  stifled competition ...."  (Ex. 31 at BD_CA0227138.)

### B.    BD's Settlement Of The Class Action Lawsuits.

As with the RTI Action, BD was concerned about the antitrust damages it

faced in the Class Actions – plaintiffs' expert estimated BD had been paid $2.67

billion in overcharges because of its illegal conduct.  (*See* Ex. 33 at

BC_CA00022049; Ex. 9, Hector Tr. at 146:10-14.)  As a result, on April 27, 2009,

BD settled with the distributor plaintiffs (direct purchasers of BD's products) for

$45 million.  (Ex. 9, Hector Tr. at 156:19-25; *see also* Ex. 34.)  Although BD did

not believe the healthcare plaintiffs (hospitals and pharmacists that purchased BD's

products from the distributor plaintiffs), as indirect purchasers, had standing, on

July 30, 2013, BD agreed to pay $22 million to settle their claims.  (Ex. 35 at ¶ 7.)

      C.     <u>BD Determined It Had No Insurance For The Class Actions.</u>

Mr. Hector, by then BD's Head of Litigation, oversaw the Class Actions.

(*See* Ex. 9, Hector Tr. at 129:24-130:7.)  After reviewing the complaints, he

determined that BD had no insurance coverage:  "[T]he perception from the first

complaint we got was that antitrust claims didn't fall within the ambit of whatever

[insurance] policy we had."  (*Id.* at 159:3-8.)  As a result, BD did not provide

notice of the Class Actions to its insurers, nor did it seek their consent before

settling those claims.  (*Id.* at 130:8-14, 158:24-159:2.)

## III.    BD'S BELATED DEMAND FOR INSURANCE COVERAGE.

      A.     <u>A Law360 Article Triggers BD's Demand For Coverage.</u>

In August 2013, a Law360 article reported on BD's $22 million settlement

with the healthcare plaintiffs.  (Ex. 36.)  BD's regular outside coverage counsel

McCarter & English ("M&E") apparently read that article, contacted BD, and

suggested BD seek coverage.  (Ex. 10, BD Tr. at 12:20-13:23, 29:6-16.)  Although

Mr. Hector, Mr. Young, and BD's prior counsel had determined – multiple times

over multiple years – that there was no insurance coverage for the RTI Action or

Class Actions, Andrew Walpole (Young's replacement as Director of Risk

Management) and Greg Vincinanza (Hector's replacement as Head of Litigation)

decided to retain M&E and seek coverage:

> Q.    … [T]he company represented by three lawyers in an ongoing
> proceeding says, we do not have insurance coverage for the
> claims in that federal RTI case, correct?
>
> A.    Rightly or wrongly, that's what they said.
>
> Q.    And then 12 years later Mr. Bartell [at M&E] reads an article in
> Law360 and gets hired to represent the company in connection
> with the claim for coverage for that lawsuit; correct?
>
> A.    Mr. Bartell is representing the company, yes.
>
> Q.    And that was the result of him seeing an article in Law360 and
> reaching out to the company about coverage; correct?
>
> A.    Essentially, yes.

(Ex. 10, BD Tr. at 185:17-186:7.)

> B.    <u>BD's Initial Demands For Coverage.</u>

BD cast a wide net when it first sought coverage for the antitrust claims it

settled.  For example, BD requested coverage from Lloyd's relating to policies

covering 1976-85; from Everest Re, successor to Prudential Re ("Pru Re"), relating

to policies covering 1977-78; from Bedins Vermont Insurance Company ("Bedins

Vermont") relating to policies covering 2002-03; and from ACE relating to policies covering 2003-05.  (*See* Exs. 40-43.)

While BD believed that at least some of the conduct for which it faced liability occurred during these periods, it quickly abandoned its claims against those insurers for a variety of reasons.  For example, BD dropped its claim against BD-owned Bedins Vermont because it would be "taking money from one [BD] pocket and putting it in another."  (Ex. 10, BD Tr. at 81:8-15.)  And BD abandoned its claim against Pru Re, which had denied BD's claim, because "[w]e're very busy people."  (*Id.* at 106:23-107:3.)  BD found time, however, to pursue Travelers Casualty & Surety Co. ("Travelers") and National Union.

C.    BD Demands Coverage From Travelers.

Travelers, or one of its affiliates, was BD's primary insurer from 1985-99. (Ex. 37 at 2.)  In December 2013, BD sought coverage from Travelers for the Class Actions and, in June 2014, BD sought coverage from Travelers for the RTI Action. (Exs. 37, 44.)  Travelers denied coverage and sought a declaration that it owed BD nothing for either action.  *See Travelers Cas. & Sur. Co., et al. v. Becton, Dickinson & Co.*, No. 14-cv-4410-JMV-JBC (D.N.J. 2014), ECF No. 4 at 17. After preliminary motion practice, Travelers and BD settled.  (*Id.* at ECF No. 155.)

### D.   BD Demands Coverage From National Union.

In June 2014, more than 16 years after RTI first sued BD and more than a decade after BD settled the RTI Action, BD first requested insurance coverage from National Union.  (Ex. 44.)  In a letter from M&E, BD demanded coverage for the $100 million it paid to settle the RTI Action, plus defense costs, under three excess liability policies issued by National Union:  (1) Policy No. BE 3091479, effective October 1, 1994-1997; (2) Policy No. BE 9328155, effective October 1, 1997-1999; and, (3) Policy No. BE 3574259, effective October 1, 1999-2002 (collectively, the "1994, 1997 and 1999 Policies").  (Exs. 3-5.)  National Union denied BD's request for coverage on multiple grounds.  (Ex. 46.)

In September 2014, almost a decade after the first Class Action was filed, and well after the Class Actions were settled, BD first requested coverage from National Union for the $67 million it paid to settle those cases, and related defense costs, under the 1994, 1997, and 1999 Policies.  (Ex. 47, 48.)  BD also sought coverage under two additional National Union excess liability policies:  (1) Policy No. BE 3087644, effective October 1, 1985 to April 1, 1994 (Ex. 1); and (2) Policy No. BE 3087643, effective April 1, 1993 to October 1, 1994 (Ex. 3) (collectively, the "1993 Policies" and, with the 1994, 1997, and 1999 Policies, the "Policies"). (*Id.*)  National Union again denied BD's request for coverage.  (Exs. 49, 50.)

