# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| | : | |
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., | : | Case No. 2:14-cv-04318-CCC-MF |
| | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| BECTON, DICKINSON AND COMPANY, | : | |
| | : | |
| Defendant. | : | |

## DEFENDANT'S BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

**McCarter & English, LLP**
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
Attorneys for Defendant

Of Counsel
    Anthony Bartell

On The Brief
    Anthony Bartell
    Nicole Corona

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................1

STATEMENT OF THE CASE ................................................................2

I.   The Insurance Policies ................................................................2

     A.   National Union's 1993 Policies ................................................2

     B.   National Union's 1994 And 1997 Policies ................................4

     C.   National Union's 1999 Policy ................................................5

     D.   National Union Leaves Critical Policy Terms Undefined ..................7

II.   The Underlying Lawsuits ................................................................9

     A.   The RTI Action ................................................................9

     B.   The Class Actions ................................................................11

     C.   The Underlying Actions Fall Squarely In The Policies'
         Disparagement And Unfair Competition Coverages ..........................12

         1.   RTI Alleges It Suffered Unfair Competition and
             Disparagement Injury From BD's Conduct During
             The Policies' Periods ................................................13

         2.   The Class Actions Plaintiffs Allege They Suffered
             Unfair Competition and Disparagement Injury
             From BD's Conduct During The Policies' Periods ................18

         3.   The Underlying Plaintiffs Allege They Suffered
             Unfair Competition and Disparagement Injury
             From BD's Advertising And Marketing
             Campaigns ................................................................20

III.    Procedural History ........................................................31

IV.    The Travelers Action ....................................................31

V.     This Court's Denial Of National Union's Prior Dispositive
       Motion...........................................................................32

ARGUMENT ............................................................................32

POINT I                                                                     32

FEDERAL COURT SUMMARY JUDGMENT PRINCIPLES AND
SETTLED NEW JERSEY INSURANCE POLICY INTERPRETATION
LAW PREVENT NATIONAL UNION FROM PREVAILING ON
SUMMARY JUDGMENT ..........................................................32

POINT II                                                                    35

THIS COURT SHOULD DENY NATIONAL UNION SUMMARY
JUDGMENT BECAUSE DISPUTED ISSUES EXIST REGARDING
COVERAGE FOR BD'S COSTS ARISING FROM THE UNDERLYING
ACTIONS' UNFAIR COMPETITION AND DISPARAGEMENT CLAIMS ......35

A.     The Underlying Actions' Unfair Competition Claims Fall
       Within National Union's 1993 Policies.........................................35

B.     The Underlying Actions' Claims Fall Within The
       Disparagement Coverage Of National Union's Policies..............................43

POINT III                                                                   45

THIS COURT SHOULD DENY NATIONAL UNION SUMMARY
JUDGMENT BECAUSE DISPUTED ISSUES PREVENT THE INSURER
FROM ESCAPING ITS COVERAGE OBLIGATIONS BASED ON
ALLEGED LATE NOTICE OR LACK OF CONSENT .......................................45

A.     BD's Risk Management Department Received No Required
       Notice Of The Underlying Actions ..............................................46

ii

B.      Any Late Notice Caused National Union No Appreciable
        Prejudice ........................................................................................47

POINT IV                                                                                54

THIS COURT SHOULD DENY NATIONAL UNION SUMMARY
JUDGMENT BECAUSE DISPUTED ISSUES EXIST REGARDING THE
INSURER'S COVERAGE OBLIGATION FOR BD'S DEFENSE COSTS .........54

POINT V                                                                                 56

THIS COURT SHOULD DENY NATIONAL UNION SUMMARY
JUDGMENT BECAUSE DISPUTED ISSUES EXIST REGARDING THE
INSURER'S BAD FAITH INVESTIGATION OF BD'S COVERAGE
CLAIMS..............................................................................................56

CONCLUSION .....................................................................................57

ME1 35623509v.4

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Amerada Hess Cor. V. Zurich Ins. Co.*,
   29 F. App'x 800 (2002) .....................................................................................54

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)....................................................................................33, 34

*Berne v. Cont'l Ins. Co.*,
   753 F.2d 27 (3d Cir. 1985) .............................................................................53

*Bowersox Truck Sales & Serv., Inc. v. Harco Nat. Ins. Co.*,
   209 F.3d 273 (3d Cir. 2000) ...........................................................................56

*British Ins. Co. of Cayman v. Safety Nat. Cas.*,
   335 F.3d 205 (3d Cir. 2003) ...........................................................................48

*Chem. Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co.*,
   817 F. Supp. 1136 (D.N.J. 1993)...........................................................46, 49, 50

*Chem. Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co.*,
   89 F.3d 976 (3d Cir. 1996) ..................................................................48, 49, 52

*Ethicon, Inc. v. Aetna Cas. and Sur. Co.*,
   737 F. Supp. 1320 (S.D.N.Y. 1990) ................................................................39

*Fed. Ins. Co. v. Purex Indus., Inc.*,
   972 F. Supp. 872 (D.N.J. 1997).......................................................................46

*Hooters of Augusta, Inc. v. Am. Global Ins. Co.*,
   272 F. Supp. 2d 1365 (S.D. Ga. 2003) ............................................................38

*Kitchnefsky v. Nat'l Rent-A-Fence of Am., Inc.*,
   88 F. Supp. 2d 360 (D.N.J. 2000).................................................................50, 51

*LaSalandra v. Pa. Gen. Ins. Co.*,
   No. CIV.A. 03-6805, 2004 WL 1636977 (E.D. Pa. July 12, 2004) ..................57

ME1 35623509v.4

*Marion Diagnostic Center, LLC v. Becton, Dickinson, and Company*,
  Civil Action No. 3:18-cv-01059 (S.D. Ill. 2018)................................................20

*McDowell-Wellman Eng'g Co. v. Hartford Acc. & Indem. Co.*,
  711 F.2d 521 (3d Cir. 1983) ................................................................53

*Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Becton, Dickinson, and Co.*,
  Civil Action No. 2:17-cv-00691-CCC-MF (D.N.J. Feb. 20, 2018) .............37, 38

*Park Univ. Enters., Inc. v. Am. Cas. Co. of Reading, PA*,
  314 F. Supp. 2d 1094 (D. Kan. 2004)....................................................38

*Pennbarr Corp. v. Ins. Co. of N. Am.*,
  976 F.2d 145 (3d Cir. 1992) ..........................................................40, 53

*Pittston Co. v. Allianz Insurance Co.*,
  905 F. Supp. 1279 (D.N.J. 1995).........................................................52

*Rhodes v. Marix Servicing, LLC*,
  302 F. Supp. 3d 656 (D.N.J. 2018).......................................................33

*Ripepi v. American Ins. Cos.*,
  3349 F.2d 300 (3d Cir. 1965) ............................................................53

*Ruehl v. Viacom, Inc.*,
  500 F.3d 375 (3d Cir. 2007) .............................................................33

*Smith v. Travelers Casualty Insurance Company of America*,
  Case No. 2:12-cv-65, 2013 WL 12101002 (S.D. Ohio Sept. 13, 2013) ....................................................................................41

*Transportes Ferreos de Venezuela II CA v. NKK Corp.*,
  239 F.3d 555 (3d Cir. 2001) ...........................................48, 49, 50, 51

*Travelers Cas. & Sur. Co. et al. v. Becton, Dickinson and Co.*,
  Case No. 2:14-cv-04410-JMV-JBC (D.N.J filed July 11, 2014) ..........32, 33, 48

*Vickers, Inc. v. Seaboard Surety Co.*,
  1996 U.S. Dist. LEXIS 19689 (D.N.J. Feb. 5, 1996)..................................36, 37

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
  401 U.S. 321 (1971)....................................................................43, 45

v

## State Cases

*Abouzaid v. Mansard Gardens Associates, LLC*,
    207 N.J. 67 (2011) ................................................................55

*Atl. Emp'rs Ins. Co. v. Chartwell Manor School,* 280 N.J. Super. 457
    (App. Div. 1995)................................................................55

*Bacon v. American Insurance Co.*,
    131 N.J. Super. 450 (Ch. Div. 1974) ...............................54

*Baen v. Farmers Mut. Fire Ins. Co. of Salem Cty.*,
    318 N.J. Super. 260 (App. Div. 1999)...............................54

*C.R. Bard, Inc. v. Wordtronics Corp.*,
    235 N.J. Super. 168 (App. Div. 1989)...............................36

*Danek v. Hommer*,
    28 N.J. Super. 68 (App. Div. 1953) ..................................55

*Diamond Shamrock Chemicals v. Aetna*,
    258 N.J. Super. 167 (App. Div. 1992)...............................42

*Doto v. Russo,* 140 N.J. 544 (1995) ..............................................45, 53

*Fairlawn Indus., Ltd. v. Gerling Am. Ins. Co.*,
    342 N.J. Super. 113 (App. Div. 2001)...............................35

*Flomerfelt v. Cardiello*,
    202 N.J. 432 (2010) ........................................................53

*Gazis v. Miller*,
    186 N.J. 224 (2006) ........................................................46

*Gen. Acc. Ins. Co. of Am. v. State, Dep't of Envir. Prot.*,
    143 N.J. 462 (1996) ........................................................55

*Griggs v. Bertram*,
    88 N.J. 347 (1982) ....................................................54, 57

*Mazzilli v. Accident & Cas. Ins. Co. of Winterthur, Switzerland*,
    35 N.J. 1 (1961) ..............................................................34

