## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., | : : : | **Civil Action No. 14-04318 (JXN)(JSA)** |
| Plaintiff, | : : | |
| v. | : : | **OPINION** |
| BECTON, DICKINSON AND COMPANY, | : : | |
| Defendant. | : : : | |

**NEALS**, District Judge:

 **THIS MATTER** comes before the Court on Plaintiff National Union Fire Insurance Company of Pittsburgh, Pa.'s ("Plaintiff" or "National Union") motion for summary judgment (ECF No. 255). Defendant Becton, Dickinson and Company ("Defendant" or "BD") opposed the motion (ECF No. 266), and Plaintiff filed a reply (ECF No. 291). The Court reviewed all submissions made in support and in opposition to the motion, and considered the motion without oral argument pursuant to Federal Rule of Civil Procedure 78(b) and Local Civil Rule 78.1(b). For the reasons stated herein, the Court will deny Plaintiff's motion for summary judgment.[1]

## I.    BACKGROUND[2]

### A.  Factual Background

 This declaratory judgment action arises out of an insurance coverage dispute between Plaintiff, an insurance carrier, and Defendant, its insured. Plaintiff seeks a declaration that it is not

---

[1] As explained below, certain portions of the motion are denied conditionally.

[2] The Court draws all facts from Plaintiff's Statement of Undisputed Material Facts in Support of Motion for Summary Judgment ("Pl.'s SOMF") (ECF No. 255-1), Defendant's Response to Plaintiff's Statement of Alleged Material Facts ("Def.'s SOMF") (ECF No. 288), and the relevant record. For the sake of clarity, unless otherwise noted, all references to page numbers correspond to the page numbers generated by the ECF system.

obligated to defend or indemnify Defendant for costs Defendant incurred in certain underlying actions. The Court writes only for the parties and recites only those facts necessary to the resolution of Plaintiff's motion.

### 1. The RTI Action

The events giving rise to this matter began in or around August 1998, when Retractable Technologies, Inc. ("RTI") brought an action against Defendant and others in Texas state court. (Declaration of Lynnette Cortes Mhatre, Esq. ("Mhatre Decl."), Ex. 12, ECF No. 255-5 at 90-94.) Defendant is a global company primarily engaged in the manufacture and sale of medical supplies, systems, and devices. (Mhatre Decl., Ex. 24, ECF No. 255-5 at 355.) RTI claimed that Defendant had "participated in an antitrust conspiracy and other illegal conduct" and "contracted . . . to exclude RTI from selling" certain retractable syringes and safety products that RTI developed in violation of Texas law. (*Id.* ¶¶ 9-11.) Roy Weber, Defendant's Head of Litigation, determined that Defendant did not have insurance coverage for the state court action at the time. (Mhatre Decl., Ex. 10, Defendant's Fed. R. Civ. P. 30(b)(6) Deposition ("Def.'s 30(b)(6) Dep.") Tr. at 44:1-2, 135:6-23, 246:20-25, ECF No. 257.)

In or around January 2001, RTI dismissed its state court action and filed a new action against Defendant and others in the United States District Court for the Eastern District of Texas (the "RTI Action"). (*See* Mhatre Decl., Ex. 13, ECF No. 255-5 at 95-108, Ex. 25, ECF No. 257-1 at 45.) The RTI Action asserted claims for, *inter alia*, state and federal antitrust violations and business disparagement. (Mhatre Decl., Ex. 13, ECF No. 255-5 at 103-06.) Bruce Hector, Defendant's then-Associate General Counsel, and David Young, Defendant's Director of Risk Management, both concluded that BD did not have insurance coverage for the RTI Action at the time. (*See* Mhatre Decl., Ex. 9, Deposition of Bruce Hector ("Hector Dep.") Tr. at 19:9-17,

34:15-21, ECF No. 255-5; Ex. 8, Deposition of David Young ("Young Dep.") Tr. at 83:16-25, 165:4-23, ECF No. 255-5.) During the RTI Action, Defendant confirmed in a discovery response that "[w]ith respect to this litigation, [BD] has no insurance policy that covers this case." (Mhatre Decl., Ex. 26, ECF No. 255-5 at 359.) Defendant moved for summary judgment. (*See* Def.'s 30(b)(6) Dep. Tr. at 193:5-9.) In a response to Defendant's motion, RTI acknowledged that Defendant was entitled to summary judgment on the business disparagement claim due to insufficient evidence. (*See* Mhatre Decl., Ex. 53, ECF No. 257-3 at 9.)

On July 2, 2004, Defendant agreed to pay RTI $100,000,000 to settle the RTI Action. (Mhatre Decl., Ex. 28, ECF No. 255-5 at 363.) Defendant did not seek Plaintiff's consent before settling. (Pl.'s SOMF ¶ 3; Def.'s SOMF ¶ 3.) The parties dispute whether the settlement covered the business disparagement claim. (*See* Pl.'s Mov. Br. at 23, 28; Def.'s Br. at 53 n.36.) While RTI acknowledged in motion practice that Defendant was entitled to summary judgment on this claim, (*see* Mhatre Decl., Ex. 53, ECF No. 257-3 at 9), Defendant asserts that the court never dismissed the claim and RTI noted on its March 31, 2006, Form 10-K that Defendant had paid "$100 million to settle a lawsuit with [RTI] for anticompetitive practices, business disparagement, and tortious interference." (Corona Cert., Ex. P, ECF No. 267 at 88; *see also* Def.'s Br. at 53 n.36.)