## IV.    THE CURRENT PROCEEDING.

On July 9, 2014, National Union filed an action in this Court seeking a declaration that it has no duty to indemnify BD for the amounts BD paid to defend and settle the RTI Action ("BD I").  (ECF No. 1.)  BD I was assigned to Your Honor.  On January 30, 2017, National Union filed an action in this Court seeking a declaration that it has no duty to indemnify BD for the amounts it paid to defend and settle the Class Actions ("BD II").  (2:17-cv-00691, ECF No. 1.)  BD II was assigned to then Chief Judge Linares.  In May 2018, Chief Judge Linares deemed BD I and BD II related under Local Civil Rule 40.1(c) and assigned BD II to Your Honor.  (*See* 2:17-cv-00691, ECF No. 54.)  In June 2018, Your Honor ordered BD I and BD II consolidated under Civil Action No. 2:14-cv-04318.  (ECF No. 163.)

## ARGUMENT

Under well-settled New Jersey law, BD bears the burden of establishing that it is entitled to coverage under the Policies for the amounts that it paid to defend and settle the RTI Action and Class Actions.  *See Shaler ex rel. Shaler v. Toms River Obstetrics & Gynecology Assocs.*, 383 N.J. Super. 650, 662 (App. Div. 2006); *Sears Roebuck and Co. v. National Union Fire Ins. Co. of Pittsburgh, Pa.*, 340 N.J. Super. 223, 233-34 (App. Div. 2001), *certif. denied* 169 N.J. 608 (2001).  Discovery, which is now complete, has established that BD cannot do so.

I.   **BD CANNOT ESTABLISH THAT IT IS ENTITLED TO COVERAGE UNDER THE ADVERTISING LIABILITY PROVISION IN THE 1993 POLICIES FOR THE AMOUNTS IT PAID TO SETTLE THE ANTITRUST CLAIMS IN THE UNDERLYING ACTIONS.**

A.   The Advertising Liability Provision In The 1993 Policies Is The Only Coverage Provision Still At Issue.

Although the language of the five Policies under which BD seeks coverage varies to some extent, each provides coverage for "loss," *excess of the amounts paid by the underlying primary insurers*, that BD "shall become legally obligated to pay as damages … because of Bodily Injury, Property Damage, Personal injury or Advertising Injury …."[3]  (*See, e.g.*, Ex. 3, at NU000291.)[4]  BD seeks coverage only under the Advertising Liability/Injury and Personal Injury provisions in those Policies.  (SUMF ¶ 13.)  In light of the Court's prior ruling, however, both the Policies and coverage grants at issue are even more limited.

In BD II, before consolidation, National Union filed a motion for judgment on the pleadings ("MJOP") arguing that the claims BD settled did not trigger

---

[3]   In the 1994, 1997 and 1999 Policies, the provision is referred to as "Advertising Injury."  (*See, e.g.*, Ex. 3 at NU000293.)

[4]   As BD concedes (*see* Ex. 10, BD Tr. at 232:13-22, 234:5-21), an insured becomes "legally obligated to pay" only *after* a judge's or jury's determination of its liability *or a settlement to which National Union consents*.  *See Bacon v. Am. Ins. Co.*, 131 N.J. Super. 450, 459 (Law. Div. 1974), *aff'd,* 138 N.J. Super. 550 (App. Div. 1976) ("[T]he insured must have in hand a final judgment of damages or a settlement agreement of 'proper' form, that is, *one involving the insurer* as well as the claimant.") (emphasis added).  BD has neither.  (SUMF ¶¶ 3-4, 7-8.)  Summary judgment should be granted for this reason alone.

coverage under the Personal Injury or Advertising Liability/Injury provisions.  (*See* 2:17-cv-00691, ECF No. 17.)  Chief Judge Linares largely agreed, holding that discovery was only necessary to determine whether BD can establish it is entitled to coverage under the "unfair competition" language in the Advertising Liability provision – which appears *only* in the 1993 Policies.  (*See id.*, ECF No. 31 at 9.)

That is, the Court determined, at least implicitly, that the Advertising Liability provision in the 1993 Policies is the only coverage provision still at issue. BD recognized as much when it sought leave in October 2018 – *after* Chief Judge Linares's decision – to amend its counterclaim in BD I to also seek coverage for the RTI Action under the 1993 Policies, a claim it had not originally pursued but understood had been rendered essential.  (*See* ECF No. 181.)

B.    <u>Discovery Established That BD Seeks Coverage For Its Settlement Of The Antitrust Claims In The Underlying Actions.</u>

To establish coverage under the Advertising Liability provision in the 1993 Policies, BD must prove that when it settled the RTI Action and Class Actions, it faced at least potential liability for claims *that would have been covered* had a judge or jury found BD liable for those claims:

> Q.    … But, sir, you've been in insurance for a long time.  You understand that a basic premise of insurance coverage is to say that if you settle, let's look at what you would have been found liable for and whether there would be insurance coverage had you been found liable; correct?
>
> A.    I believe you, right.

(Ex. 10, BD Tr. at 122:15-21.)  *See also Building Materials Corp. of Am. v. Allstate Ins. Co.*, 424 N.J. Super. 448, 463 (App. Div. 2012) (insured must establish settlement included payment for covered claims).

The complaints in the Class Actions that BD settled only contained counts for violations of the Sherman and Clayton Acts.  (*See* Exs. 18, 19.)  While the complaint in the RTI Action initially contained a claim for disparagement, prior to settlement RTI ████████████████████████████████████████ ██████████ (Ex. 10, BD Tr. At 196:10-13; SUMF ¶ 2.)  Accordingly, although BD "underst[ood]" that it "did not have insurance coverage for antitrust claims" (*see* Ex. 8, Young Tr. at 83:16-25), BD must now establish that it did.

C.    The "Unfair Competition" Language In The Advertising Liability
      Provision Does Not Provide Coverage For Antitrust Claims.

The 1993 Policies state that Advertising Liability "shall mean" liability for damage because of:

(a) unintentional Libel, Slander or Defamation of Character;

(b) Infringement of copyright or title or of slogan;

(c) piracy or *unfair competition* or idea misappropriation under an implied contract;

(d) Invasion of the rights of privacy,

committed or alleged to have been committed during the policy period in any advertisement, publicity article, broadcast or telecast and arising out of [BD's] advertising activities.