ME1 35623509v.4

*Miglicio v. HCM Claim Mgmt. Corp.*,
    288 N.J. Super. 331 (Ch. Div. 1995) ....................................................................57

*Muralo Co., Inc. v. Employers Ins. of Wausau*,
    334 N.J. Super. 282 (App. Div. 2000) ..............................................................42

*Ohaus v. Cont'l Cas. Ins. Co.*,
    292 N.J. Super. 501 (App. Div. 1996) ..............................................................51

*Pickett v. Lloyds*,
    131 N.J. 457 (1993) ................................................................................39, 45, 57

*President v. Jenkins*,
    180 N.J. 550 (2004) ..............................................................................................34

*Princeton Gamma-Tech, Inc. v. Hartford Ins. Grp.*,
    1997 WL 35384066 (N.J. Super. Ct. Law. Div. June 5, 1997) .........................57

*Rudolf v. Home Indemn. Co.*,
    138 N.J. Super. 125 (Law Div. 1975)..........................................................37, 38

*Sandler v. N.J. Realty Title Ins. Co.*,
    36 N.J. 471 (1962) ...............................................................................................34

*Sealed Air Corp. v. Royal Indem. Co.*, 404 N.J. Super. 363 (App. Div.
    2008) ....................................................................................................................34

*SL Indus., Inc. v. Am. Motorists Ins. Co.*,
    128 N.J. 188 (1992) ................................................................................39, 45, 55

*Simonetti v. Selective Ins. Co.*, 372 N.J. Super. 421 (App. Div. 2004) ............40, 53

*Solvents Recovery Serv. of New England v. Midland Ins. Co.*,
    218 N.J. Super. 49 (App. Div. 1987)....................................................................50

*Sussex Commons Outlets, L.L.C. v. Chelsea Prop. Grp., Inc.*, No. A-
    3714-07T1, 2010 WL 3772543, at *9 (N.J. Super. Ct. App. Div.
    Sept. 23, 2010) ...............................................................................................36

*Voorhees v. Preferred Mut. Ins. Co.*,
    128 N.J. 165 (1992) ................................................................................34, 36, 55

**Statutes**

Clayton Act Section 4, 15 U.S.C. § 15(a)............................................................9, 18

*N.J.S.A.* 17:29B-4(9)(d) ...........................................................................57

## PRELIMINARY STATEMENT

The insurance company's summary judgment motion requires this Court to determine whether there exist disputed factual issues which require a trial on policyholder's coverage claims.  A great deal hinges on the Court's determination because policyholder's damages/allocation expert will demonstrate at trial that the insurer bears responsibility for $177 million of policyholder's underlying defense and indemnity costs.

The insurance company knows it cannot – and its Brief confirms it does not – meet its high burden of proving no disputed issues of fact.  The insurer, therefore, tries mightily to divert this Court's attention from the above dispositive summary judgment question.  The insurer spends a remarkable number of Brief pages attacking policyholder and its counsel for not recognizing sooner the underlying claims fall within the subject insurance policies.  The insurer's efforts, however, prove nothing (other than, perhaps, that only insurance companies remain infallible). No principle of insurance coverage law, not to mention justice, strips a policyholder of the coverage for which it paid simply because it fails to possess the insurance knowledge held by the insurance industry.  New Jersey courts, in fact, have long recognized the disparity in insurance knowledge between policyholders and their insurers who draft unilaterally the insurance policies, and the courts have crafted insurance policy interpretation principles to address this disparity.

1

The insurer's straw men cannot deprive policyholder of its right to present before a jury the voluminous evidence supporting its coverage claims.  This evidence presents numerous factual disputes requiring resolution by a jury of this coverage dispute.  Policyholder looks forward to receiving its day in court.

## STATEMENT OF THE CASE

### I.   The Insurance Policies

Policyholder/defendant Becton Dickinson and Company ("BD") purchased from plaintiff National Union Fire Insurance Company of Pittsburgh, PA ("National Union") the following insurance policies, under which it seeks coverage for the underlying lawsuits (infra at 9-12).

#### A.   National Union's 1993 Policies

National Union sold to BD:

- insurance policy number BE 308-76-43, effective April 1, 1993 through October 1, 1994 providing applicable liability limits of $25 million ("1993/94 Policy"). *See* Exhibit 2 to the Declaration of Lynnette Cortes Mhatre, Esq. ("Mhatre Dec."); and

- insurance policy number BE 308-76-44, effective April 1, 1993 through April 1, 1994, providing applicable liability limits of $25 million ("Sunrise Policy"). The Sunrise Policy provides coverage "for occurrences or circumstances happening between the dates October 1, 1985 to April 1, 1993."  *See* Mhatre Dec., Ex. 1 at NU006379.[1]

---

[1]   BD refers collectively to the 1993/94 Policy and the Sunrise Policy as the "1993 Policies."

2

Contrary to National Union's incorrect statement, the 1993 Policies – and all of the insurer's policies at issue here – provide far broader coverage than that for "accidental conduct that causes bodily injury or property damage."[2]   The 1993 Policies – and National Union's other subject policies – also provide coverage to BD for claims alleging "Personal Injury" and "Advertising Liability."  *See* Mhatre Dec., Exs. 1 and 2 at NU006370 and NU006272.  The 1993 Policies define Personal Injury to include injury arising out of "libel, slander, defamation of character or invasion of right of privacy unless arising out of Advertising Liability."[3]  The 1993 Policies define Advertising Liability to include "liability for damage because of: . . . unfair competition . . . committed or alleged to have been committed during the policy period in any advertisement, publicity article, broadcast or telecast and arising out of [BD's] advertising activities."  *See id.* at NU006375 and NU006277.

The 1993 Policies contain endorsements (hereinafter, "Notice Endorsements"), which provide that:

> knowledge of an occurrence, claim or suit by any agent, servant or employee of [BD] shall not constitute knowledge by [BD] unless notice of such occurrence, claim or suit is received by the Risk Manager.

---

[2]   *See* National Union's Memorandum of Law in Support of Its Motion for Summary Judgment at 2.

[3]   *See id.* at NU006374-75 and NU006276–77.  The 1993 Policies follow form to, and adopt the language of, underlying policy number TJ-GLSA-201T0597-TIL-92 sold to BD by The Travelers Indemnity Company of Illinois.

### B.      National Union's 1994 And 1997 Policies

National Union also sold to BD:

- insurance policy number BE 309-14-79, effective October 1, 1994 through October 1, 1997 ("1994 Policy"), providing liability limits of $25 million; *see* Mhatre Dec., Ex. 3; and

- insurance policy number BE 932-81-55, effective October 1, 1997 through October 1, 1999 ("1997 Policy"), providing liability limits of $50 million per-occurrence and $100 million general aggregate. *See* Mhatre Dec., Ex. 4.[4]

The 1994/97 Policies also provide coverage to BD for claims alleging Personal Injury or Advertising Injury. *See* Mhatre Dec., Exs. 3 and 4 at NU000291 and NU000332. They define Personal Injury to include injury arising out of "oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services." *See id*. at NU000295–96 and NU000336–37. And, the 1994/97 Policies define Advertising Injury as:

> Injury arising solely out of your advertising activities as a result of one or more of the following offenses:
>
> 1. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; . . . [*See id.* at NU000293 and NU000334].

The 1994/97 Policies also contain Notice Endorsements, which provide that:

> knowledge of an occurrence, claim or suit by any agent, servant or employee of [BD] shall not constitute knowledge by [BD] unless notice

---

[4]      BD hereinafter refers collectively to the 1994 Policy and the 1997 Policy as the "1994/97 Policies."

of such occurrence, claim or suit is received by the Director of Risk Management.

### C.     National Union's 1999 Policy

BD, finally, purchased from National Union insurance policy number BE 357-42-59, effective October 1, 1999 through October 1, 2002 ("1999 Policy"), which provides applicable liability limits of $50 million per-occurrence and $100 million general aggregate.  The 1999 Policy sits above a Lumbermans Mutual Casualty Company primary policy for the period from October 1, 1999 through October 1, 2003 ("Kemper Policy").   The Kemper Policy contains an explicit coverage exclusion for personal injury and/or advertising claims "arising out of actual or alleged antitrust violations."  *See* Exhibit A to the Certification of Nicole Corona ("Corona Cert.") at BD08653.[5]

The 1999 Policy divides coverage into two parts: Coverage A and Coverage B.  *See* Mhatre Dec., Ex. 5 at NU000376–77.  Coverage B of the 1999 Policy applies where, as here, the underlying lawsuits fall outside of the Kemper Policy's coverage. The 1999 Policy provides coverage for "Advertising Injury," which the Policy defines as:

---

[5]     The existence of such exclusion demonstrates two facts.  First, and contrary to National Union's incorrect assertion, general liability policies provide coverage for antitrust claims if based upon otherwise covered conduct.  Second, National Union knew how to draft an antitrust exclusion for its Policies, but chose not to do so.

ME1 35623509v.4

injury, other than Bodily Injury or Personal Injury, arising solely out of your Advertisement as a result of one or more of the following offenses: 1. . . . disparagement of a person's or organization's goods, products or services in your Advertisement.  [*See id.* at NU000379].

The Policy defines "Advertisement" as "a paid broadcast, publication or telecast to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters." *Id*.

The 1999 Policy also requires National Union to "defend any Suit against [BD] that seeks damages . . . because of . . . Advertising Injury . . . even if the Suit is groundless, false or fraudulent." *See id.* at NU000377.  National Union must pay defense costs "in addition to the applicable Limits of Insurance."  *See id.* at NU000378.