### 2. The Class Actions

After the RTI Action settled, Louisiana Wholesale Drug Company, Inc. ("LWDC") filed a putative class action against Defendant in this District on March 23, 2005. (*See In re Hypodermic Products Antitrust Litigation*, Master Docket No. 05-1602, ECF No. 1.) LWDC alleged that it was a direct purchaser of Defendant's products and that Defendant had "stifl[ed] . . . competition" that "caused the artificial inflation of market prices of overall market prices . . . result[ing] in [LWDC] and the other Class members buying" Defendant's products "at supracompetitive prices." (*See id.*

¶ 13.) Following the LWDC action, other direct and indirect purchasers of Defendant's products brought separate putative class actions against Defendant, which were later consolidated into a multidistrict litigation in this District (the "Class Actions," and, together with the RTI Action, the "Underlying Actions"). (*See* Mhatre Decl., Ex. 32, ECF No. 257-2 at 73; Hector Dep. Tr. at 147:9-21.) Hector, who by that time was Defendant's Head of Litigation, oversaw the Class Actions and determined that Defendant did not have insurance coverage for them. (Hector Dep. Tr. at 129:24-130:7, 158:24-159:13).

Defendant settled with the direct purchaser plaintiffs for $45,000,000 on April 27, 2009, and with the indirect purchaser plaintiffs for $22,000,000 on July 30, 2013. (Mhatre Decl., Exs. 34-35, ECF No. 255-5 at 421-64.) Defendant settled the Class Actions without seeking Plaintiff's consent. (Pl.'s SOMF ¶ 7; Def.'s SOMF ¶ 7.)

### 3.   Defendant's Demands for Insurance Coverage for the Underlying Actions

On August 1, 2013, Law360 published an article on Defendant's settlement with the indirect purchaser plaintiffs. (Mhatre Decl., Ex. 36, ECF No. 255-6 at 1-3.) Defendant's outside counsel McCarter & English ("McCarter") read the article, contacted Defendant, and suggested it consider seeking insurance coverage for the Underlying Actions. (*See* Def. 30(b)(6) Dep. Tr. at 11:25-13:21, 29:1-16.) Despite the fact that Hector, Young, and Defendant's prior counsel all previously determined that Defendant did not have coverage for the Underlying Actions, Andrew Walpole, who replaced Young as Director of Risk Management, and Greg Vincinanza, who replaced Hector as Head of Litigation, retained McCarter to pursue claims for coverage. (*See* Def. 30(b)(6) Dep. Tr. at 18:6-22, 185:17-186:7.)

In 2013, Defendant, represented by McCarter, began requesting coverage from several insurers for the Underlying Actions. (*See, e.g.*, Mhatre Decl., Exs. 37, 39-41, 44, 47, ECF No. 255-6

at 4-6, 10-18, 25-26, 47-48.) In December 2013, Defendant sought coverage from its primary insurer ("Travelers") for defense and indemnity costs related to the Class Actions, and in June 2014, it sought coverage from Travelers for defense and indemnity costs related to the RTI Action. (Mhatre Decl., Exs. 37, 44, ECF No. 255-6 at 4-6, 25-26.) On July 11, 2014, Travelers sought a declaratory judgment that it did not have any obligation to defend or indemnify Plaintiff with respect to the Underlying Actions. *See Travelers Cas. & Sur. Co. et al. v. Becton, Dickinson & Co.*, No. 14-04410 (JMV)(JBC) (D.N.J. 2014), ECF No. 1. The matter settled in September 2018. (*Id.* at ECF No. 155.)

On June 13, 2014, Defendant first demanded insurance coverage from Plaintiff for the RTI Action. (Mhatre Decl., Ex. 46, ECF No. 255-6 at 32.) Specifically, Defendant requested coverage for the $100,000,000 it paid to settle the RTI Action, plus its defense costs, under three commercial umbrella liability insurance policies issued by Plaintiff to Defendant: (1) Policy No. BE 309 14 79, in effect from October 1, 1994, to October 1, 1997 (the "1994 Policy"); (2) Policy No. BE 932-81-55, in effect from October 1, 1997, to October 1, 1999 (the "1997 Policy"); and (3) Policy No. 357-42-59, in effect from October 1, 1999, to October 1, 2002 (the "1999 Policy"). (*See* Mhatre Decl., Ex. 46, ECF No. 255-6 at 42, Exs. 3-4, ECF No. 255-4 at 165-270, Ex. 5, ECF No. 255-5 at 1-48; Pl. SOMF ¶ 10; Def. SOMF ¶ 10.) On August 11, 2014, Plaintiff denied Defendant's coverage request. (*See* Mhatre Decl., Ex. 46, ECF No. 255-6 at 29-46.)