(Ex. 1 at NU006375 (emphasis added); Ex. 2 at NU006277.)  Like the other torts in this provision, "unfair competition" is undefined.  In the absence of a definition, an insurer's words must be interpreted in accordance with their plain and usual meaning.  *See Cypress Point Condo. Ass'n, Inc. v. Adria Towers, LLC*, 226 N.J. 403, 425 (2016); *Zacarias v. Allstate Ins. Co.*, 168 N.J. 590, 594-95 (2001).

In connection with National Union's MJOP in BD II, the Court stated that "[w]hile Plaintiff attempts to provide a definition for the term 'unfair competition' in its briefs, and while that definition may ultimately be true, the Court cannot rule that, as a matter of law, Defendant does not enjoy coverage under the policies," at least before permitting discovery to proceed.  (2:17-cv-00691, ECF No. 31, at 9.) With discovery now complete, it is clear that – as BD agrees – the plain and usual meaning of "unfair competition" *does not include* antitrust claims.

The District of New Jersey has explained that, while "amorphous," the offense of "unfair competition" is not "boundless":

> The law of unfair competition has its roots in the common-law tort of deceit: its general concern is with protecting consumers from confusion as to source.  It has been stated that "[t]he essence of unfair competition is the practice of palming off one's product as that of another." Most cases of unfair competition encompass one of two business torts: the passing off of one's goods or services as those of another and unprivileged imitation. Thus, "[a]lthough it is impossible to categorize all acts which constitute unfair competition, there are a few fundamental elements that are definite … it consists of the misappropriation of one's property by another …."

*Aetrex Worldwide, Inc. v. Sourcing for You, Ltd.*, No. 13-1943 (DMC)(MF), 2013 WL 1680258, *6 (D.N.J. Apr. 16, 2013), *aff'd*, 555 F. App'x 153 (3d Cir. 2014) (citations omitted); *Sussex Commons Outlets, L.L.C. v. Chelsea Prop. Grp., Inc.*, No. A-3714-07T1, 2010 WL 3772543, *9 (N.J. Super. Ct. App. Div. Sept. 23, 2010) ("New Jersey courts have noted that … unfair competition is a business tort, generally consisting of the misappropriation of a business's property ….").[5]

Such an interpretation is consistent with the well-settled meaning of the other offenses listed alongside "unfair competition" in the Advertising Liability provision, such as piracy and idea misappropriation (*see Baer v. Chase*, 392 F.3d 609, 627 (3d Cir. 2004) and *N.J.S.A.* 2C:21–21), another factor considered by New Jersey courts when construing undefined terms in an insurance policy:

> [I]t is well understood that "the meaning of words may be indicated and controlled by those with which they are associated …." As particularly relevant in the insurance world—where scriveners often use series of similar words … as the means of reaching or ensuring a particular goal—'words of a feather flock together.'  Consequently, we reject the contention that a phrase … may be given a far greater scope than its neighboring phrases.

---

[5]  Decisions from other jurisdictions are in accord.  *See, e.g.*, *Open Software Found., Inc. v. U.S. Fid. & Guar. Co.*, 307 F.3d 11, 17-19 (1st Cir. 2002) (finding that, consistent with the "approach of a majority of jurisdictions," the "unfair competition" provision in the advertising liability provision of an insurance policy "refer[s] to conduct that causes confusion on the part of consumers, such as palming off or passing off"); *Standard Fire Ins. Co. v. Peoples Church of Fresno*, 985 F.2d 446, 450 (9th Cir. 1993) ("Within the context of the standard CGL policy, 'unfair competition' can only refer to the common law tort.").

*Gil v. Clara Maass Med. Ctr.*, 450 N.J. Super. 368, 386 (App. Div. 2017).

Regardless of the precise scope of the offense of "unfair competition," there can be no reasonable dispute that it *does not include antitrust claims*. "Participation in a conspiracy to violate federal antitrust law is both deliberate and criminal …." *Rose Acre Farms, Inc. v. Columbia Cas. Co*, 662 F.3d 765, 769 (7th Cir. 2011). "[I]t is highly implausible to suppose that 'unfair competition' in a list of torts … would sweep under the policy … liability" for such conduct. *See USX Corp. v. Adriatic Ins. Co.*, 99 F. Supp. 2d 593, 619 (W.D. Pa. 2000), *aff'd*, 345 F.3d 190 (3d Cir. 2003).

BD cannot meet its burden to establish otherwise. Indeed, even BD has taken the position that the offense of "unfair competition" does not include antitrust claims. In 2007, RTI again sued BD for, among other things, violations of the Sherman Act ("RTI II"). (*See* Ex. 20; Ex. 10, BD Tr. at 39:15-40:6.) In RTI II, BD argued to the Fifth Circuit and then the U.S. Supreme Court that:

> The antitrust laws "do not create a federal law of unfair competition …." … [T]he Fifth Circuit [has] recognized that "the purposes of antitrust law and unfair competition law generally conflict." … That is because "[u]nfair competition is still competition." … It is "the elimination of the competition," not an "unfair method" of competing, "that is the concern of the antitrust law."

(Ex. 22 at 6-7 (citations omitted); *see also* Ex. 21 at 26.)

The Court's "function in construing [an] insurance policy, as with any other contract, is to search broadly for the probable common intent of the parties …."

- 19 -

*Bello v. Hurley Limousines, Inc.*, 249 N.J. Super 31, 40 (App. Div. 1991).  As BD's statements to the U.S. Supreme Court and the testimony of Messrs. Weber, Hector, and Young establish, BD had no expectation that the term "unfair competition" in the Advertising Liability provision of the 1993 Policies would provide coverage for the antitrust claims that it settled.  BD's contrary arguments now, triggered by review of a Law360 Article, do not establish otherwise.

      D.    <u>The "Conduct" BD Identified Also Does Not Trigger Coverage Under The Advertising Liability Provision In The 1993 Policies.</u>

Because BD recognized "that antitrust claims didn't fall within the ambit of whatever … policy [it] had" (Ex. 9, Hector Tr. at 159:3-8), BD now asserts it is seeking coverage for certain "conduct" purportedly at issue in the RTI Action and Class Actions, rather than the claims in those lawsuits for which BD faced potential liability.  (*See* Ex. 10, BD Tr. at 71:7-16 ("Yes, [the settled claims] assert causes of action for Sherman Act violations ... [b]ut we're seeking coverage for the conduct.").)  BD's shift in tactics does not rescue its coverage claims.