The 1999 Policy contains a Notice Endorsement, which provides that:

[k]nowledge of an Occurrence, claim or Suit by your agent, servant or employee shall not in itself constitute knowledge by [BD], unless the individual(s) designated in the schedule below has received notice of such Occurrence, claim or Suit from said agent, servant or employee.[6]

Illustrating the lack of care by which National Union drafted its insurance policies, the insurer failed to identify any BD individuals to whom notice of "an Occurrence, claim or Suit" triggers an obligation to provide notice to the insurer.

---

[6]     BD hereinafter refers collectively to the 1993 Policies, the 1994 and 1997 Policies and the 1999 Policy as the "Policies."

6

This Court, however, legitimately can infer the identity of such individual as BD's Risk Manager.

### D.   National Union Leaves Critical Policy Terms Undefined

National Union, the sole drafter of the Policies, left undefined the critical Policy language discussed below.  Equally significant for purposes of this summary judgment motion, National Union – through its Rule 30(b)(6) underwriting witness – neither could define the coverage language it drafted here nor testify such language precludes coverage for antitrust claims:[7]

> Q.     Does the definition of unfair competition encompass antitrust claims?
>
> A.     I can't speak to that.  [*See* Corona Cert., Ex. C at 26:17-19]
>
> *      *      *      *
>
> Q.     And National Union cannot define or explain unfair competition as it appears in that definition [of advertising injury], correct?
>
> *      *      *      *
>
> A.     As part of the underwriting process, we would not define the language.  We would leave that to claims and legal.  [*Id.* at 60-16-23]

National Union, in other words and rather conveniently, left to its claims and legal counsel the task of defining its Policy language only after receiving coverage claims implicating such language.

---

[7]     National Union's own expert Michael Averill testified an insurer's underwriter should know the meaning of the language he/she inserts into its policies. *See* Corona Cert., Ex. B at 95:13-21.

This questionable system broke down here, however, because even National Union's claims handler Michael DiDonato possessed no understanding of the relevant Policy language until instructed by its **outside** coverage counsel:

> Q.    So legal counsel informed your understanding of the phrase "unfair competition"?
>
> *       *       *       *
>
> A.    Legal counsel provided me with a – with legal advice as to how the phrase "unfair competition" or [what] the phrase "unfair competition" means.  [*See* Corona Cert., Ex. D 113:13-20; *and see id.* at 132:21-133:5.]

Although National Union itself possessed no understanding of the critical phrase "unfair competition," the insurer's expert testified that because National Union failed to define this phrase, "the common definition . . . would apply":

> Q.    So in the 1976 version for example, if the term unfair competition is listed under the definition of advertising injury and unfair competition is not itself defined, we would apply the common use definition of that term, correct?
>
> A.    If it's not defined as a defined term in the contract, correct.  [*See* Corona Cert., Ex. B at 110:13-20]

National Union's expert further opined:

> When terms are not defined, it is intended that the generally understood meaning of the term would apply.  That meaning could be further

8

explained through the use of common dictionary(ies) or by common public use." [*See* Corona Cert., Ex. E at 9-10].[8]

Policyholders (like BD) certainly do not commonly understand the phrase "unfair competition" to mean only the tort of passing off.

## II.     The Underlying Lawsuits

### A.     The RTI Action

Discovery confirmed the underlying plaintiffs filed against BD unfair competition and disparagement lawsuits dressed in antitrust clothing. This Court already recognized this fact in denying National Union's prior dismissal motion, holding the insurer's antitrust claims "all relate to Defendant's alleged anti-competitive conduct." *Infra* at 32-33. They did so for obvious reasons, including the potential to secure treble damages and attorneys' fees. *See* Section 4, Clayton Act, 15 U.S.C. § 15(a).



*See e.g.,* Corona Cert., Ex. H. In 1994, Shaw formed Retractable

---

[8]      National Union, in short, agrees with the opinion expressed by BD's underwriting expert that "[t]here's nothing in personal advertising injury that says this is coverage for tort." *See* Corona Cert., Ex. F at 67:22-68:6.

ME1 35623509v.4

Technologies, Inc. ("RTI"), and transferred to the company a license for the retractable needle called VanishPoint®. *See* Mhatre Dec., Ex. 24.

RTI grew frustrated with its inability to gain market traction and blamed BD for its troubles. Convinced that BD suppressed competition and disparaged its competitors and their products, RTI sued BD and others in a 1998 Texas state court action, alleging certain Texas Free Enterprise and Antitrust Act violations. *See* Mhatre Dec., Ex. 12. As discovery in that action revealed multiple BD advertising campaigns and strategies spanning decades, RTI dismissed its state court action and filed, on January 29, 2001, a new lawsuit in the federal court in the Eastern District of Texas, captioned *Retractable Technologies, Inc. v. Becton, Dickinson & Co. et al.*, Civil Action No. 5:01-cv-036 (E.D. Tex. 2001) ("RTI Action"). The federal court Action added, among other claims, an explicit disparagement Count against BD. *See* Mhatre Dec. Ex. 13. RTI subsequently filed three Amended Complaints, expanding on its unfair competition and disparagement allegations from the advertising and marketing materials it received during discovery. *See, e.g.,* Mhatre Dec., Ex. 14.

BD incurred approximately $72 million defending the RTI Action, and BD settled the Action for $100 million. BD will present at trial the testimony of its expert, former Judge Stephen Orlofsky, that BD appropriately defended and settled

10

the RTI Action.  National Union proffered no expert testimony contradicting Judge Orlofsky's opinions.

**B.    The Class Actions**

National Union's Policies also provide personal injury and advertising injury coverage for BD's costs of defending and settling direct and indirect purchaser lawsuits consolidated in the action captioned *In re Hypodermic Products Antitrust Litigation*, Lead Docket No. 05-CV-1602 ("Class Actions").  The Class Actions plaintiffs piggybacked off of the RTI Action and alleged "BD's conduct, which was disparaging of various competitor's products," constituted unfair competition which "unlawfully inflated prices and prevented access to competing products."  *See* Mhatre Dec., Ex. 10 at 16:15-16 and Corona Cert., Ex. I at 10.  The Class Actions plaintiffs alleged that through its marketing practices, ███████████████ ████████████████████████████████████  *See* Corona Cert., Ex. MMM.[9]

BD incurred approximately $29 million defending against the Class Actions, and BD settled the Class Actions for a combined total of $67 million.[10]  Judge

---

[9]    *See*, *e.g.*, Mhatre Dec., Ex. 18 [*In re Hypodermic Direct Purchaser Antitrust Litigation Second Amended Compl.* ¶¶ 44–45]; *accord The Hebrew Home for the Aged at Riverdale* Compl. ¶¶ 7, 70–71; *In re Hypodermic Products Antitrust Litigation (Jabo's Pharmacy, Inc.)* Compl. ¶¶ 7, 71–72, 74.

[10]   BD hereinafter refers collectively to the RTI Action and the Class Actions as the "Underlying Actions," and to the plaintiffs in those Actions as the "Underlying Plaintiffs."

11

Orlofsky will testify at trial that BD appropriately incurred these defense and indemnity costs to resolve the Class Actions.  National Union, again, has proffered no expert testimony on this issue.

### C.   The Underlying Actions Fall Squarely In The Policies' Disparagement And Unfair Competition Coverages

The 1993 Policies provide coverage for:  (i) "liability for damage because of"; (ii) "unfair competition"; (iii) "committed or alleged to have been committed during the policy period"; (iv) "in any advertisement, publicity article, broadcast or telecast"; and (v) "arising out of [BD's] advertising activities."[11]

The 1994/1997 Policies provide coverage for:  (i) "oral or written publication of material" that; (ii) "disparages a person's or organization's goods, products or services;"[12] or; (iii) "Injury"; (iv) "arising solely out of [BD's] advertising activities as a result of"; (v) "Oral or written publication of material" that; (vi) "disparages a person's or organization's goods, products or services."[13]

The 1999 Policy provides coverage for injury arising out of:  (i) "[BD's] Advertisement as a result of"; (ii) "disparagement of a person's or organization's goods, products or services"; (iii) "in [BD's] Advertisement."[14]

---

[11]   *See* Mhatre Dec., Exs. 1 and 2 at NU006376 and NU006277.

[12]   *See id.* at Exs. 3 and 4 at NU000295–96 and NU000336–37.

[13]   *See id.* at Exs. 3 and 4 at NU000293 and NU000334

[14]   *See id.* at Ex. 5 at NU000379.

Voluminous factual evidence demonstrates BD confronted, defended and settled Underlying Actions claims for injury allegedly resulting from BD's unfair competition and disparagement committed during the Policies' periods through its advertising and marketing campaigns.

### 1. RTI Alleges It Suffered Unfair Competition and Disparagement Injury From BD's Conduct During The Policies' Periods

RTI's Complaint sets forth an explicit business disparagement Count which indisputably falls within the Policies' advertising liability/injury and personal injury coverages.  The Complaint's examples of BD's allegedly disparaging publications include:

• Publishing to healthcare workers that RTI's products deliver inaccurate dosing;

• Publishing to healthcare workers that RTI's products cause hematomas;

• Telling the financial world RTI cannot manufacture its products for less than $.50 per syringe, a cost that prevents widespread use; and

• Telling healthcare workers that RTI employs unreasonable business people.[15]

RTI, moreover, supported its antitrust allegations through the above statements and BD's other allegedly disparaging statements and unfair competition.