On or about September 19, 2014, Plaintiff first received notice that Defendant sought coverage for the Class Actions. (*See* Mhatre Decl., Exs. 47, 49, ECF No. 255-6 at 47-48, 54.) Defendant requested coverage for the Class Actions under the 1994 Policy, 1997 Policy, and 1999 Policy, as well as two additional commercial umbrella liability insurance policies issued by Plaintiff: (1) Policy No. 308-76-44, in effect from April 1, 1993, to April 1, 1994, and covering

"occurrences or circumstances happening between the dates October 1, 1985 to April 1, 1993";
and (2) Policy No. 308-76-43, in effect from April 1, 1993, to October 1, 1994 (together, the "1993
Policies," and, collectively with the 1994 Policy, 1997 Policy, and 1999 Policy, the "Policies").
(*See* Mhatre Decl., Exs. 1-2, ECF No. 255-4 at 1-164.) Plaintiff again denied Defendant's request.
(*See* Mhatre Decl., Exs. 49-50, ECF No. 255-6 at 51-90.)

### 4. The Relevant Policy Provisions

Although the language of the Policies varies slightly, all provide coverage for sums in
excess of the amounts paid by underlying primary insurers that Defendant "becomes legally
obligated to pay . . . because of . . . Personal Injury, or Advertising Injury . . . ."[3] (Mhatre Decl.,
Ex 3, ECF No. 255-4 at 211-12; *see also* Mhatre Decl., Ex. 1, ECF No. 255-4 at 5-6, Ex. 2, ECF
No. 255-4 at 70-71, Ex. 4, ECF No. 255-4 at 254, 256, Ex. 5, ECF No. 255-5 at 29.) Defendant
seeks coverage for the Underlying Actions under the "Advertising Liability" provision in the 1993
Policies, the "Advertising Injury" provision in the 1994, 1997, and 1999 Policies, and the
"Personal Injury" provision in all of the Policies. (Pl.'s SOMF ¶ 13; Def.'s SOMF ¶ 13.)

The 1993 Policies define "Advertising Liability" as "liability for damage because of" one
of the following:

(a) unintentional Liable, Slander or Defamation of Character;
(b) infringement of copyright or title or of slogan;
(c) piracy or unfair competition or idea misappropriation under an implied contract;
(d) Invasion of the rights of privacy,

committed or alleged to have been committed during the policy period in any
advertisement, publicity article, broadcast or telecast and arising out of Named
Insured's advertising activities.

(Mhatre Decl., Ex. 1, ECF No. 255-4 at 10; Ex. 2, ECF No. 255-4 at 75.)

---

[3] The 1993 Policies refer to "Advertising Injury" as "Advertising Liability." (*See* Mhatre Decl., Ex. 1 at ECF No. 255-4 at 5, Ex. 2, ECF No. 255-4 at 70.)

Similarly, the 1994 Policy, 1997 Policy, and 1999 Policy generally define "Advertising Injury" as "[i]njury arising solely out of [the insured's] advertising activities" due to one or more of the following:

1. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products, or services;
2. Oral or written publication of material that violates a person's right of privacy;
3. Misappropriation of advertising ideas or style of doing business; or
4. Infringement of copyright, title or slogan.

(Mhatre Decl., Ex. 3, ECF No. 255-4 at 214; *see also* Mhatre Decl., Ex. 4, ECF No. 255-4 at 256; Ex. 5, ECF No. 255-5 at 32.)

With respect to "Personal Injury," all of the Policies generally provide coverage for "injury other than Bodily Injury or Advertising Injury arising out of one or more of the following offenses . . . Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or [] Oral or written publication of material that violates a person's right of privacy." (Mhatre Decl., Ex. 3, ECF No. 255-4 at 216-17; *see also* Mhatre Decl., Ex. 1, ECF No. 255-4 at 9-10; Ex. 2, ECF. No. 255-4 at 74-75; Ex. 4, ECF No. 255-4 at 258-59; Ex. 5, ECF No. 255-5 at 35.)

**B. Defendant's Advertising Campaigns and Related Programs**

Defendant argues that the Policies cover the Underlying Actions because the plaintiffs in the Underlying Actions alleged that they suffered "unfair competition" and "disparagement" as a result of Defendant's advertising campaigns and related programs. (*See* Def.'s Br. at 22-39, ECF No. 266.) The first such campaign was called "Block Terumo." In or about 1985, Defendant retained an independent marketing consultant to compete against Terumo Corporation, a Japanese manufacturer that sought to gain market share in the United States by introducing a low-cost yet effective safety needle "comparable" to Defendant's product. (*See* Mhatre Decl., Ex. 54, ECF No.

257-6 at 7-9.) To compete, Defendant focused its efforts during Block Terumo on improving product quality and "run[ning] sophisticated advertising and direct mail." (*See id.* at 8.)

Following its Block Terumo campaign, Defendant shifted tactics to address "value" and pricing issues. (*See id.* at 13-14.) It launched the "Safety Compliance Initiative," which focused on selling the "value" of Defendant's product. (*Id.* at 13.) Through "information and training material and compliance material," Defendant emphasized to hospitals and nurses the safety benefits of Defendant's product. (*Id.* at 8, 13.) Defendant also devised the "Cost-Reduction Initiative," another value-centered advertising campaign aimed at "educat[ing] purchasers about [Defendant's] safe and cost-effective needles." (*Id.* at 14.) As part of the Cost-Reduction Initiative, Defendant "associated itself with a leading authority on needle sticks" to "develop[] and sponsor[] EpiNet, a program . . . [that] tracked and calculated the costs, for hospital users, associated with needle sticks, thereby highlighting the costs savings of buying safety products to prevent sticks." (*Id.*) Defendant's efforts ultimately proved effective, and Terumo Corporation never gained a foothold in the market. (*See id.* at 8.)