      1.    *After Two Years, BD Finally And Begrudgingly Identified The "Conduct" It Asserts Triggers Coverage Under The 1993 Policies.*

From the moment the RTI Action and Class Actions were filed until the moment they were settled, the individuals at BD handling those cases understood that ██████████████████████████████████████████████

██████████████████████████████████████████████████

████████████ and that the "crux" of the Class Actions was whether "Becton's contracts and discount pricing programs ... stifled competition …." (Ex. 16, at BD_RTI 2810; Ex. 31 at 4.) Thus, as Mr. Hector testified, BD settled those actions because the damages it faced for its alleged violations of the Sherman and Clayton Acts posed an "existential threat" to the company (*see supra* at 7):

> Q.   And when [BD] decided to pay $100 million [to settle the RTI Action] at least you as [the] person – the senior litigator in charge of this case knew that RTI had abandoned its disparagement claims, correct?
>
> A.   I suppose I did. *The more important thing I knew [was] that the antitrust claims were still there*. …
>
> Q.   And at the time you [BD] were all in agreement to pay $45 million to settle these [Class Actions] claims, at least your understanding of the claims was illegal and anticompetitive conduct that resulted in Becton overcharging for the goods bought by these plaintiffs, correct?
>
> A.   *That's the lawsuit we were settling*.

(Ex. 9, Hector Tr. at 116:3-9, 156:19-25 (emphasis added).)

BD's contrary assertion now – that it paid millions to avoid potential liability for advertising-related conduct – is no more than a story concocted by BD's new Head of Litigation and new Director of Risk Management, neither of whom were involved in litigating the Underlying Actions, when they decided to chase the proverbial golden goose. It is not surprising, therefore, that BD struggled, and at times simply refused, to identify the purported advertising

conduct in the Underlying Actions on which it now seeks to rely to recoup the amounts it paid to defend and settle antitrust claims.

Efforts to get BD to identify that conduct began in October 2018, when BD sought leave to seek coverage for the RTI Action under the 1993 Policies.  (*See* ECF No. 179.)  In connection with that request, Chief Magistrate Judge Falk ordered BD to "provide a substantive response" to the following interrogatory:

> Identify each instance of 'unfair competition … alleged [by RTI] to have been committed during the policy period [10/1/85-10/1/94] in any advertisement, publicity article, broadcast or telecast and arising out of [BD's] advertising activities.'

(*Id.* at 3.)  In response, BD provided a seven-page, single-spaced narrative drafted by counsel that referenced 33 exhibits.  (*See* ECF No. 215; Ex. 53.)  BD also provided an eleven-page single-spaced narrative and 50 exhibits in response to a similar interrogatory in the Class Actions.  (Exs. 54, 55.)

National Union combined BD's interrogatory responses and the referenced exhibits into bound volumes that were marked "PX 63" for the RTI Action and "PX 68/69" for the Class Actions.  (*See* Exs. 53, 54, 55.)  As BD represented to both Chief Magistrate Judge Falk and Your Honor, BD's corporate representative had "confirmed repeatedly 'that all information and documents supporting BD's claim for coverage for the RTI Action, if any, were contained solely in BD's

Supplemental [Interrogatory] Responses.'"  (ECF No. 220, at 17; ECF No. 231-1,

at 27; *see also* Ex. 10, BD Tr. at 188:1-5, 190:9-23, 265:7-19.)[6]

Nevertheless, BD's corporate representative, Andrew Walpole, who was one

of the individuals who decided to seek coverage from National Union in 2014,

could not identify any document or information referenced in PX 63 or PX 68/69

that RTI or the plaintiffs in the Class Actions relied on to allege unfair competition,

in an advertisement, during the policy periods of the 1993 Policies:

> Q.   Please identify – as the corporate designee who had knowledge
>      of that topic, please identify each instance of unfair competition
>      alleged by RTI to have been committed during the policy
>      period.
>
> A.   I'm not able to do that.

(Ex. 10, BD Tr. at 273:17-22; *see also id.* at 125:10-15, 268:19-269:2, 379:5-21,

380:8-20 (answering similar questions regarding Class Actions).)  Instead, Mr.

---

[6]   On November 2, 2020 – after the close of discovery, more than five weeks after
      the Court-ordered resumption of BD's deposition, and despite BD's
      representations to the Court that "all information and documents supporting
      BD's claim for coverage" were "contained solely" in PX 63 and PX 68/69 – BD
      identified *approximately 260 additional documents* totaling *more than 8,000
      pages* that it now asserts it may rely on to support its claim for coverage.  (*See*
      Ex. 59.)  Should BD seek to rely on any of those documents in support of its
      opposition to summary judgment, National Union reserves the right to seek an
      order from the Court, under Rule 37 of the Federal Rules of Civil Procedure,
      precluding BD from doing so.

Walpole refused to do anything more than simply reference the responses in PX 63 and PX 68/69, which were drafted by counsel.  (*Id.* at 266:9-19, 269:3-270:2.)

Chief Magistrate Judge Falk granted National Union's subsequent motion to compel, finding BD's evasiveness on this key issue "improper and unfair":

> [W]hen Mr. Walpole was questioned on th[is] key issue, [he] repeatedly referred generally (not specifically) to the lengthy 7-page interrogatory with 400 pages of documents attached.  When asked for specificity, he apparently was unable to answer and refused to … answer the questions specifically.  *This is improper and unfair.* … The wholesale reference to a multi-page interrogatory answer prepared by a lawyer … is not sufficient.

(ECF No. 225, at 8-9 (emphasis added) (granting additional corporate testimony); *see also* ECF No. 249 (Cecchi, J., denying BD's appeal).)

At the Court-ordered resumption of BD's deposition, almost two years after Chief Magistrate Judge Falk first ordered BD to provide the information, Mr. Walpole finally identified the "conduct" that BD now asserts triggers coverage under the offense of "unfair competition" in the Advertising Liability provision of the 1993 Policies.  Specifically, BD identified "campaigns" called "Block Terumo" and related programs – the "Cost Reduction Initiative," "EpiNet," and the "Safety Compliance Initiative" – as well as "Block Terumo II."  (SUMF ¶ 16.)[7]  BD's interrogatories, and its witness's testimony, provide context for these campaigns.