████████████████████████████████████████████

---

[15] *See* Mhatre Dec., Ex. 14 at ¶ 50 a–e.  The RTI Action Court never dismissed RTI's business disparagement Count, and this Count remained in force through, and was included in, BD's settlement of the Action.  *Infra* at 17.

13



14

RTI could not have asserted more clearly how its antitrust claims rely on BD's alleged unfair competition and disparagement than through its May 15, 2001 opposition to BD's dismissal motion:

> RTI has alleged that the defendants have maliciously used disparaging words that were false to interfere with RTI's economic interests (Complaint ¶ 43). These [disparaging] remarks, made in the context of the other types of predatory conduct discussed elsewhere in the complaint, and outlined above, have had the effect of unlawfully excluding RTI from the relevant market, thus hurting it financially (Complaint ¶ 44). Using disparaging words to obstruct a competitor's opportunity to participate in the market is inexcusable behavior. *See* Corona Cert., Ex. N.

RTI confirmed, during an August 15, 2001 court hearing, how BD's alleged disparagement supported its antitrust claims:

> But recall, Your Honor, that there are cases that speak directly to a disparagement of the quality of the products. . . . [T]hat, too, is an antitrust violation, and that's what has been alleged here. *See* Corona Cert., Ex. O.

RTI, perhaps most tellingly, attributes its BD settlement to its business disparagement claim, identifying in government filings BD's payment of "$100 million to settle a lawsuit with [RTI] for anticompetitive practices, business disparagement, and tortious interference." *See* Corona Cert., Ex. P.

RTI's Third Amended Complaint specifically alleges BD published disparaging "statements about Retractable and the quality of Plaintiff's products . . .

15

in the course of building and maintaining its monopolistic practices." *See* Mhatre Dec., Ex. 18 at ¶ 50; *accord id.* ¶ 53.   RTI alleged these disparaging statements blocked RTI from the relevant product markets.   *Id.* ¶ 53.   RTI asserted BD's unlawful conduct, including its disparaging statements, "unreasonably restrained competition in the relevant interstate market or markets and has unreasonably restrained the reasonable interchange of product alternatives for the relevant markets." *Id.* ¶ 55.

RTI based its antitrust case almost entirely on its theory that BD's decades-old marketing and advertising strategies inhibited and/or prevented itself and others from entering the marketplace.





---

17    The Court, on this summary judgment motion, must draw all inferences in favor of the non-movant BD. *Infra* at 33-34.

ME1 35623509v.4

███████████████████████████████████████

BD defended and settled the RTI Action to avoid liability based upon its alleged disparagement, whether such conduct supported RTI's explicit disparagement Count or its antitrust claims.  Such conduct, and all defense and indemnity costs arising from same, fall squarely within the coverage of National Union's Policies.

### 2. The Class Actions Plaintiffs Allege They Suffered Unfair Competition and Disparagement Injury From BD's Conduct During The Policies' Periods

The Class Actions plaintiffs likewise alleged BD engaged in anti-competitive and disparaging conduct, including through marketing/advertising campaigns that highlighted and exploited competitors' weaknesses.[19]  The Class Actions Complaints, perhaps most importantly, incorporate fully the RTI Action claims.[20]

---

[18]    The Fifth Circuit Court of Appeals issued an opinion in RTI's second action against BD ("RTI2"), which confirms RTI's unfair competition and disparagement allegations formed the basis of its antitrust claims.  *See Retractable Technologies, Inc. v. Becton Dickinson & Co*., Case No. 14-41384, Document 00513781379 at 18 (5th Cir. Dec. 2, 2016).  The Court recognized RTI alleged against BD false advertising/disparagement claims wrapped in antitrust clothing and, therefore, dismissed RTI's antitrust claims but allowed its disparagement/false advertising claims to move forward.  *Id*.███████████████████████████
████████████████████████████████████

[19]    *See, e.g.,* Corona Cert., Ex. DD.

[20]    *See, e.g.*, Mhatre Dec., Ex. 19 at ¶¶ 6–7, 74–75; Ex. 18 at  ¶¶ 6, 51, 52, 65, 91 and 93.

18



19



Actions.  A later-filed putative class action captioned *Marion Diagnostic Center,*

*LLC v. Becton, Dickinson, and Company*, Civil Action No. 3:18-cv-01059 (S.D. Ill.

2018) ("Class Action 2") – which mirrored, in all material respects, the Class

Actions – reiterates that "over many years," BD:

> "committed other anticompetitive acts in aid of the conspiracy, including . . . disparagement . . . and false advertising aimed against its most aggressive and innovative safety syringe competitor, Retractable Technologies, Inc."  *See* Corona Cert., Ex. JJ.

BD defended and settled the Class Actions to avoid disparagement and unfair

competition liability, whether couched in antitrust verbiage or otherwise.  Such

liability falls squarely within the advertising liability/injury and personal injury

coverage of National Union's Policies.

### 3.    The Underlying Plaintiffs Allege They Suffered Unfair Competition and Disparagement Injury From BD's Advertising And Marketing Campaigns

BD traditionally has used consumer education as the core of its sales and

marketing efforts.  BD's sales/marketing campaigns generally consist of multiple

elements branching from a safety epicenter, including educational posters, tools, and

software, branded and coupled with BD advertisements.  ███████████

20

[22] Global needle manufacturer and BD competitor, Terumo Corporation, opened its first U.S. plant in 1974 to increase its product distribution in the U.S.

[23] *See, e.g.*, Corona Cert., Exs. KK, LL, MM, NN and OO.

[24] *See, e.g.*, Mhatre Dec., Ex. 11 at 53:23-54:15; Corona Cert., Exs. PP and QQ.



22



23



RTI alleged Block Terumo caused it injury because BD's "actions (i) decreased [the] quality of hypodermic products, (ii) unreasonably restricted consumer and provider choice and access to safer, higher quality products; (iii) increased [BD's] market power, and (iii) (sic) had a dramatic anti-competitive

24

impact in restraining entry of competition into the relevant markets." *See* Mhatre

Dec., Ex. 14 at BD77593; 

The Class Actions adopted these RTI Action allegations and similarly alleged

BD's advertising/marketing campaigns – including Block Terumo – employed

"exclusionary and predatory sales practices" to restrain trade by competing

manufacturers, thereby reducing, through unfair competition and disparagement, the

number of products available in the marketplace. *See* Mhatre Dec., Ex. 19 at

BD77151-2.

The Underlying Actions, in short, alleged injury resulting from BD's

disparagement and unfair competition conducted through its Block Terumo

advertising and marketing campaign through each and every period of the Policies.

ME1 35623509v.4



26



27

ME1 35623509v.4



ME1 35623509v.4



ME1 35623509v.4



ME1 35623509v.4

### III.  Procedural History

National Union filed, on July 9, 2014, an action ("Becton I") against BD seeking a declaration it need provide no defense or indemnity coverage for the RTI Action and for the 1998 state court action, captioned *Retractable Technologies Inc. v. Becton, Dickinson & Company et al.*, Civil Action No. 5333*JG98 in the District Court of Brazoria County, Texas.

National Union filed, on January 30, 2017, a separate action ("Becton II") against BD seeking a declaration it need provide no defense or indemnity coverage for the Class Actions.  National Union thereafter moved, on October 13, 2017, for judgment on the pleadings.  The insurer's dismissal motion asserted "not one [Class Action] allegation or cause of action . . . alleges any damages potentially covered by the Policies."  This Court, on February 20, 2018, denied National Union's motion.

The Court, on June 4, 2018, consolidated Becton I and Becton II.

### IV.  The Travelers Action

Travelers Casualty and Surety Company and Travelers Property Casualty Company of America (collectively, "Travelers") sold to BD primary insurance policies, underlying National Union's Policies, during the periods from 1985 through 1999 ("Travelers Policies").  The Travelers Policies contain language nearly identical to that found in National Union's Policies.  Travelers, on July 18, 2014, sued BD seeking a declaration it owed no coverage for the Underlying Actions.  *See*

31

*Travelers Cas. & Sur. Co. et al. v. Becton, Dickinson and Co.*, Case No. 2:14-cv-04410-JMV-JBC (D.N.J filed July 11, 2014) ("Travelers Action").

National Union seriously misrepresents the Travelers Action as settling "[a]fter preliminary motion practice." That Action, in truth, settled only after the parties engaged in four (4) years of intensive and hotly disputed discovery. BD and Travelers, following such discovery, resolved their coverage disputes through a June 12, 2018 mediation before the Honorable Mark Epstein (retired).

## V.   This Court's Denial Of National Union's Prior Dispositive Motion

On February 20, 2018, this Court denied National Union's dismissal motion in Becton II. National Union then, as now, argued "the Underlying Actions are not covered under the policies because they did not stem from 'personal injury' or 'advertising liability' as defined by the policies." *See* ECF 17-cv-00691 Doc 31 at 4-5. The Court disagreed, finding it "[un]clear from the language of the policies whether or not the [Class] Actions fall within the parameters of said policies." *Id.* at 7. The Court, contrary to National Union's imaginative assertion, gave no indication it considered coverage unavailable under the Policies' disparagement provisions.