Although Defendant's corporate designee testified that Block Terumo "officially ended in 1992," (Def.'s 30(b)(6) Dep. Tr. 392:2-9, ECF No. 257, Ex. 11), Defendant contends that RTI alleged the campaign "continued long past 1992," (Def.'s Br. at 32). For example, Defendant asserts that RTI relied on an October 5, 1994, memorandum sent to Gary Cohen, who worked for Defendant, "containing a transcribed conversation with a former Terumo Sales Manager, highlighting the competitor's marketing weaknesses, for BD's continued (allegedly unfair and disparaging) competitive use against Terumo." (Def.'s Br. at 32 (citing Corona Cert., Ex. QQ, ECF No. 281 at 52-75.) Furthermore, RTI's expert characterized the Block Terumo campaign as

extending beyond 1992. (*See* Corona Cert., Ex. QQ, ECF No. 76-77 ¶ 150 (citing documents from 1994, 1996, and 1998 in describing the Block Terumo campaign.))

In or around 2001, Defendant launched another advertising campaign against Terumo called "Block Terumo II." (Corona Cert., Ex. XX, ECF No. 281 at 128-53; Def.'s 30(b)(6) Dep. Tr. at 52:6-54:15, ECF No. 257-1, Ex. 11.) Similar to Block Terumo, Block Terumo II was focused on preventing Terumo from breaking into the United States market. (*See* Def.'s 30(b)(6) Dep. Tr. at 48:1-22, ECF No. 257-1, Ex. 11.)

### C. Procedural History

On July 9, 2014, Plaintiff filed an action in this District seeking a declaration that it has no duty to defend or indemnify Defendant for the RTI Action ("BD I"). (*See generally* Complaint for Declaratory Judgment ("BD I Compl."), ECF No. 1.) Defendant answered and counterclaimed for a declaratory judgment that Plaintiff must pay its defense and indemnity costs for the RTI Action and for compensatory and consequential damages arising out of Plaintiff's alleged breach of contract and breach of the duty of good faith and fair dealing. (*See generally* Defendant's Amended Answer, Affirmative Defenses, Amended Counterclaims and Jury Demand ("BD I Answer"), ECF No. 181.) BD I was assigned to the Hon. Claire C. Cecchi, U.S.D.J.

On January 30, 2017, Plaintiff filed a second action against Defendant in this District seeking a declaration that it has no duty to defend or indemnify Defendant for the Class Actions ("BD II"). (*See generally* Complaint for Declaratory Judgment ("BD II Compl."), No. 17-00691 at ECF No. 1.) Defendant again answered and counterclaimed for declaratory judgment, breach of contract, and breach of the duty of good faith and fair dealing. (*See generally* Defendant's Answer, Affirmative Defenses, Counterclaims and Jury Demand ("BD II Answer"), No. 17-00691 at ECF No. 4.) BD II was assigned to the Hon. Jose L. Linares, then-Chief U.S.D.J. On February 20, 2018,

Chief Judge Linares denied Plaintiff's motion for judgment on the pleadings in BD II, concluding that "no determination of coverage c[ould] be rendered at this juncture" and that Plaintiff was not "entitled to judgment . . . based upon the language in the policies" alone. (No. 17-00691, ECF No. 31 at 9-10.)

BD I and BD II were consolidated on June 4, 2018. (ECF No. 163.) On December 20, 2020, Plaintiff moved for summary judgment on its claims and Defendant's counterclaims. (ECF No. 255.) Thereafter, Defendant opposed Plaintiff's motion, and Plaintiff filed a reply. (ECF Nos. 266, 291.) On April 12, 2021, Defendant filed a supplemental opposition to address an argument raised in Plaintiff's reply that it should be barred from relying on certain exhibits due to improper disclosure. (ECF No. 301.) Plaintiff filed a response to Defendant's supplemental opposition on April 22, 2021. (ECF No. 303.) On July 9, 2021, this matter was reassigned to the undersigned. (ECF No. 309.)[4]

## II.   LEGAL STANDARD FOR SUMMARY JUDGMENT

The Court will grant summary judgment if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgement as a matter of law." Fed. R. Civ. P. 56(c). As the moving party, Plaintiff bears the burden of showing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). An issue is "genuine" if the evidence is such that a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Plaintiff may satisfy its burden by either 1) submitting affirmative evidence that negates an essential element of the nonmoving party's claim; or (2) demonstrating to the Court

---

[4] The Court has also considered Defendant's notice of supplemental authority, (ECF No. 310), and Plaintiff's response thereto, (ECF No. 311).

that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's case. *Celotex*, 477 U.S. at 331.

## III.   DISCUSSION

### A.  Coverage Under the 1993 Policies

Plaintiff first argues that it is entitled to summary judgment because Defendant cannot establish that it faced potential liability in the Underlying Actions for claims covered by the "Advertising Liability" provisions in the 1993 Policies. (*See* Pl.'s Mov. Br. at 21-27, ECF No. 256.)