---

[7]   Mr. Walpole also identified a "Guest Editorial" written by Gary Cohen, a former marketing executive at BD.  (SUMF ¶ 16; *see also* Ex. 54, at Tab 4D.) Mr. Walpole had no idea where or precisely when that "Guest Editorial" was



(Ex. 7, Transcript of Deposition of Louis Scott ("Scott Tr.") at 41:2-43:20.)  To compete against Terumo, BD retained Louis Scott & Associates, an independent marketing consultant, and began "Block Terumo" "in earnest" in 1988.  (*See* Ex. 54 at 8; Ex.7, Scott Tr. at 53:15, 88:3-11, 89:1-14.)

As Mr. Scott testified,

As a result, BD changed tactics:

> Meeting resistance from hospitals because of Safety-Lok's price, BD devised its next large marketing and advertising campaign to

published (*see* Ex. 11, BD Tr. II at 30:5-6; 31:1-32:5) – indeed, BD stamped that document "CONFIDENTIAL FOR OUTSIDE COUNSEL ONLY," suggesting it may never have been published at all.  Regardless, the editorial simply advocates for government guidelines, rather than mandates, relating to hospitals' use of safety needles since such products were in the early stages of development.  (*See* Ex. 54, at Tab 4D.)  That hardly qualifies as unfair competition, in an advertisement, sufficient to trigger coverage for BD's settlement of claims that it violated U.S. antitrust laws.

emphasize the value of BD's products.  Named the Cost Reduction Initiative ("CRI"), the new program featured various components to educate purchasers about BD's safe and cost-effective needles.  As part of CRI, BD associated itself with a leading authority on needle sticks, Janine Jagger [a professor at University of Virginia Medical School].  BD and Jagger developed and sponsored EpiNet, a program … that tracked and calculated the costs, for hospital users, associated with needle sticks, thereby highlighting the costs savings of buying safety products to prevent sticks.

(Ex. 54, at 13; *see also* Ex. 7, Scott Tr. at 90:14-21.)

"BD [also] launched its Safety Compliance Initiative ("SCI") in the late 1980s."  (Ex. 53 at 5.)  As Mr. Scott explained, 

Essentially, BD sought to show hospitals that, whatever its price, BD's Safety-Lok needle was a critical part of its efforts to reduce the significant costs associated with accidental needle sticks.  (*See* Ex. 7, Scott Tr. at 53:15-55:15.)

2.    *BD Cannot Establish That The "Conduct" It Identified Amounts To Unfair Competition, In An Advertisement, As Part Of BD's Advertising Activities, During The Policy Periods Of The 1993 Policies.*

Now that BD finally identified the "conduct" it claims triggers coverage for the settlement of the Underlying Actions, its reticence to do so makes sense.  The Advertising Liability provision of the 1993 Policies provides coverage *only* for "unfair competition" and *only* if it was "alleged to have been committed [i] during the policy period [ii] in any advertisement, publicity article, broadcast or telecast and [iii] arising out of the Named Insured's advertising activities."  (*See, e.g.*, Ex. 2 at NU006277.)  The conduct BD identified does not satisfy these requirements.[8]

For the RTI Action, BD seeks coverage under the 1993 Policies starting on January 1, 1993.  (*See* Ex. 10, BD Tr. at 347:2-22.)  BD's sworn interrogatory responses and corporate testimony, however, establish that Block Terumo, and related programs, "officially ended in 1992."  (SUMF ¶ 17.)[9]  Coverage under the 1993 Policies ends on October 1, 1994.  (*See* Exs. 1, 2.)  Although BD provided virtually no information about Block Terumo II, Mr. Walpole confirmed that it did

---

8    Chief Judge Linares did not consider these requirements because discovery in BD II had not yet started at the time of the Court's decision on National Union's MJOP.  (*See* 2:17-cv-00691, ECF No. 31.)

9    In an effort to identify an advertisement during the 1993/94 time period, Mr. Walpole identified a chart produced by BD.  (*See* Ex. 54, Tab 12B.)  Other than parroting baseless assumptions he learned from counsel, Mr. Walpole had no idea when that chart was created, by whom, and precisely what it was meant to show.  (*See* Ex. 11, BD Tr. II at 61:9-17, 62:10-16.)

not begin until late 2001 or 2002.  (SUMF ¶ 18.)  Accordingly, BD cannot satisfy its burden to establish that the conduct on which it relies to trigger coverage for the RTI Action *occurred during the policy periods* of the 1993 Policies.

BD seeks coverage for the Class Actions beginning on October 1, 1985, the date that BD claims the "groundwork" for Block Terumo began.  (Ex. 10, BD Tr. at 354:2-7, 354:12-15.)  Again, since Block Terumo "officially ended in 1992" and Block Terumo II did not begin prior to 2001 (SUMF ¶¶ 17-18), whatever conduct was at issue and whatever advertisements may have been used could not have occurred or been published during the policy period of Policy BE3087643 (one of the two 1993 Policies), which only covers conduct that occurred between April 1, 1993 and October 1, 1994.  (*See* Ex. 2.)  Although Policy BE3087644 (the other of the 1993 Policies) covers conduct that occurred as early as October 1, 1985 (*see* Ex. 1), that policy does not provide coverage for the Class Actions for multiple additional reasons – reasons that also apply to Policy BE3087643.

For example, to trigger coverage under the 1993 Policies, BD must establish that it faced at least potential liability for the claims it settled.  But BD could not have faced *potential liability* for any conduct at issue in the Block Terumo and related campaigns that occurred outside the limitations period.  The Supreme Court has consistently held that to assert a timely claim, an antitrust plaintiff must prove its injury resulted *from conduct within the four-year limitations period.  See Klehr*

*v. A.O. Smith Corp.*, 521 U.S. 179, 189-90 (1997); *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971); *see also* 15 U.S.C. § 15b.