## ARGUMENT

## POINT I

## FEDERAL COURT SUMMARY JUDGMENT PRINCIPLES AND SETTLED NEW JERSEY INSURANCE POLICY

32

INTERPRETATION LAW PREVENT NATIONAL UNION
FROM PREVAILING ON SUMMARY JUDGMENT

This Court on this summary judgment motion, must "consider all facts and their logical inferences in the light most favorable to the non-moving party" BD. *See Rhodes v. Marix Servicing, LLC*, 302 F. Supp. 3d 656, 661 (D.N.J. 2018) (citing *Curley v. Klem*, 298 F.3d 271, 276–77 (3d Cir. 2002)); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court can grant "[s]ummary judgment . . . only where, drawing all reasonable inferences in favor of the nonmoving party, there [exists] no genuine issue as to any material fact[.]" *See Ruehl v. Viacom, Inc.*, 500 F.3d 375, 380 n.6 (3d Cir. 2007) (quoting *Lexington Ins. Co. v. W. Pa. Hosp.*, 423 F.3d 318, 322 n.2 (3d Cir. 2005)).

"In considering [this summary judgment] motion, the Court 'does not resolve factual disputes or make credibility determinations.'" *Rhodes*, 302 F. Supp. 3d at 661 (quoting *Siegel Transfer, Inc. v. Carrier Exp., Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995)). This Court neither can weigh disputed evidence nor draw inferences against BD. *See Anderson*, 477 U.S. at 255 (holding "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts" remain "jury functions, [and] not those of a judge. . . on a motion for summary judgment" (citation omitted)).

Fundamental principles of New Jersey insurance policy interpretation law, moreover, require this Court to construe liberally the Policies "to the end that

coverage is afforded 'to the full extent that any fair interpretation will allow.'"

*President v. Jenkins*, 180 N.J. 550, 563 (2004) (quoting *Kievit v. Loyal Protective Life Ins. Co.*, 34 N.J. 475, 482 (1961)).  New Jersey courts:

> recognize those well-settled principles governing the interpretation of contracts of insurance that mandate broad reading of coverage provisions, narrow reading of exclusionary provisions, resolution of ambiguities in the insured's favor, and construction consistent with the insured's reasonable expectations.

*Sealed Air Corp. v. Royal Indem. Co.*, 404 N.J. Super. 363, 375 (App. Div. 2008); *accord Sandler v. N.J. Realty Title Ins. Co.*, 36 N.J. 471, 479 (1962).  "If the controlling language will support two meanings, one favorable to the insurer, and the other favorable to the insured," then this Court should apply "the interpretation sustaining coverage."  *Mazzilli v. Accident & Cas. Ins. Co. of Winterthur, Switzerland*, 35 N.J. 1, 7 (1961); *accord Voorhees v. Preferred Mut. Ins. Co.*, 128 N.J. 165, 173–74 (1992).

BD proffers volumes of evidence, including documents and fact and expert testimony, supporting its coverage claims against National Union.  BD chronicles decades of allegedly disparaging and unfairly competitive advertisements falling (at least arguably) within the Policies' coverage grants.  The Court should review all of this evidence, and draw all inference therefrom, in the light most favorable to the non-movant policyholder BD.

ME1 35623509v.4

## POINT II

**THIS COURT SHOULD DENY NATIONAL UNION SUMMARY JUDGMENT BECAUSE DISPUTED ISSUES EXIST REGARDING COVERAGE FOR BD'S COSTS ARISING FROM THE UNDERLYING ACTIONS' UNFAIR COMPETITION AND DISPARAGEMENT CLAIMS**

**A.    The Underlying Actions' Unfair Competition Claims Fall Within National Union's 1993 Policies**

The 1993 Policies provide coverage for advertising injury arising out of "unfair competition."   *See* Mhatre Dec., Exs. 1 and 2 at NU006375, NU006277. National Union unilaterally drafted, but failed to define, its "unfair competition" language.  National Union's underwriters, moreover, testified they had and have no idea what this phrase means and that they leave such meaning to their counsel. *Supra* at 7. *Id*.[26] Although National Union's coverage counsel, not surprisingly, interprets here "unfair competition" as never including "antitrust claims," the insurer itself expressed considerably less certainty about this issue during its deposition testimony. *Id*.[27] National Union, moreover, removed "unfair competition" from its

---

[26]    New Jersey courts hold that "[i]n the absence of a specific definition in a policy, … or when the meaning of a phrase in a policy is ambiguous, … courts must resolve the dispute in line with the insured's objectively reasonable expectations." *See Fairlawn Indus., Ltd. v. Gerling Am. Ins. Co.*, 342 N.J. Super. 113, 118 (App. Div. 2001) (emphasis added) (citing *Crest-Foam Corp. v. Aetna Ins. Co.*, 320 N.J. Super. 509, 519 (App. Div. 1999)); *Voorhees*, 128 N.J. at 174.

[27]    The question itself, of course, misstates the relevant inquiry.  New Jersey courts focus their coverage inquiry not on the legal theory advanced, or label used, by the underlying claimants but on the alleged conduct resulting in the claimed harm. *Infra* at 38-39.

35

post-1993 Policies, because it feared the expansive coverage afforded thereby. *See* Corona Cert., Ex. C at 93:20-94:8; 95:13-20.

This Court interprets the undefined phrase "unfair competition" broadly and in keeping with its common sense meaning. In *Vickers, Inc. v. Seaboard Surety Co.*, 1996 U.S. Dist. LEXIS 19689, at *11 (D.N.J. Feb. 5, 1996), the insurer argued, as does National Union here, that "unfair competition as it is used in the policy is limited to the common law tort of passing off one's goods as those of another." *Id.* at *13. This Court found the insurer's argument "not persuasive," and held the policy covered allegations of unfair competition against the policyholder's distributors. *Id.* at *13–14.[28] *Vickers* also construed the undefined phrase "advertising" broadly, holding it includes "any oral, written or graphic statement made by the seller in any manner in connection with the solicitation of business." 1996 U.S. Dist. LEXIS 19689, at *17–18.[29]

---

[28]   *See also Sussex Commons Outlets, L.L.C. v. Chelsea Prop. Grp., Inc.*, No. A-3714-07T1, 2010 WL 3772543, at *9 (N.J. Super. Ct. App. Div. Sept. 23, 2010) (finding "the trial judge erred in dismissing [plaintiff's] unfair competition claim as limited to misappropriation of another's property" and noting unfair competition claims have "been described in broader terms: 'There is no distinct cause of action for unfair competition. It is a general rubric which subsumes various other causes of action.'" (quoting *C.R. Bard, Inc. v. Wordtronics Corp.*, 235 N.J. Super. 168, 172 (App. Div. 1989))).

[29]   *Vickers* stands far from alone in rejecting, under New Jersey law, insurer efforts to impose strict common law meanings on insurance policy terms. *See, e.g.*, *Rudolf v. Home Indemn. Co.* (rejecting the insurer's argument that the policy term

This Court already applied *Vickers* in denying National Union's dismissal motion. Observing the unfair competition "language of the policies is not as clear as [National Union] argues," the Court correctly recognized the underlying antitrust claims "all relate to Defendant's alleged anti-competitive conduct." *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Becton, Dickinson, and Co.*, Civil Action No. 2:17-cv-00691-CCC-MF, at 7–8 (D.N.J. Feb. 20, 2018). This Court, therefore, concluded:

> It seems apparent that the plaintiffs in the [Class] Actions brought against Defendant, at least in part, alleged Defendant was engaged in unfair competition. However, a review of the policies does not reveal any definition of the term "unfair competition," and courts have interpreted this term broadly. *Vickers, Inc. v. Seaboard Surety Co.*, 1996 U.S. Dist. LEXIS 19689 (D.N.J. Feb. 5, 1996), *aff'd,* 107 F.3d 9 (3d Cir. 1997).

*Id.* at 9.[30]  National Union presents nothing warranting reconsideration of this Court's prior ruling.

National Union could have drafted alternative Policy language limiting "unfair competition" to its common law tort meaning, or excluding therefrom antitrust claims. *See*, *e.g.*, *Doto v. Russo,* 140 N.J. 544, 557 (1995). National Union

---

"theft or larceny" incorporates "the common law and statutory limitations given to those terms." 138 N.J. Super. 125, 135-6 (Law Div. 1975).

[30]   Having presided, for eight (8) years, over the Class Actions, Judge Linares' *Becton II* ruling reflects his unique knowledge and insights into the core of the underlying allegations. *Id.*

failed to do so, and the insurer, not BD, now must bear the consequences of its drafting decisions.  Courts, moreover, construe policy language "as a layman would read it and not as it might be analyzed by an insurance expert or an attorney." *Hooters of Augusta, Inc. v. Am. Global Ins. Co.*, 272 F. Supp. 2d 1365, 1372 (S.D. Ga. 2003) (citations omitted); *Rudolf*, 138 N.J. Super. at 136; *Park Univ. Enters., Inc. v. Am. Cas. Co. of Reading, PA*, 314 F. Supp. 2d 1094, 1107-9 (D. Kan. 2004). BD's underwriting expert will testify that even the insurance industry does not understand the phrase "unfair competition" to possess only its common law tort meaning.  National Union's expert agrees with this conclusion.  *See supra* at 8-9.

Faced with this overwhelming evidence, National Union argues that whatever "unfair competition" means, it cannot encompass antitrust claims.  The New Jersey Supreme Court, however, repeatedly has held that "[i]nsureds expect their coverage and defense benefits to be determined by the nature of the claim against them, not by the fortuity of how the plaintiff, a third party, chooses to phrase the complaint against the insured."  *SL Indus., Inc. v. Am. Motorists Ins. Co.*, 128 N.J. 188, 198–99 (1992); *see also Pickett v. Lloyds*, 131 N.J. 457, 470 (1993) ("Compensation should not be dependent on what label we place on an action but rather on the nature of the injury inflicted on the plaintiff and the remedies requested.").  New Jersey coverage law, therefore, gives no dispositive effect to the fact that the Underlying Plaintiffs dressed their disparagement and unfair competition claims in antitrust

clothing.  This Court, in this case, already correctly concluded that the Underlying Actions' antitrust claims "all relate to [BD's] alleged anti-competitive conduct."