As an initial matter, the Court rejects Plaintiff's contention that, in light of Chief Judge Linares's decision on the motion for judgment on the pleadings in BD II, the only section of the 1993 Policies under which Defendant could possibly recover is the "unfair competition" language in the "Advertising Liability" provisions. (*Id.* at 22.) According to Plaintiff, Chief Judge Linares "determined, at least implicitly, that the Advertising Liability provision in the 1993 Policies is the only coverage provision still at issue" and that "discovery was only necessary to determine whether BD could establish that it is entitled to coverage under the 'unfair competition' language . . . which appears *only* in the 1993 Policies." (*Id.*) The Court does not read Chief Judge Linares's opinion so narrowly. A review of the BD II opinion indicates that Chief Judge Linares concluded it was "not clear from the language of the policies whether or not the Underlying [Class] Actions fall within the parameters from said policies." No. 17-00691, ECF No. 31 at 7. While the opinion did focus its analysis on the "unfair competition" language in the 1993 Policies, *see id.* at 8-9, contrary to Plaintiff's assertions, it made no finding that the "only" provision still at issue was the "unfair

11

competition" language. Rather, Chief Judge Linares merely found that "a genuine issue of fact exists with regards to the meaning of the term 'unfair competition.'" (*Id.* at 9.)

Turning to the merits of Plaintiff's argument, Plaintiff asserts that Defendant cannot establish entitlement to coverage under the "Advertising Liability" provisions because Defendant only faced potential liability in the Underlying Actions for antitrust claims, which are not covered by the "Advertising Liability" provisions. As noted above, the "Advertising Liability" provisions provide coverage for, *inter alia*, "liability for damage because of . . . unfair competition . . . arising out of" Defendant's "advertising activities." (Mhatre Decl., Ex. 1, ECF No. 255-4 at 10, Ex. 2, ECF No. 255-4 at 75.) The 1993 Policies do not define the term "unfair competition," and the parties dispute whether it covers antitrust claims.

According to Plaintiff, the term "unfair competition" generally retains its common law meaning of "'misappropriation of one's property by another'" and, in any event, cannot include antitrust claims. (Pl. Mov. Br. at 24-26 (quoting *Aetrex Worldwide, Inc. v. Sourcing for You, Ltd.*, No. 13-1943, 2013 WL 1680258, *6 (D.N.J. Apr. 16, 2013), *aff'd*, 555 F. App'x 153 (3d Cir. 2014)). Plaintiff raised a similar argument in BD II. As the BD II Court explained in the opinion on the motion for judgment on the pleadings, "a review of the policies does not reveal any definition of the term 'unfair competition,' and courts have interpreted this term broadly." (No. 17-00691, ECF No. 31 at 9 (citing *Vickers, Inc. v. Seaboard Stir. Co.*, 1996 U.S. Dist. LEXIS 19689 (D.N.J. Feb. 5, 1996), *aff'd*, 107 F.3d 9 (3d Cir. 1997)). As a result, the BD II Court reasoned, "[w]hile Plaintiff attempts to provide a definition for the term 'unfair competition' in its briefs, and while that definition may ultimately be true, . . . [t]he only way to ascertain the meaning of this term would be through meaningful discovery." (*Id.*) The BD II Court further noted that "'drafting history is relevant to the interpretation of policy language.'" (*Id.* (quoting *Nestle foods*

12

*Corp v. Aetna Cas. & Sur. Co.*, 135 F.R.D. 101, 105 (D.N.J. 1990)). Accordingly, the BD II Court found that Plaintiff was not entitled to judgment based on the language of the Policies. (*Id.*)

The Court reaches a similar conclusion here. Although "unfair competition" has certainly been found to include "misappropriation of one's property . . . which has some sort of commercial or pecuniary value," *Aetrex Worldwide, Inc.*, 2013 WL 1680258, at *6, as the BD II Court suggested, the term has been construed to encompass more than its common law definition. Indeed, in *Vickers, Inc.*, which the BD II Court cited with approval, the court rejected the "argument[] that 'unfair competition' is limited to the traditional common law understanding of passing off one's goods as the goods of another."[5] 1996 U.S. Dist. LEXIS 19689 at *13-14.

Furthermore, the drafting history does not conclusively resolve, as a matter of law, the question of whether the 1993 Policies cover antitrust claims. When Plaintiff's 30(b)(6) witness was asked whether "the definition of unfair competition encompass[es] antitrust claims," he responded that he "can't speak to that." (*See* Corona Cert., Ex. C, Plaintiff's 30(b)(6) Deposition ("Pl. 30(b)(6) Dep.") Tr. at 26:17-19, ECF No. 267.) Moreover, the record indicates that unlike the 1993 Policies, the later-issued 1999 Policy sits above a primary policy that expressly excluded antitrust claims from coverage. (*See* Corona Cert., Ex. A, ECF No. 267 at 14; *see also* Def. Br. at 14.) Viewing the record in the light most favorable to Defendant, as the Court must at this stage, a

---

[5] In so finding, the *Vickers, Inc.* court relied on the Third Circuit's decision in *Granite State Ins. Co. v. Aamco Transmissions, Inc.*, in which the Third Circuit determined that "the phrase 'unfair competition'" in an advertising liability insurance policy does not "unambiguously refer[] only to the traditional common law tort of that name." *Granite State Ins. Co. v. Aamco Transmissions, Inc.*, 57 F.3d 316, 319 (3d Cir. 1995); *see also Vickers, Inc.*, 1996 U.S. Dist. LEXIS 19689 at *13-14 & n.3.