Accordingly, regardless of how far back BD's misconduct began, BD could not have faced liability in the RTI Action for conduct prior to 1997, four years prior to the filing of the RTI Action, and BD could not have faced liability in the Class Actions for conduct that occurred prior to 2001, four years before the first Class Action complaint was filed.  (Exs. 13, 17)  Thus, any conduct in the Underlying Actions for which BD could have faced potential liability could not have occurred until well after the end of the policy periods of the 1993 Policies.

Further, BD did not identify any advertisements published in connection with Block Terumo and related campaigns that RTI or the plaintiffs in the Class Actions alleged, much less established, were false.  (*See* Ex. 10, BD Tr. at 355:3-6.)  Indeed, in RTI II, which BD asserts was based on the same conduct as the RTI Action (*see* Ex. 10, BD Tr. at 13:10-18, 40:7-14), it was determined, after a trial on the merits, that the first instance of any purportedly *false* advertising by BD occurred no earlier than 2003.  (Ex 20, *Retractable Techs., Inc. v. Becton Dickinson & Co.*, 842 F.3d 883, 893 (5th Cir. 2016).)  Simply put, improving product quality and selling value do not constitute *unfair* competition.

Regardless, neither the Fifth Circuit nor the Third Circuit (where the RTI Action and Class Actions were pending) recognize antitrust claims based on false

advertising.  As BD argued, "a competitor's misleading statements about its own and another competitor's products d[o] not constitute a restraint on competition, and thus d[o] not give rise to a claim under the antitrust laws."  (Ex. 21 at 27; *see id.* at 1 ("Under this Court's own precedents, false advertising … [is] not [an] antitrust violation[.]").) *See also Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123, 132 (3d Cir. 2005) ("wrong, misleading, or debatable" arguments relating to a product's merits do not raise antitrust concerns).

## II.   BD CANNOT ESTABLISH IT IS ENTITLED TO COVERAGE UNDER THE ADVERTISING INJURY PROVISION IN THE 1994, 1997 AND 1999 POLICIES, OR THE PERSONAL INJURY PROVISION IN ANY OF THE POLICIES.

BD also seeks coverage under the Advertising Injury provision in the 1994, 1997 and 1999 Policies and the Personal Injury provision in all five Policies. (SUMF ¶ 13.)  As discussed, the Court already determined that BD is not entitled to coverage under those provisions and policies.  (*See supra* at 14-15.)  Discovery established that any argument by BD that there is coverage available under those provisions and policies would be without merit.

*First,* while similar to the Advertising Liability provisions in the 1993 Policies, the Advertising Injury provisions in the 1994, 1997 and 1999 Policies only provide coverage for "injury arising *solely* out of [BD's] advertising activities …."  (*See, e.g.*, Ex. 3 at NU000293 (emphasis added).)  Yet BD concedes that ███

████████████████████████████████████████████████████████

████████████████████████████████████████████ and the

"crux" of the Class Actions was whether "Becton's contracts and discount pricing

programs … stifled competition …." (*See supra* at 20-21.)  It cannot, therefore, be

disputed that the "injury" alleged in the RTI Action and the Class Actions did not

arise *solely* out of BD's advertising activities.  (*See, e.g.*, Ex. 3 at NU000293.)

      *Second*, and notably, neither the definition of Advertising Injury in the

1994, 1994 and 1999 Policies nor the definition of Personal Injury in any of the

Policies provides coverage for "unfair competition."  (*See, e.g.*, Ex. 3 NU000293,

295-96.)  Instead, BD seeks to rely on the offenses of "[o]ral, written, or electronic

publication of material that slanders or libels a person or organization, or

disparages a person's or organization's goods products, or services" to support its

claim for coverage under those policies.[10]  (Ex. 10, BD Tr. at 208:9-24.)

      Yet neither the RTI Action nor the Class Actions asserted a cause of action

for libel or slander (*see* Exs. 13, 18, 19), nor could they have done so.  Under the

laws of Texas and New Jersey (where the RTI Action and Class Actions were

---

[10] Again, the Advertising Injury provision requires the libel, slander or
disparagement to take place in an advertisement and as part of BD's advertising
activities.  (*See, e.g.*, Ex. 5, at NU379.)  Personal Injury in the Policies,
however, "means injury arising out of your business, *other than … Advertising
Injury*, caused by one or more of the following offenses: … oral, written, or
electronic publication of material that slanders or libels a person or
organization, or disparages a person's or organization's goods products, or
services."  (*Id.* at NU382 (emphasis added).)

pending), libel and slander require a *false statement*.  *See Albion Eng'g Co v. Hartford Fire Ins. Co.*, 779 F. App'x 85, 88 (3d Cir. 2019); *Forbes Inc. v. Granada Biosciences, Inc*., 124 S.W.3d 167, 170 (Tex. 2003).  As noted above (*see supra* at 29), neither RTI nor the Class Action Plaintiffs alleged, much less established, that anything published in connection with Block Terumo was false.

 *Third,* while the RTI Action did initially contain a claim for disparagement, as noted above, RTI acknowledged prior to settlement that BD was entitled to summary judgment on that claim.  (SUMF ¶ 2.)  Regardless, discovery established that the disparagement claim pleaded in the RTI Action could not have triggered coverage under the Policies.  RTI was not incorporated until 1994 and did not start selling the VanishPoint until 1997.  (*See supra* at 3-4.)  Thus, BD did not make (and could not have made) disparaging statements about RTI's products in the Block Terumo campaign, which ended by 1992.  (SUMF ¶ 17.)

 Instead, according to BD's current theory, BD made statements about the safety of its own products that somehow implicitly disparaged RTI's future, yet-to-be-sold, products.  (*See* Ex. 10, BD Tr. at 274:15-25.)  But neither Texas nor New Jersey law recognizes a claim for *implicit disparagement*.  *See Forbes*, 124 S.W.3d at 170; *Albion*, 779 F. App'x at 90 ("New Jersey law … does not recognize a claim for implicit disparagement or defamation …. [A] plaintiff must allege the defendant published false statements about the plaintiff's product.")

Further, the Policies provide coverage only for amounts "the Insured becomes legally obligated to pay … *because of* … Personal Injury or [] Advertising Injury."  (*See* Ex. 5, NU376 (emphasis added).)  Courts have relied on such language to reject efforts to expand coverage to lawsuits brought by plaintiffs who never *themselves* suffered any disparagement, such as the plaintiffs in the Class Actions.  *See, e.g.*, *Info. Spectrum, Inc. v. Hartford*, 364 N.J. Super. 54, 66-67 (App. Div. 2003), *aff'd*, 182 N.J. 34 (2004); *Great Am. Ins. Co. v. Riso, Inc.*, 479 F.3d 158, 162 (1st Cir. 2007).