In *Ethicon, Inc. v. Aetna Cas. and Sur. Co.*, 737 F. Supp. 1320 (S.D.N.Y. 1990), the court applied New Jersey and California law to find coverage for a malicious prosecution claim "brought through the vehicle of a federal antitrust action."  *Id.* at 1326-7.  Disposable plastic glove manufacturer Ethicon sought coverage for underlying Sherman Act claims based on bad faith patent prosecution. *Id.* at 1331-2.  Ethicon's insurance policy, like National Union's, failed explicitly to exclude antitrust claims.  *Id.* at 1326.  The court concluded that under New Jersey law, the insurer must provide coverage for "a complaint sounding solely in a federal statutory claim" if based upon conduct otherwise covered by the policy.  *Id.* at 1329.

National Union's 1999 Policy, again, sits above a Kemper Policy which explicitly excludes coverage for personal injury and/or advertising injury "arising out of actual or alleged antitrust violations."  The existence of the Kemper Policy exclusion proves two things.  First, it eviscerates National Union's position that advertising/personal injury provisions never cover antitrust claims.  If so, then the exclusion would serve no purpose.  Second, it demonstrates National Union knew how to draft an antitrust exclusion, but opted not to do so.  National Union must bear the consequences of its drafting decision and deliver the coverage it promised.  *See*

*Pennbarr Corp. v. Ins. Co. of N. Am.*, 976 F.2d 145, 155 (3d Cir. 1992); *Simonetti v. Selective Ins. Co.,* 372 N.J. Super. 421, 428 (App. Div. 2004).

The Underlying Actions alleged – and the extrinsic evidence confirms – harm from BD's alleged unfair competition, conducted through multiple advertising campaigns, falling squarely within the 1993 Policies.[31]  *See supra* 21-31.  National Union cannot escape its coverage obligations – especially on this summary judgment motion – by arguing the statute of limitations relieved BD of liability for the unfair competition occurring during the 1993 Policy.  National Union firstly, and dispositively, calculates incorrectly the four year period from RTI's 2001 federal court Complaint rather than its August 3, 1998 state court Complaint.  Correcting this mistake alone eviscerates the insurer's argument because no statute of limitations applies to the unfair competition falling within the 1993 Policy.

National Union secondly ignores its own 1993 Policies' language, which provides coverage for "liability for damage because of . . . unfair competition . . . committed or alleged to have been committed during the policy period in any advertisement, publicity article, broadcast or telecast and arising out of [BD's] advertising activities."  *See* Mhatre Dec., Exs. 1 and 2 at NU006375 and NU006277.

---

[31]    The same alleged conduct likewise supports coverage under the 1993 Policies' Personal Injury and Advertising Liability "Defamation of Character" language.

ME1 35623509v.4

BD demonstrates herein that the Underlying Actions sought damages for unfair competition committed allegedly by BD, through numerous advertisements, falling squarely within the 1993 Policies' coverage.  The statute of limitations might have provided BD with a potential defense to the Underlying Actions but certainly cannot provide National Union with a defense to coverage for those Actions.  *See, e.g.,* *Smith v. Travelers Casualty Insurance Company of America*, Case No. 2:12-cv-65, 2013 WL 12101002, at *5 (S.D. Ohio Sept. 13, 2013) (ruling policyholder's inability to succeed on an underlying claim provided only a potential defense to the claim, and not to coverage for the claim).[32]

National Union thirdly, and relatedly, cannot force BD to prove the underlying claims against itself (*i.e.*, that the statute of limitations did not apply) in order to secure coverage for such claims.[33]  New Jersey courts determine coverage for a policyholder's settlement of a claim based upon whether the claim falls within such coverage.  In *Diamond Shamrock Chemicals v. Aetna*, 258 N.J. Super. 167 (App.

---

[32]    National Union has proffered no expert testimony on whether BD reasonably defended and settled the Underlying Actions in the face of its possible liability defenses, including the statute of limitations.  BD, in sharp contrast, will present the expert testimony of former Judge Orlofsky that BD appropriately defended and settled the Underlying Actions in the face of possible statute of limitations and other defenses.

[33]    National Union attempts this same bad faith coverage defense in arguing BD must prove the falsity of its advertisements.  Tom Shaw nevertheless testified that "everything [BD] said about our products were [sic] false."  *See* Corona Cert., Ex. BBB at 161:3-24.

Div. 1992), *certif. den.*, 134 N.J. 481 (1993), the Appellate Division held "a liability incurred by reasonably settling a case is a covered loss so long as the claim settled would itself have been a covered loss." *Id.* at 244-45. The Court noted – in language applying equally here – that any other rule:

> would place settling defendants in the "hopelessly untenable" position of being forced to refute liability in the underlying action until the moment of settlement, and then of "turning about face" to prove liability in the insurance action. Such a rule would markedly diminish the advantages of settling. Faced with the choice of defending the tort action vigorously or settling it without a realistic hope of insurance reimbursement, insureds would generally take the safer former course.

*Id.* at 245 (citations omitted); *accord Muralo Co., Inc. v. Employers Ins. of Wausau*, 334 N.J. Super. 282, 294 (App. Div. 2000), *certif. den.*, 167 N.J. 632 (2001). National Union cannot turn the insurer/insured relationship on its head to defeat coverage.

Fourthly, and finally, National Union simply misstates the potential applicability of the statute of limitations.[34] In *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338-343 (1971), the Supreme Court specifically considered whether the plaintiff could recover damages suffered as a result of conduct occurring prior to the statute of limitations period. The Court held "[a] plaintiff in an antitrust action may recover damages occurring within the statutory

---

[34] National Union reiterates its arguments in connection with disparagement coverage under the 1994, 1997 and 1999 Policies. The insurer's arguments remain unavailing under any of the Policies, regardless of the coverage grant.

limitation period that are the result of conduct occurring prior to that period if, at the time of the conduct, those damages were speculative, uncertain, or otherwise incapable of proof." *Id.* at 322.  The Underlying Action plaintiffs allegedly suffered damages within the statutory period as a result of BD's prior unfairly competitive and disparaging conduct targeted against Terumo and RTI.  Such damages clearly would have been "speculative, uncertain, or otherwise incapable of proof" at the time of the alleged conduct.  The statute of limitations, therefore, posed no bar to recovery for the Underlying Actions.[35]

Because the Underlying Actions allege BD's advertising practices, during the 1993 Policies and thereafter, caused underlying plaintiffs' injuries and constituted unfair competition, National Union must provide coverage for BD's costs of defending and settling the Underlying Actions.

## B. The Underlying Actions' Claims Fall Within The Disparagement Coverage Of National Union's Policies

The Policies cover claims for advertising injury/liability and/or personal injury arising out of disparagement.  RTI's Complaint asserted an explicit Count for business disparagement, and cited numerous examples of BD's allegedly disparaging publications.  *See supra* at 13.  RTI supported these allegations with fact

---

[35]   Certain of the Class Actions plaintiffs argued their damages period should be tolled but the parties settled before the Court adjudicated the issue.  *See, e.g.,* Mhatre Dec., Ex. 19 at ¶ 7.

and expert testimony, documents and expert reports, identifying numerous incidences of oral and written publications explicitly disparaging RTI, other sharps competitors, and their products. *See supra* at 13-31.  BD's allegedly disparaging conduct, beginning in 1993 and continuing through the Action's settlement, constituted the very heart of RTI's claims against BD. *See supra* at 15.[36]

The Underlying Plaintiffs' disparagement allegations and evidence also formed the very heart of their antitrust claims.[37]  BD demonstrates above that the Underlying Plaintiffs possessed clear legal and financial motives to seek antitrust relief for BD's alleged disparagement. *Supra* at 17.  By framing its disparagement claims as antitrust, moreover, RTI potentially could hold BD liable for damages it suffered as a result of BD's allegedly disparaging conduct from 1993 forward. *See Zenith Radio*, 401 U.S. at 322.  The Class Actions plaintiffs, similarly, could recover from BD for its disparagement of Terumo and RTI.[38]

---

[36]    The RTI Action court never dismissed RTI's disparagement Count.  This Count remained in the Action until the parties' settlement, and it became part of the settlement.  *See supra* at 17.  RTI, in fact, informed its shareholders and the public, in government filings, that BD paid "$100 million to settle a lawsuit with [RTI] for anticompetitive practices, business disparagement, and tortious interference."  *See* Corona Cert., Ex. P.

[37]    National Union's Policies, again, provide disparagement coverage regardless of the label under which the Underlying Plaintiffs sought to recover damages for BD's conduct.  *See SL Indus., Inc.*, 128 N.J. at 198-99; *Pickett*, 131 N.J. at 470.

[38]    National Union implies incorrectly that its Policies provide coverage only if BD disparaged the Class Actions plaintiffs (and not any third parties).  The Policies, in fact, contain no such requirement.  The clear language of the Policies requires

44

BD explained clearly the nature of the claims it defended and settled:



BD's alleged disparaging conduct occurred during each of the Policies' periods.  *See supra* at 21-31.