jury could reasonably conclude that the absence of such an exclusion in the 1993 Policies was deliberate, and that the 1993 Policies were intended to cover antitrust claims.[6]

The Court further finds, conditionally, that Defendant has raised a triable issue of fact as to whether certain "conduct" allegedly at issue in the Underlying Actions is covered by the 1993 Policies. Although Defendant's opposition is not entirely clear on this subject, as best as the Court can discern, Defendant primarily relies on alleged advertising materials contained in Exhibits KK through OO to support its conduct-based coverage claims. (*See* Def. Br. at 30 n.23; *see also* Corona Cert., Exs. KK-OO.) According to Defendant, its Block Terumo and related advertising campaigns "generated hundreds of advertisements and collectively spanned the entire period covered by National Union's Policies," (Def. Br. at 30 (citing Corona Cert., Exs. KK-OO)), and Exhibits KK through OO contain "collection[s]" of such advertisements, (Corona Cert. ¶¶ 37-41). While Defendant provides little background for these Exhibits, viewing the record in the light most favorable to Defendant, as the Court must at this stage, the Court cannot say there is no genuine dispute as to whether the Underlying Actions sought damages for unfair competition based on the materials in Exhibits KK through OO. A review of these materials suggests that at least some were disseminated during the 1993 Policies periods and relate to Defendant's advertising activities, (*see, e.g.*, Corona Cert., Ex. KK, ECF No. 271 at 3 (document dated August 1993 concerning EpiNet), and there is no dispute that Defendant produced these materials in both this matter as well as the Underlying Actions (*See* Def.'s 30(b)(6) Dep. Tr. at 14:11-21, ECF No. 257-1, Ex. 11.)

---

[6] To be sure, the record also contains evidence to support Plaintiff's position. For example, Defendant's in-house counsel testified that they did not believe Defendant had insurance coverage for the Underlying Actions at the time. (*See* Hector Dep. Tr. at 19:9-17, 34:15-21, 129:24-130:7, 158:24-159:13; Young Dep. Tr. at 83:16-25, 165:4-23.) Such conflicts in the evidence must be resolved by a jury. *See Boyle v. Cnty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998) (noting that "at the summary judgment stage, a court may not weigh the evidence or make credibility determinations; these tasks are left to the fact-finder").

What remains unclear, however, is the context in which these materials were prepared and distributed. For example, while Defendant asserts that the documents in Exhibits KK through OO constitute "advertisements," (Def. Br. at 30), it does not direct the Court to any portion of the record indicating whether these materials were in fact advertisements, when they were created, by whom, for what purpose, if and where they were published, or any other information that establishes their provenance and relevance to each of the Underlying Actions. Moreover, despite several discovery requests from Plaintiff and Court Orders to do so, (*see* ECF No. 179 at 3; ECF No. 225; ECF No. 249), Defendant never specifically identified Exhibits KK through OO as the basis for its coverage claims before the close of discovery. Consequently, Plaintiff has not had an opportunity to question Defendant about these documents. (*See* Pl. Reply Br. at 19.) Given this posture, the Court will deny Plaintiff's motion for summary judgment as to the conduct-based claims at this time and grant Plaintiff an opportunity to take appropriate discovery related to these Exhibits.[7] The Court emphasizes the conditional nature of its ruling. If, after taking this additional discovery, Plaintiff wishes to renew its arguments concerning the 1993 Policies' coverage for conduct allegedly at issue in the Underlying Actions, it may seek leave to do so.[8]

---

[7] Because Defendant premises all of its coverage claims under the 1993 Policies on the same conduct, (*see* Def.'s Br. at 49 n.31), the Court's analysis applies to Defendant's claims for coverage under the personal injury and defamation of character provisions, as well.

[8] Plaintiff also asserts that Defendant is not entitled to coverage under the 1993 Policies because it never faced potential liability in the Underlying Actions for conduct occurring during the coverage periods. (*See* Pl. Mov. Br. at 36.) According to Plaintiff, a four-year statute of limitations applied to the antitrust claims in the Underlying Actions, meaning that Defendant could not have been liable in the RTI Action, which was filed in 2001, for conduct occurring before 1997, or in the Class Actions, the first of which was filed in 2005, for conduct occurring before 2001. (*Id.*) Because coverage under the 1993 Policies ended in 1994, Plaintiff argues, Defendant could not have faced liability for conduct covered by the 1993 Policies. (*Id.*) As both parties note, however, the Supreme Court has recognized an exception to the statute of limitations for speculative damages. *See Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 339 (1971). Neither party devotes much attention to this issue, and it is not clear from the record whether any damages sought in the Underlying Actions were speculative in nature. As with its conduct-based arguments, Plaintiff may renew its statute of limitations arguments after discovery on an appropriate motion. In any future motion, the parties should be mindful to support their assertions with appropriate citations to the record. The Court's analysis also applies to Plaintiff's statute of limitations arguments for the 1994, 1997, and 1999 Policies. (*See* Pl.'s Mov. Br. at 40-41.)

**B.  Coverage Under the 1994, 1997, and 1999 Policies**

The Court will also conditionally deny Plaintiff's motion for summary judgment on the advertising and personal injury coverage claims based on the 1994, 1997, and 1999 Policies.