*Fourth*, the timing of the "conduct" that BD claims triggers coverage under the Policies again renders that conduct insufficient to do so.  As noted, BD concedes that Block Terumo and related campaigns "officially ended in 1992." (SUMF ¶ 17.)  Mr. Walpole also confirmed that Block Terumo II did not begin until late 2001 or 2002.  (SUMF ¶ 18.)  Accordingly, the conduct on which BD seeks to rely to trigger coverage did not *take place during the policy periods* of the 1994, 1997 and 1999 Policies, which began on October 1, 1994 and ended (for purposes of this case (*see* Ex. 10, BD Tr. at 354:2-7)) on January 30, 2001.

As also discussed above, BD could not have faced liability for any conduct at issue in Block Terumo and Block Terumo II that occurred outside the four-year limitations period for the federal antitrust claims pled in the Underlying Actions. (*See supra* at 28-29.)  Thus, in the RTI Action, BD only faced liability for conduct

that occurred after 1997, four years before that action was filed, and in the Class

Actions, BD only faced liability for conduct that occurred after 2001, four years

before the first class action complaint was filed.  (*See id*.)  Because BD did not

face liability before those time periods, BD cannot establish it is owed coverage for

the RTI Action under any pre-1997 Policies and for the Class Actions under any

pre-2001 Policies.  *See Bacon*, 131 N.J. Super. at 459.

Further, BD asserts that the purported conduct for which it faced liability in

the Underlying Actions was one continuous "pattern of behavior" that occurred

"over a protracted period of time" that began in 1985 and continued for years.  (*See*

Ex. 10, BD Tr. at 402:8-403:19.)  Discovery established that by 1998, when the

RTI State Action was filed, BD was on notice of allegations that it had engaged in

that continuous "pattern of behavior."  (*See supra* at 4.)

As BD admits, it was not seeking to – nor could it – buy insurance coverage

for that ongoing, continuous "pattern of behavior" after that point:

> Q.    And based on your testimony before, now that these allegations
>       have been made against the company, they couldn't seek
>       coverage for those allegations under future policies; correct?
>       …
>
> A.    That would typically be correct, yes.

(Ex. 10, BD Tr. at 159:12-18; *see also id.* at 161:9-12 ("Q. Becton was not seeking

to buy coverage for conduct that had already occurred and that it knew about;

correct?  A.  Correct.")); *see also* 20-129 Appleman on Insurance Law & Practice

Archive § 129.2 (2nd 2011) ("A covered fortuitous event is one which is dependent on chance as far as the parties to the insurance contract (insured and insurer) are concerned."); *Astro Pak Corp. v. Fireman's Fund Ins. Co.*, 284 N.J. Super. 491, 498 (App. Div. 1995) (same).  BD cannot establish it is owed coverage for any of the Policies in place after August 1998.

## III.   BD ALSO IS NOT ENTITLED TO COVERAGE BECAUSE IT VIOLATED KEY CONDITIONS OF THE POLICIES.

A.   <u>BD Violated The Notice Provisions Of The Policies.</u>

The Policies require BD to notify National Union "as soon as practicable" of an occurrence that may result in a claim.  (*See, e.g.*, Ex. 5 at NU392-93.)  The RTI Action was first filed in 1998, and the Class Actions were first filed in 2005.  (Exs. 12, 17.)  BD's Director of Risk Management had knowledge of those lawsuits when they were filed.  (Ex. 8, Young Tr. at 91:21-25, 157:15-18, 170:23-171:7.)  Yet BD did not request coverage for the RTI Action or Class Actions until 2014, well after BD settled those claims.  (Exs. 39, 45.)  This significant delay undoubtedly constitutes late notice.  *See, e.g.*, *Peskin v. Liberty Mut. Ins. Co.*, 219 N.J. Super. 479, 481 (App. Div. 1987) (notice untimely 11 years after occurrence and 21 months after suit); *Ethicon, Inc. v. Aetna Cas. & Sur. Co.*, 805 F. Supp. 203, 205-06 (S.D.N.Y. 1992) (applying New Jersey law to find "appreciable prejudice by reason of [insured's] 16 years' late notice").

BD likely will argue that its breach of the Policies' notice provisions does not matter because National Union cannot show it suffered appreciable prejudice as a result.  BD is wrong.  As an initial matter, BD's egregious disregard of the notice provisions of the Policies warrants a *prima facie* finding of appreciable prejudice.  *See Perini/Tompkins Joint Venture v. Ace Am. Ins. Co.*, 738 F.3d 95, 104-105 (4th Cir. 2013) (finding prejudice as a matter of law under egregious circumstances); *Herman Bros., Inc. v. Great West Cas. Co.*, 582 N.W.2d 328, 336 (Neb. 1998) (same).  Appreciable prejudice must be found here unless the notice requirements of an insurance policy are to be disregarded altogether.

Further, as a result of BD's intentional breach of the Policies' notice provisions, and even assuming there was coverage, National Union irretrievably lost, among other things, its right to: (i) ensure that *all* insurers were put on notice and pursued; (ii) perform a contemporaneous investigation of the facts as the cases were litigated;[11] (iii) oversee counsel retained to defend the Underlying Actions, who were paid almost $100 million; (iv) ensure that BD did not, as it now claims it did, pay millions to settle claims for libel, slander and disparagement that were either never pled or were abandoned by plaintiffs; and (iv) participate in settlement

---

[11]  Because of BD's intentional delay in seeking coverage from National Union, at least one witness died before they could testify, and numerous other witnesses had significant memory lapses on key issues.  (*See, e.g.*, Ex. 8, Young Tr. at 69:23-25, 70:23-71:5, 111:13-19; 120:5-8, 13-21; 125:15-19; Ex. 10, BD Tr. at 141:7-142:21, 143:19-20, 145:1-3, 168:3-25.)

discussions and evaluate the proposed terms, including the proper allocation of settlement amounts.[12]  (SUMF ¶ 20.)