## POINT III

**THIS COURT SHOULD DENY NATIONAL UNION SUMMARY JUDGMENT BECAUSE DISPUTED ISSUES PREVENT THE INSURER FROM ESCAPING ITS COVERAGE OBLIGATIONS BASED ON ALLEGED LATE NOTICE OR LACK OF CONSENT**

National Union bears the burden of proving BD breached the Policies' notice provisions.  *Chem. Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co.*, 817 F. Supp. 1136, 1158 (D.N.J. 1993), *aff'd in part and remanded,* 89 F.3d 976 (3d Cir. 1996) (citing *Cooper v. Gov't Emp. Ins. Co.*, 51 N.J. 86, 94 (1968)); *Fed. Ins. Co. v. Purex*

---

only "[o]ral or written publication of material that … disparages a person's or organization's goods, products or services."  *See, e.g.,* Mhatre Cert., Exs. 3 and 4 at NU000293 and NU000334.  The Class Actions plaintiffs allege they suffered injury from BD's alleged disparagement of Terumo, RTI and others.  National Union, again, could have drafted alternative Policy language to clarify the meaning and scope of its coverage obligations, but failed to do so.  *See, e.g., Doto*, 140 N.J. at 557.

*Indus., Inc.*, 972 F. Supp. 872, 880 (D.N.J. 1997); *Gazis v. Miller*, 186 N.J. 224, 228 (2006).  National Union cannot meet its heavy burden, especially on this summary judgment motion.

### A.      BD's Risk Management Department Received No Required Notice Of The Underlying Actions

BD purchased, and National Union drafted, the Notice Endorsements which required that the insurer receive "notice" of an occurrence only after certain BD individuals had received such "notice."  *Supra* at 3-5.  Disputed factual issues, at the very least, exist as to when BD's Risk Manager/Director of Risk Management received notice of the Underlying Actions.  Discovery, in fact, established these individuals received such "notice" only shortly before BD conveyed same to National Union.  *See, e.g.,* Mhatre Dec., Ex. 10 at 26:1-27:10   BD's corporate designee confirmed the company's counsel handling the Underlying Actions never provided notice of same to BD's Risk Management Department until 2013.  *Id*.

National Union cannot satisfy the Notice Endorsements by arguing BD's Risk Manager may have possessed some amorphous general knowledge of the Underlying Actions.  The insurer drafted carefully the Endorsements to trigger "notice" of the Actions to National Union only after the designated BD individual received the same "notice" thereof.  National Union conceded its Notice Endorsements require the same "notice" formality level for BD as the insurer.  *See*

46

Corona Cert., Ex. C at 54:6-17.  National Union also conceded "notice" required

more than just the Risk Manager's general knowledge of the Underlying Actions:

> Q.     Is it your understand that the word "notice" in the knowledge of
> an occurrence endorsement here in [the Sunrise Policy] is, it's a term
> that refers to a specific event, correct?  Notice is something that's
> happened as opposed to just knowledge, correct?
>
> That would be my understanding, that's fair.  [*Id.* at 52:7-15]

National Union also conceded it never knew if or when BD's Risk Manager received

notice of the Underlying Actions.  *See* Corona Cert., Ex. OOO at 104:24-105:19;

164:3-20.

National Union bears the burden of proving BD provided late notice of the

Underlying Actions.  The (surprisingly) clear Policy language, which National

Union alone drafted, required BD to provide notice of the Underlying Actions only

after it received notice of same.  Because National Union cannot dispute BD's Risk

Manager received notice of the Underlying Actions only shortly before it provided

such notice to the insurer, National Union cannot possibly secure summary judgment

on its late notice defense.

## B.     Any Late Notice Caused National Union No Appreciable Prejudice

Even if National Union could prove BD provided late notice of the Underlying

Actions, it certainly cannot prove – especially on this summary judgment motion –

that such notice caused it appreciable prejudice.  This Court, in the Travelers Action,

applied New Jersey law to the exact same Underlying Actions facts and to nearly

identical policy language, and twice confirmed BD's insurers cannot escape coverage for the Underlying Actions unless they prove appreciable prejudice from BD's alleged late notice. *See supra* at 32. National Union cannot demonstrate appreciable prejudice because it does not (and cannot) prove it: (1) irretrievably lost substantial rights; **and** (2) likely would have defended successfully against the Underlying Actions. *British Ins. Co. of Cayman v. Safety Nat. Cas.*, 335 F.3d 205, 212 (3d Cir. 2003); *Transportes Ferreos de Venezuela II CA v. NKK Corp.*, 239 F.3d 555, 561 (3d Cir. 2001); *accord Chem. Leaman Tank Lines, Inc.,* 89 F.3d at 996.[39]

National Union cannot satisfy the first prejudice prong through "the mere fact that it cannot employ its normal procedures in investigating and evaluating the claim." *Chem. Leaman Tank Lines, Inc.*, 817 F. Supp. at 1158 (quoting *Morales v. Nat'l Grange Mut. Ins. Co.*, 176 N.J. Super. 347, 355 (Ch. Div. 1980)). National Union, instead, "must show that substantial rights have been *irretrievably* lost." *Id.* (emphasis in original); *accord NKK Corp.*, 239 F.3d at 561 (quoting *Kitchnefsky v. Nat'l Rent-A-Fence of Am., Inc.*, 88 F. Supp. 2d 360, 368 (D.N.J. 2000)). Such rights

---

[39]   The appreciable prejudice issue, at the very least, raises questions of fact inappropriate for summary judgment. A jury must assess the credibility of National Union's testimony about (among other issues): (1) when BD's Risk Manager received notice of the Underlying Actions; (2) how, if at all, BD's alleged failure to comply with the Notice provision prejudiced National Union; and (3) how, if at all, National Union would have achieved a better Underlying Actions outcome than that secured by BD.

48

include the availability of witnesses, the ability to discover information regarding the covered incident(s), the preparation and preservation of demonstrative and illustrative evidence, and the ability of experts to opine on the dispute. *Id.*

National Union identifies no **material** documents or witnesses irretrievably lost or presently unavailable. *Id.* at 1158–59.  To the contrary, "a wealth of relevant documentary evidence remains intact" and available to National Union.  *See Chem. Leaman Tank Lines, Inc.*, 89 F.3d at 996 (quoting *Chem. Leaman Tank Lines, Inc.*, 817 F. Supp. at 1159).  BD produced to the insurer the entire Underlying Actions files, consisting of more than four (4) million pages of documents, and made 7 fact and expert witnesses available for 9 deposition days.  National Union relies, in a footnote, on the unfortunate death of "one witness" and the alleged "memory lapses" of other individuals.  The insurer, however, makes no effort to demonstrate how, if at all, these circumstances caused it to lose irretrievably substantial rights.  The Third Circuit consistently and correctly has held that "[u]nder New Jersey law, mere conjecture or suspicions may not form the basis for establishing appreciable prejudice."  *NKK Corp.*, 239 F.3d at 561.  The Circuit Court also has rejected insurers' arguments that "the loss of a [key] piece of physical evidence will per se establish substantial prejudice," reasoning "New Jersey law is not so generous."  *Id.* National Union, in short, cannot demonstrate, especially, on this summary judgment

motion, that it lost substantial rights due to BD's alleged failure to comply with the Policies' notice provisions.

National Union also cannot satisfy the second prejudice prong because it requires the insurer to prove "the likelihood that it would have had a meritorious defense [to the Underlying Actions] had it been informed of the accident in a timely fashion." *Chem. Leaman Tank Lines, Inc.*, 817 F. Supp. at 1158 (quoting *Morales*, 176 N.J. Super. at 355–56)); *accord Kitchnefsky*, 88 F. Supp. 2d at 368–70; *Solvents Recovery Serv. of New England v. Midland Ins. CO.*, 218 N.J. Super. 49, 55 (App. Div. 1987).  National Union proffers no fact or expert testimony that BD deficiently defended or settled the Underlying Actions.  BD, in sharp contrast, offers the fact that it defended the Actions with "one of the best litigation firms . . . in the country," Paul Weiss.  *See* Corona Cert., Ex. PPP at 75:13-16.  BD also will offer at trial the expert testimony of former Judge Orlofsky that "Paul Weiss has represented BD for two decades, and has handled high-stakes antitrust litigation for decades.  The firm has a depth of experience in preparing and trying complicated cases, like the RTI Litigation."  *See* Corona Cert., Ex. I at 28.  Judge Orlofsky also will testify at trial that:

> BD's defense of the RTI Litigation and Class Actions was sufficient and reasonable;
>
> The defense costs incurred in the RTI Litigation and the Class Actions were reasonable; and

> The settlements reached in the RTI Litigation and in the Class Actions were fair and reasonable.

*Id*.

National Union, in short, simply cannot prove – certainly on this summary judgment motion – that it would have achieved a better outcome in the Underlying Actions than that secured by BD.  National Union also cannot demonstrate BD settled the Underlying Actions for unreasonable amounts or following collusive and/or bad faith negotiations.  *See NKK Corp.*, 239 F.3d at 562–63; *Kitchnefsky*, 88 F. Supp. 2d at 369–70; *Ohaus v. Cont'l Cas. Ins. Co.*, 292 N.J. Super. 501, 512 (App. Div. 1996).  National Union's alleged late notice/appreciable prejudice defense remains, at best for the insurer, a jury issue for trial.