As noted above, "Advertising Injury" under the 1994, 1997, and 1999 Policies includes "[i]njury arising solely out of [the insured's] advertising activities" due to "[o]ral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products, or services . . . ." (Mhatre Decl., Ex. 3, ECF No. 255-4 at 214; *see also* Ex. 4, ECF No. 255-4 at 256; Ex. 5, ECF No. 255-5 at 32.) "Personal Injury" under the 1994, 1997, and 1999 Policies includes "injury other than . . . Advertising Injury arising out of . . . Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services . . . ." (*Id.* at Ex. 3, ECF No. 255-4 at 216-17; Ex. 4, ECF No. 255-4 at 258-59; Ex. 5, ECF No. 255-5 at 35.)

Here, as best as the Court can discern from Defendant's brief, the advertising injury coverage claims under the 1994, 1997, and 1999 Policies are based primarily on the alleged advertising materials in Exhibits KK through OO. (*See* Def.'s Br. at 30 n.23.) While Defendant's brief does not clearly parse out the basis for its personal injury claims under the 1994, 1997, and 1999 Policies, read as a whole, it appears that the materials and arguments underlying its personal injury claims generally overlap with those underlying its advertising injury claims. (*See, e.g.*, Def.'s Br. at 37, 49 n.31.) As discussed above, because Plaintiff has not yet had an opportunity to take all necessary discovery, the Court will conditionally deny Plaintiff's motion on these claims until the record has been fully developed. Once Plaintiff has completed this supplemental discovery, it may seek leave of Court to renew its arguments on the coverage claims under the 1994, 1997, and 1999 Policies.

**C.  Alleged Violations of Notice and Consent Provisions**

Plaintiff next argues that Defendant is not entitled to coverage as a matter of law because Defendant violated the Policies' notice and consent provisions. (*See* Pl.'s Mov. Br. at 42-45.)

The Policies required Defendant to notify Plaintiff "as soon as practicable of an Occurrence that may result in a claim or Suit . . . ." (*See, e.g.*, Mhatre Decl., Ex. 5, ECF No. 255-5 at 45.) Plaintiff contends that because Defendant did not provide notice of the Underlying Actions until 2014—approximately 16 years after RTI filed the state court action and 10 years after the Class Actions were first filed—Defendant breached the notice provisions and is therefore precluded from obtaining coverage as a matter of law. (*See* Def. Br. at 42.) Plaintiff's argument is unavailing for two reasons. First, there is a dispute as to when Defendant's Director of Risk Management received appropriate notice of the Underlying Actions. Although the provisions differ slightly, the Policies generally provide that "knowledge of an occurrence, claim or suit by any agent, servant or employee of the Insured shall not constitute knowledge by the Insured unless notice of such occurrence, claim or suit is received by the Risk Manager." (Mhatre Decl., Ex. 3, ECF No. 255-4 at 204.) While Young, Defendant's Director of Risk Management, testified that he was "aware" of the Underlying Actions in or around the time they were filed, (*see* Young Dep. Tr. at 91:3-25, 170:23-171:7), Defendant's corporate designee stated that Young's knowledge is "not the same thing as receiving notice" because Defendant's "law group" had not formally communicated the notice, as is Defendant's practice. (Def.'s 30(b)(6) Dep. Tr. at 240:9-241:2, ECF No. 257, Ex. 10.) According to Defendant's corporate designee, notice, at least for the Class Actions, was given in 2013. (*See* Def.'s Br. at 55 (citing Def.'s 30(b)(6) Dep. Tr. at 26:1-27:10).) Furthermore, Plaintiff's

corporate designee agreed that "the word 'notice' in the knowledge of an occurrence endorsement . . . refers to a specific event . . . as opposed to just knowledge." (Pl.'s 30(b)(6) Dep. Tr. at 52:7-15.)

Second, even if the Court were to assume Defendant failed to provide timely notice, there is a triable issue of fact as to whether Plaintiff suffered appreciable prejudice as a result. Under New Jersey law, an insurer "must show a likelihood of appreciable prejudice to prevail on a late notice defense asserted against its insured." *Brit. Ins. Co. of Cayman v. Safety Nat. Cas.*, 335 F.3d 205, 212 (3d Cir. 2003) (citing *Cooper v. Gov't Emps. Ins. Co.*, 51 N.J. 86 (1968); *Pfizer, Inc. v. Emp'rs Ins. of Wausau*, 154 N.J. 187 (N.J. 1998)). "Prejudice in a late notice defense is determined by examining (1) whether substantial rights have been irretrievably lost and (2) the likelihood of success of the insurer in defending against the victim's claim." *Id.* at 212.