Instead, years after resolution of the Underlying Actions, BD dumped millions of pages of documents – both relevant and irrelevant – on National Union, prohibited National Union from conducting a full and fair investigation and discussing the lawsuits with the counsel who represented BD, permitted coverage counsel to push theories with respect to the Underlying Actions that are wholly inconsistent with the allegations in the complaints and BD's long-held coverage positions, and then required National Union to undertake years of discovery, and file multiple motions to compel, just to identify the most basic information about BD's claims for coverage.  (SUMF ¶¶ 21-23.)

B.    BD's Violation Of The Voluntary Payments Provisions Is Also An Absolute Bar To Coverage.

Although BD knew it was obligated to do so, it did not seek consent from National Union before settling the RTI Action or Class Actions.  (SUMF ¶¶ 3,7.) As such, whether under the terms of the Policies, case law, or both, and regardless of whether it suffered appreciable prejudice, National Union has no obligation to indemnify BD for the Underlying Actions.  (*See, e.g.*, Ex. 3 at NU000303.); *see*

---

[12]  Under New Jersey law, an insured has the burden to allocate between covered and uncovered losses, and an insurer is only required to indemnify an insured for the covered losses.  *SL Indus., Inc. v. Am. Motorists Ins. Co*., 128 N.J. 188, 215 (1992).

*also New Jersey Eye Ctr. P.A. v. Princeton Ins. Co.*, 394 N.J. Super. 557, 570-71 (App. Div. 2007) (denying coverage to insured who settled lawsuits without insurer's consent, noting that the settlement "represented … a fundamental breach of the insured's obligations"); *Bacon*, 131 N.J. Super. at 459 (same).

## IV.   BD IS NOT ENTITLED TO RECOVER ITS DEFENSE COSTS FROM THE UNDERLYING ACTIONS.

BD seeks to recover the roughly $71 million in defense costs it claims to have incurred in connection with the RTI Action and the $29 million in defense costs it claims to have incurred in connection with the Class Actions.  (*See* Exs. 56, 57.)  A liability insurer, however, is not required to reimburse an insured for pre-tender defense expenses.  *See, e.g.*, *State Nat'l Ins. Co. v. Cnty. of Camden*, 10 F. Supp. 3d 568, 577 n.8 (D.N.J. 2014); *Chem. Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co.*, 817 F. Supp. 1136, 1160-61 (D.N.J. 1993), *aff'd in part and remanded,* 89 F.3d 976 (3d Cir. 1996); *SL Indus.*, 128 N.J. at 198-99.  BD concedes it incurred no defense costs after it first sought coverage for the Underlying Actions in 2014. (SUMF ¶¶ 5, 9.)

Additionally, as an umbrella insurer, National Union had no obligation to reimburse BD for defense costs until BD's primary insurers – Travelers and Kemper – exhausted its per-occurrence limits through payment of damages or a consensual settlement.  (Ex. 10, BD Tr. at 63:25-66:14.)  It is undisputed that neither Travelers nor BD ever exhausted their limits.  (SUMF ¶ 19.)

Finally, the duty to defend is only triggered by the filing of a complaint alleging a covered claim.  *See Abouzaid v. Mansard Gardens Assocs., LLC*, 200 N.J. 67, 77-80 (2011) (citing New Jersey cases).  For all the reasons discussed above, neither of the Underlying Actions alleged a covered claim.

## V.   BD'S COUNTERCLAIMS FOR BAD FAITH ARE WHOLLY WITHOUT MERIT.

BD's counterclaim for bad faith also should be dismissed because, for all the reasons discussed above, National Union is not liable for coverage and thus cannot be found liable for bad faith for refusing to pay such coverage.  *See Hudson Universal, Ltd. v. Aetna Ins. Co.*, 987 F. Supp. 337, 342 n.3 (D.N.J. 1997) ("It is clear that the determination of whether an insurance company has acted in bad faith requires, as a predicate, a determination that coverage exists for the loss claimed by the insured."); *Pickett v. Lloyd's*, 131 N.J. 457, 473-74 (1993) (same).

Regardless, under New Jersey law, an insured's claim of bad faith against an insurer cannot be sustained – even when there is coverage found – when the insurer had a "fairly debatable" reason for disclaiming coverage.  *See Pickett*, 131 N.J. at 471 (an insurer's disclaimer of coverage cannot be held to be in bad faith *unless* the insured can establish it was entitled to summary judgment on the issue of coverage, and the issue was thus not "fairly debatable"); *Arcelormittal Plate, LLC v. Joule Tech. Servs., Inc.*, 558 F. App'x 205, 213 (3d Cir. 2014) (same).  BD can make no such showing here.

As discussed above, there are multiple reasons why BD is not entitled to coverage under any of the Policies for the amounts it paid to defend and settle the antitrust claims at issue in the RTI Action and the Class Actions.  (*See supra* at Argument § I-IV.)   Each of these reasons provided National Union with a "fairly debatable" basis to deny coverage.  It is hard to imagine how BD could argue otherwise, at least in a non-frivolous manner, when BD's Director of Risk Management, two Heads of Litigation, and outside counsel all agreed that BD had no insurance coverage for the RTI Action and Class Actions.  (*See supra* at 5-6, 10.)  BD's counterclaim for bad faith should be dismissed in all events.

## <u>CONCLUSION</u>

For these reasons, National Union respectfully submits that it is entitled to summary judgment granting its requests for a declaration that BD is owed no amounts under the Policies for its defense and settlement of the RTI Action or Class Actions, and dismissing all counterclaims asserted by BD.

Dated:  December 2, 2020                      Respectfully submitted,
         Newark, New Jersey

By:    /s/ Liza M. Walsh        
WALSH PIZZI O'REILLY FALANGA LLP
Liza M. Walsh
Katelyn O'Reilly
Joseph L. Linares
Three Gateway Center
100 Mulberry Street, Floor 15
Newark, New Jersey 07102
(973) 757-1100
lwalsh@walsh.law
koreilly@walsh.law
jlinares@walsh.law

-and-

WILLKIE FARR & GALLAGHER LLP
Christopher J. St. Jeanos
   (admitted *pro hac vice*)
Lynnette Cortes Mhatre
   (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
(212) 728-8000
cstjeanos@willkie.com
lmhatre@willkie.com

*Attorneys for Plaintiff*