National Union also finds no refuge in its Policies' consent provisions.  This Court agrees that National Union also must prove appreciable prejudice arising from BD's alleged failure to seek the insurer's consent to its Underlying Actions settlements.  In *Pittston Co. v. Allianz Insurance Co.*, 905 F. Supp. 1279, 1295 (D.N.J. 1995), *rev'd and remanded o.g. sub nom.*, *Pittston Co. Ultramar America v. Allianz Insurance Co.*, 124 F.3d 508 (3d Cir. 1997), this Court held that "where an insured settles a claim against it without the permission of the insurer, the insurer must, nonetheless, demonstrate prejudice before being relieved of its policy obligations."  *Accord Chem. Leaman Tank Lines, Inc.*, 89 F.3d at 996–97.  National Union, for the same reasons articulated above, cannot prove – especially on this

51

summary judgment motion – the necessary appreciable prejudice to escape coverage.

National Union relegates to a footnote a related argument deserving such treatment; *i.e.*, that it must "indemnify BD only for those sums that BD becomes 'legally obligated to pay' by means of a court's determination of liability or a settlement to which National Union consents."  None of the Policies' insuring agreements, in fact, (i) states that only a settlement to which National Union consents triggers its coverage obligations under the Policies, (ii) cross references or incorporates any other policy provision, or (iii) defines the phrase "legally obligated to pay."  National Union, therefore, can secure summary judgment on this issue only if this Court allows the insurer to rewrite its Policy language.  *See Pennbarr Corp.*, 976 F.2d at 155 ("The law will not make a better contract for the parties than they themselves have seen fit to enter into, or alter it for the benefit of one party and to the detriment of the other." (quoting *James*, 5 N.J. at 24 )); *accord Flomerfelt v. Cardiello,* 202 N.J. 432, 441 (2010).[40]

---

[40]    If National Union wanted to "make clear that BD only becomes 'legally obligated to pay' after a court's determination of liability or a settlement to which National Union consents," then the insurer easily could have drafted insuring agreements effectuating explicitly this intent.  *See Doto*, 140 N.J.at 557 (quoting *Mazzilli*, 35 N.J. at 7).  BD, at the very least, identifies an ambiguity in whether the phrase "legally obligated to pay" encompasses its coverage claim.  This Court, as a matter of summary judgment principles and New Jersey insurance law, must resolve

Third Circuit courts make clear a policyholder becomes "legally obligated to pay" when it settles underlying claims – even without the insurer's consent. *See, e.g.*, *Berne v. Cont'l Ins. Co.*, 753 F.2d 27, 28–30 (3d Cir. 1985) (holding primary and excess policies with insuring agreements containing "legally obligated to pay" language covered policyholder's underlying settlement, to which insurers did not consent); *accord McDowell-Wellman Eng'g Co. v. Hartford Acc. & Indem. Co.*, 711 F.2d 521, 528 (3d Cir. 1983); *Ripepi v. Am. Ins. Cos.*, 349 F.2d 300, 301–03 (3d Cir. 1965); *Amerada Hess Corp. v. Zurich Ins. Co.*, 29 F. App'x 800, 807 (3d Cir. 2002).[41]

The trial court's nearly 50 year old opinion in *Bacon v. American Insurance Co.*, 131 N.J. Super. 450 (Ch. Div. 1974) remains completely inapposite. The policyholder there sought coverage for a $16,755.80 credit given to its customer without either a lawsuit or formal settlement. *Id*. at 454. The trial court reached the

---

this ambiguity in BD's favor. *Simonetti*, 372 N.J. Super. at 428; *Flomerfelt*, 202 N.J. at 441.

[41] New Jersey courts, moreover, hold that where, as here, an insurer wrongfully refuses coverage to its insured, the insurer remains liable for any reasonable settlement agreement in which the insured enters. *See Griggs v. Bertram*, 88 N.J. 347, 364 (1982); *Baen v. Farmers Mut. Fire Ins. Co. of Salem Cty.*, 318 N.J. Super. 260, 269 (App. Div. 1999). Even if National Union had received notice prior to settlement of the Underlying Actions, BD would have needed no consent thereto because the insurer still would have denied coverage completely based upon the numerous other coverage defenses articulated in its belated coverage declination letter, in its Complaint and Answer to BD's Counterclaims, and in this summary judgment motion.

unremarkable conclusion that the underlying matter "ha[d] not reached a point at which it can be said that [the policyholder was] 'legally obligated' to pay damages to [its customer]." *Id*. at 458. RTI and the Class Actions plaintiffs obviously filed the Underlying Actions against BD, and those Actions resulted in formal, legally binding and enforceable settlement agreements.

## POINT IV

### THIS COURT SHOULD DENY NATIONAL UNION SUMMARY JUDGMENT BECAUSE DISPUTED ISSUES EXIST REGARDING THE INSURER'S COVERAGE OBLIGATION FOR BD'S DEFENSE COSTS

National Union's summary judgment motion ignores completely the distinction between its coverage obligation for BD's Underlying Actions' defense costs and its obligation for BD's settlements of those Actions. National Union's defense coverage obligation operates far more broadly than its indemnity coverage obligation. *See, e.g., Gen. Acc. Ins. Co. of Am. v. State, Dep't of Envir. Prot.*, 143 N.J. 462, 465 (1996). An insurer must pay defense costs whenever the underlying claims potentially fall within its policy's coverage, even if the claims prove "groundless, false or fraudulent." *Voorhees*, 128 N.J. at 173-74. In determining whether an insurer must pay defense costs, courts resolve all "doubts … in favor of the insured." *Abouzaid v. Mansard Gardens Associates, LLC*, 207 N.J. 67 (2011); *Danek v. Hommer*, 28 N.J. Super. 68, 77 (App. Div. 1953), *aff'd,* 15 N.J. 573 (1954) (citation omitted); *accord Voorhees*, 128 N.J. at 173-74 (citation omitted); *Atl.*

54

*Emp'rs Ins. Co. v. Chartwell Manor School,* 280 N.J. Super. 457, 465 (App. Div. 1995).  Even if the underlying Complaint includes no covered allegations, the insurer must defend if facts outside the Complaint establish a potentially covered claim.  *SL Indus., Inc.*, 128 N.J. at 198-99; *Abouzaid*, 207 N.J. at 81.

This Court's prior denial of National Union's dismissal motion proves the Underlying Actions fall potentially within the Policies' coverage.  Such ruling, again, at the very least, prevents the Court from granting summary judgment on National Union's coverage obligation for BD's costs of defending the Actions.

National Union cannot avoid its defense coverage obligation through its "pre-tender" argument.  That case law necessarily presupposes BD needed to provide the insurer with notice of the Underlying Actions before incurring defense costs therefor.  BD, however, purchased the Notice Endorsements, drafted by National Union, which required notice to the insurer only after BD's insurance professionals received such notice of the Actions.

National Union's position negates completely the additional notice protections BD purchased through the Notice Endorsements.  These Endorsements become meaningless if National Union can avoid paying for defense costs regardless of when BD's Risk Manager received notice of the Underlying Actions.  New Jersey courts reject policy interpretations which render coverage illusory.  *See, e.g.,*

*Bowersox Truck Sales & Serv., Inc. v. Harco Nat. Ins. Co.*, 209 F.3d 273, 278–79 (3d Cir. 2000).

<div align="center">

**POINT V**

</div>

**THIS COURT SHOULD DENY NATIONAL UNION SUMMARY JUDGMENT BECAUSE DISPUTED ISSUES EXIST REGARDING THE INSURER'S BAD FAITH INVESTIGATION OF BD'S COVERAGE CLAIMS**

Every insurer owes its policyholder a duty of good faith and fair dealing when investigating a coverage claim.  New Jersey's Unfair Claim Settlement Practices Act ("Act") codifies certain of these good faith obligations by prohibiting an insurer from, among other things, "[r]efusing to pay claims without conducting a reasonable investigation based upon all available information." *N.J.S.A.* § 17:29B-4(9)(d); *accord Princeton Gamma-Tech, Inc. v. Hartford Ins. Grp.*, 1997 WL 35384066, at *129 (N.J. Super. Ct. Law. Div. June 5, 1997).  The Act reflects New Jersey public policy with respect to the relationship between insurance companies and their policyholders.  *See, e.g.*, *Pickett*, 131 N.J. at 467.  An insurer's "deviation from the standards" in the Act constitutes "evidence of bad faith."  *Miglicio v. HCM Claim Mgmt. Corp.*, 288 N.J. Super. 331, 341 (Ch. Div. 1995); *accord LaSalandra v. Pa. Gen. Ins. Co.*, No. CIV.A. 03-6805, 2004 WL 1636977, at *2 (E.D. Pa. July 12, 2004); *Princeton Gamma-Tech, Inc.*, 1997 WL 35384066, at *128.

Even if the jury eventually concludes the Policies provide no coverage for the Underlying Actions, National Union remains liable for failing to investigate properly

<div align="center">

56

</div>

BD's coverage claims before denying same. *See, e.g., Princeton Gamma-Tech, Inc.*, 1997 WL 35384066, at *128; *Griggs*, 88 N.J. at 360–61.  National Union failed utterly to conduct any investigation whatsoever of the Underlying Actions, and should not escape the consequences of its bad faith conduct.  *See, e.g.,* Corona Cert., Exs. QQQ, RRR and SSS.

## CONCLUSION

BD respectfully requests the Court deny National Union's summary judgment motion.

McCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
Phone:  (973) 639-2062
Fax:  (973) 297-3846
Email:  abartell@mccarter.com
Attorneys for Defendant


By:    s/ Anthony Bartell
Anthony Bartell

Dated:  February 12, 2021

ME1 35623509v.4