Here, Plaintiff wholly fails to address the second prong, and there is a genuine dispute of material fact as to whether Plaintiff has satisfied the first prong. According to Plaintiff, it irretrievably lost substantial rights because, *inter alia*, it was unable to perform a contemporaneous investigation while the Underlying Actions were litigated, it could not ensure that all insurers were notified of the Underlying Actions and pursued, it could not oversee counsel retained to defend the Underlying Actions, and it did not participate in settlement discussions. (*See* Pl.'s Mov. Br. at 43-44.) To satisfy the first prong, however, Plaintiff must do more than "establish . . . the mere fact that it cannot employ its normal procedures in investigating and evaluating the claim," and "mere conjecture or suspicions" will not suffice. *Transportes Ferreos de Venezuela II CA v. NKK Corp.*, 239 F.3d 555, 561 (3d Cir. 2001) (internal citations and quotation marks omitted). While Plaintiff asserts, in conclusory fashion, that "at least one witness died before they could testify, and numerous other witnesses had significant memory lapses on key issues," (*see* Pl.'s Mov. Br. at 43 n.11), it does not show how these circumstances irretrievably impaired its ability to advance

its case. Indeed, the voluminous summary judgment record, which includes materials from the Underlying Actions and Defendant's files, suggests that "a wealth of relevant documentary evidence remains intact." *Chem. Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co.*, 817 F. Supp. 1136, 1158-59 (D.N.J. 1993), *aff'd in part and remanded*, 89 F.3d 976 (3d Cir. 1996) (finding no irretrievable loss of substantial rights where insurers failed to "prove[] that the fading or failure of witnesses' memory has irretrievably harmed their ability to advance their case" and "the material attached to the current summary judgment motions . . . shows that a wealth of relevant documentary evidence remains intact").

Furthermore, as Defendant notes, at least one Court in this District has required a showing of prejudice before finding that an insured's failure to obtain an insurer's consent relieves the insurer of any coverage obligations. *See Pittston Co. v. Allianz Ins. Co.*, 905 F. Supp. 1279, 1295 (D.N.J. 1995), *rev'd in part sub nom. Pittston Co. Ultramar Am. v. Allianz Ins. Co.*, 124 F.3d 508 (3d Cir. 1997) ("Generally, where an insured settles a claim against it without the permission of the insurer, the insurer must, nonetheless, demonstrate prejudice before being relieved of its policy obligations.") Plaintiff does not address *Pittston Co.* in its briefing, and, as explained above, there is a genuine dispute as to whether Plaintiff in fact suffered prejudice.

Accordingly, Plaintiff has not demonstrated, as a matter of law, that it was prejudiced by any breach of the Policies' notice and consent provisions.

### D. Defendant's Defense Costs

Plaintiff argues that Defendant is not entitled to reimbursement for its defense costs as a matter of law because, *inter alia*, Defendant incurred the costs prior to notifying Plaintiff about the Underlying Actions, and neither of the Underlying Actions asserted a covered claim. (Pl. Mov. Br. at 45-46.) Plaintiff's arguments are unpersuasive. As noted above, a triable issue of fact exists

as to when Defendant received notice of the Underlying Actions within the meaning of the Policies, and whether it promptly notified Plaintiff thereafter. *See SL Indus., Inc. v. Am. Motorists Ins. Co.*, 128 N.J. 188, 199-200 (1992) ("[T]he insured being sued is responsible for promptly conveying to its insurance company the information that it believes will trigger coverage. If it conveys that information properly and promptly, it will be reimbursed for previously-expended defense costs.") In addition, as set forth in detail above, further discovery is needed to determine the Underlying Actions asserted covered claims.[9]

### E. Counterclaims

Finally, similar to BD II, Plaintiff seeks dismissal of Defendant's counterclaims for bad faith. (*See* Def.'s Mov. Br. at 46-47; No. 17-00691, ECF No. 31 at 10.) The Court declines to do so at this juncture. As the BD II Court observed, "a 'determination of whether an insurance company has acted in bad faith requires, *as a predicate, a determination that coverage exists for the loss claimed by the insured*." No. 17-00691, ECF No. 31 at 10 (quoting *Hudson Universal v. Aetna Ins. Co.*, 987 F. Supp. 337, 342 n.3 (D.N.J. 1997)). Here, as explained above, there remains a triable issue of fact as to whether the 1993 Policies cover antitrust claims, and further discovery is needed on the conduct-based coverage claims. Therefore, the Court will conditionally deny Plaintiff's motion for summary judgment as to the counterclaims. Plaintiff may renew any relevant

---

[9] Plaintiff also argues that it was not required to reimburse Defendant for its defense costs until Defendant's primary insurers exhausted their policy limits for the Underlying Actions. (*See* Pl.'s Mov. Br. at 45; Pl.'s SOMF ¶ 19.) The evidence Plaintiff cites, however, does not clearly support its assertion. Plaintiff points to a stipulation from the Travelers action announcing a settlement, but the stipulation does not state whether the policy limits had been exhausted. *See* No. 14-04410, ECF No. 155. The cited deposition testimony from Defendant's corporate designee also does not clearly explain whether the policy limits had been exhausted. (*See* Def.'s 30(b)(6) Dep. Tr. at 63:25-66:14, ECF No. 257, Ex. 10.)

arguments related to the counterclaims in an appropriate motion once supplemental discovery is completed.

**IV.     CONCLUSION**

For the foregoing reasons, Plaintiff's motion for summary judgment (ECF No. 255) is **DENIED**. As noted herein, Plaintiff may seek leave of Court to renew arguments related to those portions of the motion that were conditionally denied after supplemental discovery is completed. An appropriate Form of Order accompanies this Opinion.


DATED: July 12, 2022                              s/ Julien Xavier Neals
                                                 **JULIEN XAVIER NEALS**
                                                 United States District Judge