<u>**NOT FOR PUBLICATION**</u>                                              <span style="color:red">**SEALED**</span>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, P.A., | |
| Plaintiff, | No. 14cv4318 (EP) (JSA) |
| v. | **OPINION** |
| BECTON, DICKINSON AND COMPANY, | |
| Defendant. | |

**PADIN**, **District Judge.**

Plaintiff National Union Fire Insurance Company of Pittsburgh, P.A. ("National Union"), disputes its obligation to provide coverage to Defendant Becton, Dickinson and Company ("BD"), its insured, for costs incurred in certain underlying actions. In its July 12, 2022 decision, the Court conditionally denied portions of National Union's summary judgment motion and ordered the parties to engage in supplemental discovery. D.E. 315. After completing supplemental discovery, National Union now renews its summary judgment motion. D.E. 374 ("Mot." or "Motion"). For the reasons below, the Court will **GRANT in part** and **DENY in part** National Union's Motion.[1]

---

[1] The Court has reviewed the parties' submission and decides the motion without oral argument. *See* Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b).

I.      **BACKGROUND**[2]

The factual and procedural background of this matter is well known to the parties and recounted in detail in the Court's prior Opinion, D.E. 315. The Court includes an abridged version focusing on information relevant to this Motion.

A.      **Factual Background**

1.      *The RTI Action*

BD is a global company primarily engaged in the manufacture and sale of medical supplies, systems, and devices. D.E. 315 at 2. In or around August 1998, Retractable Technologies, Inc. ("RTI") brought an action against BD and others in Texas state court. Ex. 3 at 6-9 to D.E. 374-2, Declaration of William Montemarano, Esq. ("Montemarano Decl."). RTI alleged BD had "participated in an antitrust conspiracy and other illegal conduct" and "contracted . . . to exclude RTI from selling" certain retractable syringes and safety products that RTI developed in violation of Texas law. *Id.* at ¶¶ 9, 11 to Montemarano Decl. Thereafter, in or around January 2001, RTI dismissed its state court action and filed a new action against BD and others in the United States District Court for the Eastern District of Texas (the "RTI Action"). *See* Exs. 4; 10 at 48 to Montemarano Decl. The RTI Action asserted claims for, *inter alia*, state and federal antitrust violations and business disparagement. Ex. 4 at 19-23 to Montemarano Decl.

Roy Weber, BD's Head of Litigation when the RTI Action was filed, determined that BD did not have insurance coverage for the RTI Action. Ex. 10 at 135:6-23, 246:20-25 to

---

[2] The Court draws all facts from the following documents, viewing the evidence in the light most favorable to BD, the non-movant: National Union's Statement of Undisputed Material Facts ("National Union's SOMF"), D.E. 375-1, BD's Response to National Union's Statement of Alleged Material Facts ("BD's SOMF"), D.E. 377, and the relevant record. Unless otherwise noted, all references to page numbers correspond to the page numbers generated by the ECF system.

Montemarano Decl.  Bruce Hector, then-Associate General Counsel, agreed.  Ex. 5 at 19:9-14, 147:6-8 to Montemarano Decl.  David Young, BD's Director of Risk Management, was also "aware the company did not have insurance coverage for antitrust claims."  Ex. 8 at 83:16-25, 165:4-23 to Montemarano Decl.

BD moved for summary judgment in the RTI Action, and in response to BD's motion, RTI acknowledged that BD was entitled to summary judgment on the business disparagement claim due to insufficient evidence.  *See* Ex. 7 at 193:5-13 to Montemarano Decl.; Ex. 28 at 68 to Montemarano Decl.

On July 2, 2004, BD agreed to pay RTI $100,000,000 to settle the RTI Action.  Ex. 12 at 83 to Montemarano Decl.  The parties dispute whether the settlement covered the business disparagement claim.  *See* Mot. at 43; D.E. 376 ("Opp'n Brief to Motion") at 18-19.  While RTI acknowledged in briefing that BD was entitled to summary judgment on this claim, Ex. 28 at 68 to Montemarano Decl., BD asserts that the court never dismissed the claim and RTI's March 31, 2006 Form 10-K noted that BD had paid "$100 million to settlement a lawsuit with [RTI] for anticompetitive practices, business disparagement, and tortious interference."  Ex. P at 30 to D.E. 376-2, Certification of Anthony Bartell ("Bartell Cert.").

    2.    *The Class Actions*

After the RTI Action settled, Louisiana Wholesale Drug Company, Inc. ("LWDC") filed a putative class action against BD in this Court on March 23, 2005.  *See In re Hypodermic Products Antitrust Litigation*, No. 05-1602, D.E. 1.  LWDC alleged that it was a direct purchaser of BD's products and that BD had "stifl[ed] . . . competition" that "caused the artificial inflation of market prices of overall market prices . . . result[ing] in [LWDC] and the other Class members buying" BD's products "at supracompetitive prices."  *Id.* ¶ 13.  Following the LWDC action, other direct

3

and indirect purchasers of BD's products brought separate putative class actions against BD, which were later consolidated into a multidistrict litigation (the "Class Actions," and, together with the RTI Action, the "Underlying Actions").  *See* Ex. 14 at 51, 5 at 147:9-21 to Montemarano Decl. Hector, who was BD's then-Head of Litigation, oversaw the Class Actions and determined that BD did not have insurance coverage for them.  Ex. 5 at 129:24-130:7, 159:3-8 to Montemarano Decl.

On April 27, 2009, BD settled the Class Actions with the direct purchaser plaintiffs for $45,000,000, and on July 30, 2013, with the indirect purchaser plaintiffs for $22,000,000.  *See* Ex. 17-18 to Montemarano Decl.

### 3.    *BD Demands Coverage from National Union*

On August 1, 2013, Law360 published an article on BD's settlement with the indirect purchaser plaintiffs.  Ex. 19 to Montemarano Decl.  BD's outside counsel McCarter & English ("McCarter") read the article, contacted BD, and suggested it consider seeking insurance coverage for the Underlying Actions.  Ex. 7 at 12:20-13, 29:6-16 to Montemarano Decl.  Hector, Young, and BD's prior counsel previously agreed that BD did not have coverage for the Underlying Actions.  *Id.* at 185:17-22.  Nonetheless, Andrew Warpole, who replaced Young as Director of Risk Management, and Greg Vincinanza, who replaced Hector as Head of Litigation, retained McCarter to pursue claims for coverage.  *Id.* at 185:23-186:7.

On June 13, 2014, BD demanded insurance coverage from National Union for the RTI Action.  Ex. 20 to Montemarano Decl.  Specifically, BD requested coverage for the $100,000,000 it paid to settle the RTI Action, plus its defense costs, under three commercial umbrella liability insurance policies issued by National Union to BD: (1) Policy No. BE 309 14 79, in effect from October 1, 1994 to October 1, 1997 (the "1994 Policy"); (2) Policy No. BE 932-81-55, in effect

from October 1, 1997 to October 1, 1999 (the "1997 Policy"); and (3) Policy No. 357-42-59, in effect from October 1, 1999 to October 1, 2002 (the "1999 Policy"). *See id.*; Exs. 21 at 189, 232; 22 at 251, 293; 23 at 295 to Montemarano Decl.

In September 2014, BD demanded coverage for the Class Actions. Ex. 27 to Montemarano Decl. BD requested coverage for the Class Actions under the 1994 Policy, 1997 Policy, and 1999 Policy, as well as two additional commercial umbrella liability insurance policies issued by National Union: (1) Policy No. 308-76-44, in effect from April 1, 1993 to April 1, 1994, and covering "occurrences or circumstances happening between the dates October 1, 1985 to April 1, 1993'" and (2) Policy No. 308-76-43, in effect from April 1, 1993 to October 1, 1994 (together, the "1993 Policies" and, collectively with the 1994 Policy, 1997 Policy, and 1999 Policy, the "Policies"). Exs. 24 at 344, 355; 25 at 409, 504 to Montemarano Decl.

National Union denied both coverage requests. *See* D.E. 315 at 5-6.

    4.    *Insurance Policies*

While the Policies' language varies slightly, all provide BD with coverage for sums in excess of the amounts paid by underlying primary insurers that BD "becomes legally obligated to pay . . . because of . . . Personal Injury or Advertising Injury . . . ."[3] Exs. 21 at 235; 22 at 277; 23 at 322; 24 at 346; 25 at 411 to Montemarano Decl. BD seeks coverage for the Underlying Actions under the "Advertising Liability" provision in the 1993 Policies, the "Advertising Injury" provision in the 1994, 1997, and 1999 Policies, and the "Personal Injury" provision in all of the Policies. National Union's SOMF ¶ 5; BD's SOMF ¶ 5.

---

[3] The 1993 Policies refer to "Advertising Injury" as "Advertising Liability." *See* Exs. 24 at 346; 25 at 411 to Montemarano Decl.

The 1993 Policies define "Advertising Liability" as "liability for damage because of" one of the following:

> (a)  unintentional Liable, Slander or Defamation of Character;
> (b)  Infringement of copyright or title or of slogan;
> (c)  Piracy or unfair competition or idea misappropriation under an implied contract;
> (d)  Invasion of the rights of privacy,
>
> committed or alleged to have been committed during the policy period in any advertisement, publicity article, broadcast or telecast and arising out of Named Insured's advertising activities.

Exs. 24 at 351; 25 at 416 to Montemarano Decl.

Similarly, the 1994 Policy, 1997 Policy, and 1999 Policy generally define "Advertising Injury" as "[i]njury arising solely out of [the insured's] advertising activities" due to one or more of the following:

> 1.  Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;
> 2.  Oral or written publication of material that violates a person's right of privacy;
> 3.  Misappropriation of advertising ideas or style of doing business; or
> 4.  Infringement of copyright, title or slogan.

Exs. 21 at 237; 22 at 279; 23 at 325 to Montemarano Decl.

With respect to "Personal Injury," all of the Policies generally provide coverage for "injury other than Bodily Injury or Advertising Injury arising out of one or more of the following offenses . . . Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or service."  Ex. 21 at 239-40 to Montemarano Decl.; *see also* Exs. 22 at 281-82; 23 at 328; 24 at 350-51; 25 at 415-16 to Montemarano Decl.

### B.    BD's Advertising Campaigns and Related Programs

BD argues that the Policies cover the Underlying Actions because the plaintiffs in the Underlying Actions alleged that they suffered "unfair competition" and "disparagement" as a result of BD's advertising campaigns and related programs. *See* Opp'n Brief to Motion at 20-28. The first campaign was "Block Terumo," which targeted Terumo Corporation, a Japanese manufacturer that sought to gain market share in the United States by introducing a low-cost yet effective safety needle "comparable" to BD's product. Ex. 30 at 7-9 to Montemarano Decl. To compete, BD focused its efforts during Block Terumo on improving product quality and "run[ning] sophisticated advertising and direct mail." *See id.* at 8.

Following this campaign, BD shifted tactics to address "value" and pricing issues by launching the "Safety Compliance Initiative," which focused on selling the "value" of BD's product. *See id.* at 13-14. BD utilized "information and training material and compliance material" to emphasize the safety benefits of BD's product to hospitals and nurses. *Id.* at 8, 13. BD also devised the "Cost-Reduction Initiative," another value-centered advertising campaign aimed at "educat[ing] purchasers about [BD's] safe and cost-effective needles." *Id.* at 14.

In or around 2001, BD launched another advertising campaign against Terumo called "Block Terumo II." *See* Ex. TT to Bartell Cert. Similar to Block Terumo, Block Terumo II was focused on preventing Terumo from breaking into the United States market. D.E. 315 at 9.

### C.    Procedural History

On July 9, 2014, National Union sought a declaration that it has no duty to defend or indemnify BD for the RTI Action ("BD I"). *See generally* D.E. 1. BD answered and counterclaimed for a declaratory judgment that National Union must pay its defense and indemnity

costs for the RTI Action and for damages arising out of National Union's alleged breach of contract and breach of the duty of good faith and fair dealing (a "bad faith claim"). *See generally* D.E. 181.

On January 30, 2017, National Union filed another action seeking a declaration that it has no duty to defend or indemnify BD for the Class Actions ("BD II"). *See generally* No. 17-00691, D.E. 1.  BD answered and counterclaimed for declaratory judgment, breach of contract, and breach of the duty of good faith and fair dealing (a "bad faith claim"). [4] *See generally* No. 17-00691, D.E. 4.  BD I and BD II were subsequently consolidated on June 4, 2018.  D.E. 163.

Thereafter, National Union moved for summary judgment on its claims and BD's counterclaims.  On July 12, 2022, the Court conditionally denied certain portions of National Union's motion for summary judgment.  D.E. 315 at 1 n.1.  National Union's motion as to the conduct-based claims was conditionally denied and it was granted an opportunity to take discovery related to "advertisements" that were not produced by BD prior to close of discovery.  *Id.* at 15-16.  Additionally, the Court conditionally denied National Union's motion as to its assertion that BD was not entitled to coverage "because it never faced potential liability in the Underlying Actions for conduct occurring during the coverage periods." *Id.* at 15 n.8.  In doing so, the Court found "it [wa]s not clear from the record whether any damages sought in the Underlying Actions were speculative in nature." *Id.*  Accordingly, the Court concluded National Union could seek leave of Court to renew its arguments on the coverage claims and statute of limitations upon completion of supplemental discovery. *Id.* at 15-16.[5]

---

[4] On February 20, 2018, the Court denied National Union's motion for judgment on the pleadings in BD II, concluding that "no determination of coverage c[ould] be rendered at this juncture" and that National Union was not "entitled to judgment . . . based upon the language in the policies" alone.  No. 17-00691, D.E. 31 at 9-10.
[5] On July 13, 2022, this matter was reassigned to the undersigned.  D.E. 317.

In accordance with the Court's July 12, 2022 decision, BD responded to supplemental interrogatories, and produced Andrew Walpole, its 30(b)(6) representative, for a supplemental deposition. *See* Exs. 35-39 to Montemarano Decl.  After the Court granted leave, D.E. 363, National Union filed a renewed motion for summary judgment on its claims and BD's bad faith counterclaim.  D.E. 374.  BD opposes National Union's motion.  Opp'n Brief to Motion.  National Union replies.  D.E. 378 ("Reply").

## II.    LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 145-46 (3d Cir. 2004).  A fact is material if it "might affect the outcome of the suit under the governing law" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party has the initial burden of showing the basis for its motion and that there is no genuine dispute of material fact.  *See Celotex Corp.*, 477 U.S. at 323.  If the moving party adequately supports its motion by citing to specific materials in the record, *see* Fed. R. Civ. P. 56(c)(1)(A), then the burden shifts to the nonmoving party to "go beyond the pleadings" and designate specific facts on the record that demonstrate a genuine dispute for trial exists.  *Celotex Corp.*, 477 U.S. at 324 (internal quotation marks omitted).  If material facts remain disputed but the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case[,]" then the dispute is not genuine and summary judgment is appropriate.  *Id.* at 322.

In reviewing a motion for summary judgment, a court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. In doing so, a court "may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255). "[W]hen there is a disagreement about the facts or the proper inferences to be drawn from, [the formality] of a trial is required to resolve the conflicting versions of the parties." *Peterson v. Lehigh Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir. 1982).

## III. ANALYSIS

The interpretation of an insurance policy is a question for the Court to decide as a matter of law. *Wimberly Allison Tong & Goo, Inc. v. Travelers Prop. Cas. Co. of Am.*, 559 F. Supp. 2d 504, 510 (D.N.J. 2008). Under New Jersey law, "[i]nsurance policies are construed in accordance with principles that govern the interpretation of contracts; the parties' agreement 'will be enforced as written when its terms are clear in order that the expectations of the parties will be fulfilled.'" *Memorial Props., LLC v. Zurich Am. Ins. Co.*, 46 A.3d 525, 532 (N.J. 2012) (quoting *Flomerfelt v. Cardiello*, 997 A.2d 991, 996 (N.J. 2010)).[6] "In assessing the meaning of provisions in an insurance contract, courts first look to the plain meaning of the language at issue." *Oxford Realty Grp. Cedar v. Travelers Excess & Surplus Lines Co.*, 160 A.3d 1263, 1270 (N.J. 2017) (citing

---

[6] The parties' briefs assume New Jersey law controls. *See* Mot. at 28-46; Opp'n at 9-10, 35, 43 n.13. "Where parties' briefs assume that a particular forum's law controls, such implied consent . . . is sufficient to establish choice of law." *Marino v. Brighton Gardens of Mountainside*, 697 F. Supp. 3d 224, 229 (D.N.J. 2023) (collecting cases) (cleaned up); *see also Dejewski v. Nat'l Beverage Corp.*, No. 19-14532, 2024 WL 2744981, at *3 n.10 (D.N.J. May 29, 2024). Accordingly, the Court will apply New Jersey law.

*Chubb Custom Ins. Co v. Prudential Ins. Co. of Am.*, 948 A.2d 1285, 1289 (N.J. 2008)). "If the language is clear, that is the end of the inquiry." *Id.* "[I]n the absence of an ambiguity, a court should not engage in a strained construction to support the imposition of liability or write a better policy for the insured than the one purchased." *Id.* (cleaned up)

"When an ambiguity exists, courts should interpret the contract in accordance with the 'reasonable expectations' of the insured." *Shotmeyer v. N.J. Realty Title Ins. Co.*, 948 A.2d 600, 605 (N.J. 2008) (quoting *Performance Ins. Co. v. Jones*, 887 A.2d 146, 152 (N.J. 2005)); *see Memorial Props.*, 46 A.3d at 532 ("The terms of insurance contracts are given their plain and ordinary meaning, with ambiguities resolved in favor of the insured.") (cleaned up). Still, "courts will not manufacture an ambiguity where none exists" and "[a]n insurance policy is not ambiguous merely because two conflicting interpretations of it are suggested by the litigants." *Oxford Realty Grp. Cedar*, 160 A.3d at 1270 (cleaned up).

### A.    Exhibits KK – OO Are Capable of Admission at Trial

As a threshold matter, the Court addresses National Union's argument that Warpole, as BD's 30(b)(6) designee, lacked the requisite knowledge to establish the admissibility of Exhibits KK through OO, which BD contends are advertisements. Mot. at 24-28, 40. In contrast, BD argues Warpole "clearly possesses the requisite knowledge to authentic[ate] these Exhibits, and he will do so again at trial."[7] Opp'n Brief to Motion at 41-42.

"It is well settled that only evidence which is admissible at trial may be considered in ruling on a motion for summary judgment." *Countryside Oil Co., Inc. v. Travelers Ins. Co.*, 928 F. Supp.

---

[7] In its reply, National Union clarifies its argument focuses on the admissibility of Exhibits KK through OO, as opposed to the authentication of said documents. *See* Reply at 8-11. Accordingly, the Court will focus its analysis on whether the exhibits are admissible and can be considered in deciding this motion.

474, 482 (D.N.J. 1995). Indeed, Federal Rule of Civil Procedure 56(c) provides that a party may argue that certain material in the record "cannot be presented in a form that would be admissible in evidence" and that, as a result, the material cannot be relied on to create or negate a genuine factual dispute. Nonetheless, material that is "*capable* of being admissible at trial" can be considered on a summary judgment motion. *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1334 n.9 (3d Cir. 1993) (emphasis added).

As National Union points out, Exhibits KK through OO were first introduced in the original summary judgment motion through an attorney certification. *See* D.E. 267 ¶¶ 37-41. If this were the only basis for the admissibility of Exhibits KK through OO, the Court would agree with National Union that there was insufficient foundation to consider these exhibits. *See D'Agostino v. Kendall*, No. 19-281, 2021 WL 4860095, at *6 (D.N.J. Oct. 19, 2021) (declining to consider exhibits that were introduced through attorney certification because "the attorney d[id] not have personal knowledge that the documents [we]re true").

However, during his supplemental deposition, Warpole testified that he had reviewed each of the documents, most "more than once," "in an effort to understand from the corporation's perspective what each document was, if it was ever published, when." *See* Ex. RRR at 28:16-22, 88:9-89:15 to Bartell Cert. Warpole reviewed the documents, added tabs, made notations, and highlighted key information to prepare for his deposition. *Id.* at 88:9-89:15. He also confirmed that "[e]verything [he had] seen is either advertising or marketing." *Id.* at 245:3-5. Given that Walpole testified that he reviewed and recognized the exhibits as either advertising or marketing, this Court will treat Exhibits KK through OO as material that are "capable of being admissible at trial" for purposes of this summary judgment motion. *Petruzzi's*, 998 F.2d at 1234.

## B.    BD is Not Entitled to Coverage Under the 1993 Policies

National Union argues that it is entitled to summary judgment because BD failed to demonstrate, through supplemental discovery, the required elements of the coverage provisions in the 1993 Policies.  *See* Mot. at 28- 38.  As set forth below, the Court finds National Union has demonstrated that it is entitled to a declaration that BD is not entitled to coverage under the 1993 Policies.

### 1.    A Reasonable Jury Could Conclude the Documents in Exhibits KK and LL Constituted Advertisements

National Union argues BD cannot establish entitlement to coverage under the 1993 Policies because "the vast majority, if not all, of the documents in Exhibits KK and LL" do not constitute advertisements, publicity articles, broadcasts, or telecasts.  *See* Mot. at 31-33.  National Union urges this Court to utilize the 1999 Policy's definition and define "advertisement" as "a paid broadcast, publication or telecast to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters."  *See* Mot. at 31-32.  In contrast, BD urges the Court to "broadly" interpret "advertising" to mean "[a]ny oral, written, or graphic statement made by the seller in any manner in connection with the solicitation of business."  *See* Opp'n Brief to Motion at 34-35 (internal quotation marks omitted).

As National Union points out, the 1993 Policies do not define "advertisement."  *See id.* at 31.  As discussed above, New Jersey law states that "words of an insurance policy are to be given their plain, ordinary meaning." *Zacarias v. Allstate Ins. Co.*, 775 A.2d 1262, 1264 (N.J. 2001). When interpretation is required, "courts interpret the contract to comport with the reasonable expectations of the insured[.]" *Id.*

To determine the plain meaning of the word "advertisement" as a reasonable person in the insured's shoes would understand it, the Court looks to the dictionary definition. *See Aleynikov v.*

*Goldman Sachs Grp., Inc.*, 765 F.3d 350, 360 (3d Cir. 2014) (finding that "dictionaries are the customary reference source that a reasonable person in the position of the party to a contract would use to ascertain the ordinary meaning of words not defined in the contract") (internal quotation marks omitted); *Posco Daewoo Am. Corp. v. Allnex USA, Inc.*, No. 17-483, 2018 WL 6077983, at *4 (D.N.J. Nov. 19, 2018) (noting courts may look to a dictionary to determine the plain meaning of an undefined term).

Black's Law Dictionary defines "advertisement" as "[a] commercial solicitation; an item of published or transmitted matter made with the intention of attracting clients or customers." 12th ed. 2024. National Union urges the Court to find the documents in Exhibits KK and LL "bear no relation to the . . . meaning of [advertisement]." Mot. at 32-33. BD directs the Court to examples of advertisements that were part of Exhibits KK and LL. *See* Opp'n Brief to Motion at 35 (citing Opp'n Brief to Motion at 29-31). One such example, Exhibit KK-20, could fit within the definition of "advertisement" as it refers to the "Safety Stickler" poster program, which BD developed "[a]s an added service to [its] customers." *See* Ex. 41 at 109-11 of Montemarano Decl. There is a genuine dispute as to whether the documents contained in Exhibits KK and LL constitute "advertisements."[8]

> 2. *A Reasonable Jury Could Conclude the Documents in Exhibits KK and LL Resulted in Unfair Competition, Libel, Slander, or Defamation During the Policy Period*

National Union further asserts that BD cannot establish entitlement to coverage under the "Advertising Liability" provisions because it "cannot establish that the documents in Exhibits KK

---

[8] National Union refers the Court to portions of Warpole's supplemental deposition where he testified that BD views "any document that *even mentions* BD's products qualifies as an 'advertisement.'" *See* Mot. at 33. However, as previously stated, at this stage, it is not the Court's task to weigh the evidence before it. *See Boyle*, 139 F.3d at 393.

and LL resulted in unfair competition, or libel, slander, or defamation, '*during the policy period*' of the 1993 Policies." Mot. at 29-31 (emphasis added). However, a review of Exhibits KK and LL does not conclusively support National Union's position as a matter of law. For example, some of the documents in Exhibit KK appear in dated publications during the policy period of the 1993 Policies. *See, e.g.*, Ex. 41 at 4 to Montemarano Decl. (August 1993 article); Ex. 41 at 124-29 to Montemarano Decl. (November 1993 article).

Additionally, Exhibits KK and LL contain numerous documents that were copyrighted during the policy period of the 1993 Policies. *See, e.g.*, Ex. 41 at 18-19 to Montemarano Decl. (material copyrighted in 1993); Ex. 41 at 107 to Montemarano Decl. (material copyrighted in 1993).[9] A jury could reasonably conclude that the documents contained in Exhibits KK and LL resulted in unfair competition, or libel, slander, or defamation during the policy period of the 1993 Policies.[10]

### 3. *A Causal Connection Appears to Exist Between the Advertisements and Alleged Injuries*

The Court next considers National Union's contention that BD is not entitled to coverage because it fails to demonstrate a "causal connection" between its advertising and the alleged injuries by the plaintiffs in the Underlying Actions. *See* Mot. at 34-36. As previously noted, the

---

[9] *See also* Ex. 41 at 109-11 to Montemarano Decl. (material copyrighted in 1989); Ex. 41 at 116-18 to Montemarano Decl. (material copyrighted in 1994); Ex. 41 at 131-34 to Montemarano Decl. (material copyrighted in 1989); Ex. 41 at 137-40 (material copyrighted in 1992), Ex. 41 at 211-14 to Montemarano Decl. (material copyrighted in 1991); Ex. 41 at 240-41 to Montemarano Decl. (copyrighted in 1987); Ex. 41 at 244-47 to Montemarano Decl. (material copyrighted in 1991); Ex. 42 at 39-42 to Montemarano Decl. (material copyrighted in 1994).

[10] The record also contains evidence to support National Union's position. For example, Warpole testified that even if a document was copyrighted in 1994, that does not necessarily mean the document was published the same year. *See* Ex. RRR at 153:25-154:23 to Bartell Cert. However, such evidentiary conflicts must be resolved by a jury. *See Boyle v. Cnty. Of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998) (noting that "at the summary judgment stage, a court may not weigh evidence or make credibility determinations; these tasks are left to the fact-finder").

1993 Policies provide BD with coverage for sums it "becomes legally obligated to pay . . . because of . . . advertising liability."  Ex. 24 at 346 to Montemarano Decl.; Ex. 25 at 411 to Montemarano Decl.

Under New Jersey law, an "advertising injury" provision requires the insurer to provide coverage only if there is "(1) a causal connection between the advertising and the injury" and (2) the injury "fall[s] within one of the four categories defined by the policy."[11]  *Tradesoft Tech., Inc. v. Franklin Mut. Ins. Co.*, 746 A.2d 1078, 1087 (N.J. App. Div. 2000).  Indeed, for a particular injury to be covered under an "advertising injury" provision of an insurance policy, "there must be an allegation that the claimed injury was 'caused by' an offense committed 'in the course of' advertising." *Information Spectrum, Inc., v. Hartford*, 860 A.2d 926, 928 (N.J. 2004).[12]  Moreover, "[f]or the 'advertising injury' provision of the policy to apply, the harm alleged must be 'caused by' the advertising act itself and not by the underlying purloinment."  *Id.* at 929.

National Union directs the Court to a 111-page, single spaced chart produced by BD as part of its supplemental discovery responses.  *See* Mot. at 35-36.  Notably, the chart indicates that for forty eight of the sixty-one documents contained in Exhibits KK and LL, BD "currently lacks information concerning whether plaintiffs in the Underlying Actions ever cited, referenced, used, or relied on the BATES RANGE, or attached the BATES RANGE to any mediation statements or motions submitted to the court, or used it at any deposition in the Underlying Actions."  *See* Ex.

---

[11] The four categories are (a) "unintentional Liable, Slander or Defamation of Character"; (b) "infringement of copyright or title or of slogan"; (c) "piracy or unfair competition or idea misappropriation under an implied contract"; and (d) "invasion of the rights of privacy."  Ex. 24 at 351 to Montemarano Decl.; Ex. 25 at 416 to Montemarano Decl.

[12] The policy language in *Tradesoft Tech.* and *Information Spectrum* is similar, but not identical to the 1993 Policies.  Notably, the 1993 Policies use the term "Advertising Liability," whereas *Tradesoft Tech.* and *Information Spectrum* use the term "advertising injury."  *See Tradesoft Tech.*, 746 A.2d at 1081; *Information Spectrum*, 860 A.2d at 927.  While the Court acknowledges this difference, it finds *Tradesoft Tech.* and *Information Spectrum* persuasive.

39 at 460-85 to Montemarano Decl. BD seemingly fails to address this portion of National Union's argument in its opposition papers. Where a party fails to "respond to . . . arguments on [certain] claims or mention them at all in [their] brief," those claims are waived. *Yucis v. Sears Outlet Stores, LLC*, No. 18-15842, 2019 WL 2511536, at *4 & n.4 (D.N.J. June 18, 2019) (collecting cases), *aff'd as modified*, 813 F. App'x 780 (3d Cir. 2020). As such, the Court finds BD has failed to submit sufficient evidence to refute National Union's argument that there is no record evidence that BD faced liability "because of" these documents.

Notwithstanding, upon an independent review of the record, the Court finds there is sufficient record evidence that demonstrates the remaining thirteen documents were utilized by the plaintiffs in the Underlying Actions. *See* Ex. 39 at 465 to Montemarano Decl. (stating KK-24 was used as an exhibit during the deposition of BD's Vice President of Marketing and Development); Ex. 39 at 468 to Montemarano Decl. (stating the information contained in KK-25 through KK-27 was used in the deposition of Louis Scott); Ex. 39 at 470 to Montemarano Decl. (stating KK-28 through KK-30 were used during the deposition of Brad Noe); Ex. 39 at 474 to Montemarano Decl. (stating KK-38 through KK-42 were produced in the Underlying Actions); Ex. 39 at 475 (stating KK-43 was used during the deposition of BD's Vice President of Marketing and Development). BD has set forth sufficient evidence through the remaining thirteen documents to demonstrate the "causal connection."

> 4.    *The Limitations Period Precludes BD's Entitlement to Coverage*

Finally, National Union argues BD is not entitled to coverage under the 1993 Policies because it never faced potential liability in the Underlying Actions for conduct occurring during the coverage periods. *See* Mot. at 36-38. According to National Union, a four-year statute of limitations period applied to the antitrust claims in the Underlying Actions, meaning that BD could

not have been liable in the RTI Action, which was filed in 2001, for conduct occurring before 1997, or in the Class Actions, the first of which was filed in 2005, for conduct occurring before 2001. *Id.* BD contends the potential liability fell within the limitations period because the Court should look to the date the RTI Action was initially filed in state court, August 3, 1998, not federal court. Opp'n Brief to Motion at 36-37.

Antitrust actions must be commenced "within four years after the cause of action accrued." 15 U.S.C. § 15b. An antitrust cause of action generally "'accrues and the statute of limitations begins to run when a defendant commits an act that injures a plaintiff's business.'" *W. Penn*, 627 F.3d 85, 105-06 (3d Cir. 2010) (cleaned up) (quoting *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971)).

The Court finds the four-year limitations period would preclude BD from coverage under the 1993 Policies. Without providing any authority, BD seemingly requests the Court to revive the state court complaint that was dismissed, and then have the RTI Action, a new and separate action, relate back to the date of the original complaint. *See Rowell v. Stecker*, 698 Fed. App'x 693, 697 (3d Cir. 2017) (declining to apply relation-back doctrine "to pleadings filed against different parties in a different lawsuit"). Additionally, in a footnote, BD references alleged injuries the plaintiffs in the Class Actions suffered during the period covered by the 1993 Policies. *See* Opp'n Brief to Motion at 37 n.8. The Court finds the mere presence of allegations of liability during the coverage period does not survive the statute of limitations argument.

To avoid the bar of limitations, BD relies upon an exception to the statute of limitations for speculative damages. *See* Opp'n Brief to Motion at 37-38. The speculative damages exception provides, "even if injury and a cause of action have accrued as of a certain date, future damages that might arise from the conduct sued on are unrecoverable if the fact of their accrual is

speculative or their amount and nature unprovable." *Zenith Radio*, 401 U.S. at 339. "In these instances, antitrust causes of action for future damages 'will accrue only on the date the damages are suffered; thereafter the plaintiff may sue to recover them at any time within four years from the date they were inflicted.'" *Meijer, Inc. v. 3M*, No. 04-5871, 2005 WL 1660188, at *5 (E.D. Pa. July 13, 2005) (cleaned up) (quoting *Zenith Radio*, 401 U.S. at 339; *see also Lender's Serv., Inc. v. Dayton Bar Ass'n*, 758 F. Supp. 429, 442 (S.D. Ohio 1991) ("However, where future damages are too speculative to be proved, a cause of action accrues on the date they are suffered.").[13] However, the Third Circuit has expressed "[d]amages are not speculative so long as the jury may 'make a just and reasonable estimate of the damages based on relevant data,' which can take the form of 'probable and inferential as well as . . . direct and positive proof.'" *Perrigo Co. v. AbbVie Inc.*, No. 21-3026, 2022 WL 2870152, at *5 (3d Cir. July 21, 2022) (quoting *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946)).

In support of its argument that the speculative damages exception applies, BD makes a generalized assertion that "[t]he Underlying Plaintiffs alleged suffered damages within the alleged statutory period resulting from BD's prior unfairly competitive and disparaging conduct targeted against Terumo and RTI." Opp'n Brief to Motion at 37. BD also cites to portions of its own mediation statements submitted in both the RTI Action and Class Actions. *See id.* at 37-38 (citing Ex. NNN and OOO to Bartell Cert.). The Court finds these citations fail to demonstrate the

---

[13] There is an important distinction, however, between "uncertain damages, which prevent recovery" and therefore toll the statute of limitations, and "uncertain extent of damage, which does not prevent recovery." *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 240 (9th Cir. 1987) (citation omitted); *see also Charlotte Telecasters, Inc. v. Jefferson-Pilot Corp.*, 546 F.2d 570, 573 (4th Cir. 1976). "The former denotes failure to establish an injury, while the latter denotes imprecision with regard to the scope or extent of the injury." *Pace Indus.*, 813 F.2d at 240. "The question of whether there is a right to recovery is not to be confused with the difficulty in ascertaining the scope or extent of the injury." *Id.*

damages in the Underlying Actions were speculative in nature and warrant an exception to the applicable statute of limitations.

Accordingly, the Court finds National Union is entitled to a declaration that BD is not permitted coverage under the 1993 Policies for the Underlying Actions.

### C.    Genuine Disputes of Material Fact Exist Regarding Whether Coverage is Triggered Under the 1994, 1997, and 1999 Policies

National Union also raises numerous arguments for BD's lack of coverage under the 1994, 1997, and 1999 Policies' "Advertising Injury" and "Personal Injury" provisions.  For the reasons below, the Court finds National Union has demonstrated it is entitled to a declaration that BD cannot obtain coverage under the "Advertising Injury" provision of the 1994, 1997, and 1999 Policies for the Class Actions.  Notwithstanding, the Court finds National Union has failed to demonstrate, as a matter of law, that it is entitled to a declaration that BD cannot obtain coverage under the "Advertising Injury" provision of the 1994, 1997, and 1999 Policies for the RTI Action or the "Personal Injury" provision for either the RTI Action or Class Actions.

> ### a.    *BD is Not Entitled to Coverage Under the Advertising Injury Provision for the Class Actions*

National Union asserts BD cannot establish entitlement to coverage under the "Advertising Injury" provisions because the injuries claimed in the Underlying Actions were not solely due to BD's advertisements.  *See* Mot. at 41-42.  BD counters that the 1994, 1997, and 1999 Policies do not require that every claim in the Underlying Actions arise out of advertising activities; rather, if the disparagement injury arose solely from BD's advertising efforts, then BD is entitled to coverage.  *See* Opp'n Brief to Motion at 39 n.32.

As previously noted, the 1994 Policy, 1997 Policy, and 1999 Policy generally define "Advertising Injury" as "[i]njury arising solely out of [the insured's] advertising activities" due to one or more of the following:

1. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;
2. Oral or written publication of material that violates a person's right of privacy;
3. Misappropriation of advertising ideas or style of doing business; or
4. Infringement of copyright, title or slogan. [14]

Ex. 21 at 237 to Montemarano Decl.; Ex. 22 at 279 to Montemarano Decl.; Ex. 23 at 325 to Montemarano Decl.

The Court adheres to the established principle that, in the absence of ambiguity, the Court must give "[t]he terms of insurance contracts . . . their plain and ordinary meaning, with ambiguities resolved in favor of the insured." *Memorial Props.*, 46 A.3d at 532 (internal quotations marks and citations omitted). The requirement that a covered advertising injury be an "injury arising solely out of . . . advertising activities" is not ambiguous: by its plain language, it simply requires that, to the extent BD is alleged to have caused the underlying plaintiffs an advertising injury, BD's advertising activities must have been the sole cause of that injury.

The Court finds BD has failed to set forth sufficient record evidence to demonstrate the Class Action plaintiffs suffered advertising injury that was solely caused by BD's disparaging conduct. Whereas the RTI Action contained a business disparagement claim, the Class Actions did not include such a claim. BD fails to point to any injury the Class Action plaintiffs suffered *solely* due to BD's disparaging conduct. As such, the Court finds BD is not entitled to coverage

---

[14] The relevant offense is "[o]ral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services." *See* Opp'n Brief to Motion at 12-13.

for the Class Actions under the "Advertising Injury" provision in the 1994, 1997, and 1999 Policies.

> ### b.     National Union has Failed to Demonstrate BD is Not Entitled to Coverage Under the Advertising Injury Provision for the RTI Action

National Union also argues BD is not entitled to coverage under the "Advertising Injury" provision because it fails to satisfy the requisite elements for coverage. *See* Mot. at 40-45. The Court disagrees with National Union and finds genuine issues of material fact preclude granting summary judgment.

> #### i.     The RTI Action raises damages arising "solely out of" BD's advertising activities

National Union argues BD is not entitled to coverage because the injuries alleged by RTI did not arise solely from BD's advertising activities. *See* Mot. at 41-42. The Court disagrees and finds the record contains evidence in support of both parties' arguments. These types of conflicts in the evidence must be resolved by the jury, not the Court. *See Boyle*, 139 F.3d at 393.

In support of its argument, National Union cites to, among other things, Warpole's supplemental deposition testimony where he stated that "the antitrust claims were not based solely on advertising activities." *See* Ex. RRR at 181:22-183:15 to Bartell Cert. This testimony would support a finding that RTI did not allege damages *solely* from BD's advertising activities.

However, as BD acknowledges in its opposition, RTI raised an explicitly business disparagement cause of action in its complaint, alleging:

> In the course of building and maintaining its monopolistic practices, [BD] published to [RTI]'s customers, prospective customers, other GPOs, and other purchasers of hypodermic products certain statements about [RTI] and the quality of [RTI]'s products. Some specific examples of such disparagement include, but are not limited to:
>
> > a.   Telling representatives of the healthcare workers union, the SEIU, that Tom Shaw is the reason no one will purchase [RTI] products;

    b.   Publishing to healthcare workers that the [RTI] products deliver inaccurate dosaging;

    c.   Publishing to healthcare workers that the [RTI] products cause hematomas;

    d.   Telling members of the financial world that the [RTI] products cannot be manufactured for less than $.50 per syringe, a cost that would not allow for widespread use, because of difficulties manufacturing in high volumes; and

    e.   Telling healthcare works that [RTI]'s employees are not reasonable business people.

*See* Ex. 6 at 58 ¶ 50.  RTI alleged it "was injured and suffered special damages as a result of such statements and conduct."  *Id.* at 59 ¶ 54.

Beyond just the pleadings, in the underlying proceedings, RTI stated BD, among other defendants, "maliciously used disparaging words that were false to interfere with RTI's economic interests" and "had the effect of unlawfully excluding RTI from the relevant market, thus hurting it." Ex. N at 24 to Bartell Cert.  Additionally, RTI's March 31, 2006 Form 10-K appears to support BD's assertion that its settlement stemmed, at least in part, from the business disparagement claim. *See* Ex. P at 30 to Bartell Cert. ("We believe that [BD's] monopolistic business practices continue despite their paying $100 million to settle its lawsuit with [RTI] for anticompetitive practices, business disparagement, and tortious interference.")  A review of the record evidence suggests that RTI's advertising injury was solely caused by BD's disparaging conduct.

          ii.      The parties dispute whether BD settled the RTI Action because of the disparagement claim

National Union also attacks BD's entitlement to coverage under the "Advertising Injury" provisions because BD cannot establish that it faced damages for liability because of "oral, written, or electronic publication of [the documents at Exhibits MM, NN, and OO] that *slander[ed]* or *libel[ed]* a person or organization, or *disparage[d]* a person's or organization's goods, products or

services." Mot. at 42-43 (quoting Ex. 23 at 328 to Montemarano Decl.)[15]  The Court disagrees with National Union's contention that the record evidence does not suggest disparaging conduct.[16] As the Court has expressed, RTI alleged disparaging conduct by BD.  *See* Ex. 6 at 58 ¶ 50.  In support of its argument, National Union contends "RTI's counsel acknowledged prior to settlement that BD was entitled to summary judgment" on its disparagement claim.  *See* Mot. at 43.  However, the parties present differing views of whether the settlement of the RTI Action included the business disparagement claim.  *Compare* Ex. 28 at 68 to Montemarano Decl. (BD acknowledging in discovery responses "RTI made a strategic litigation decision and seized on the opportunity to acknowledge . . . BD is entitled to summary judgment on . . . business disparagement") (cleaned up), *with* Ex. P at 30 to Bartell Cert. (RTI's March 31, 2006 Form 10-K stating BD had paid "$100 million to settle its lawsuit with [RTI] for anticompetitive practices, business disparagement, and tortious interference").  Viewing the record in the light most favorable to BD, there is a genuine dispute as to whether BD faced liability because of disparagement.

      iii.        The settlement amount for the RTI Action may have been paid, in part, "because of" the advertising injury

Finally, National Union urges this Court to find BD is not entitled to coverage because it has failed to demonstrate it paid the settlement amounts "because of" advertising injury.  *See* Mot. at 43-44.  As previously stated, for an insured to be entitled to coverage under an "advertising injury" provision, there must be "(1) a causal connection between the advertising and the injury" and (2) the injury "fall[s] within one of the four categories defined by the policy."[17]  *Tradesoft*

---

[15] The Court observes the 1994 and 1997 Policies do not include the "electronic publication" language.  *See* Exs. 21 at 237, 239-40; 22 at 279, 281 to Montemarano Decl.

[16] The Court agrees with National Union that, even affording BD all reasonable inferences, there is no record evidence of slander or libel.

[17] The relevant category here is "[o]ral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services."  Ex.

*Tech.*, 746 A.2d at 1087. RTI's alleged injury, business disparagement, falls within one of the four categories defined in 1994, 1997, and 1999 Policies as an "advertising injury."

The more complex issue is determining the relationship between the advertising and the business disparagement. As previously stated, RTI raised specific allegations of disparagement against BD in the underlying action and alleged it "suffered special damages as a result of such statements and conduct." *See* Ex. 6 at 58 ¶ 50, 59 ¶ 54. Additionally, as part of its 111-page chart, BD contends several of the documents contained in Exhibits MM through OO were used in the Underlying Actions and evidence alleged disparaging conduct. *See, e.g.*, Ex. 39 at 487 to Montemarano Decl. (stating MM-3 was used during the deposition of E. McGovern); Ex. 39 at 495 to Montemarano Decl. (stating MM-19 was used in the expert report of Donald House); Ex. 39 at 498 to Montemarano Decl. (stating MM-24 was used in deposition of Erika McGovern); Ex. 39 at 500-01 to Montemarano Decl. (stating NN-3 was used in deposition of Brad Noe and expert reports of David Egilman and Donald House); Ex. 39 at 501 to Montemarano Decl. (stating NN-4 was used in deposition of Paul Falkenstein); Ex. 39 at 543-44 to Montemarano Decl. (stating OO-1 was used in deposition of Paul Falkenstein). The Court finds National Union has failed to demonstrate, as a matter of law, that BD did not pay settlement amounts because of the advertising injury.

Accordingly, the Court denies National Union's summary judgment motion as to the request for declaratory judgment that BD is not entitled to coverage under the "Advertising Liability" provisions for the RTI Action.

---

21 at 237 to Montemarano Decl.; Ex. 22 at 279 to Montemarano Decl.; *see also* Ex. 23 at 325 to Montemarano Decl.

c.    *National Union has Failed to Demonstrate BD is Not Entitled to Coverage Under the Personal Injury Provision for the RTI Action or Class Actions*

The Court finds National Union fails to demonstrate, as a matter of law, that BD is not entitled to coverage under the "Personal Injury" provisions for the RTI Action or Class Actions. Similar to its coverage argument for the "Advertising Injury" provisions, National Union contends BD is not entitled to coverage under the "Personal Injury" provisions because it cannot establish that it faced damages for liability because of "oral, written, or electronic publication of [the documents at Exhibits MM, NN, and OO] that *slander[ed]* or *libel[ed]* a person or organization, or *disparage[d]* a person's or organization's goods, products or services." Mot. at 42-43 (quoting Ex. 23 at 328 to Montemarano Decl.). As noted above, "Personal Injury" under the 1994, 1997, and 1999 Policies includes "injury other than . . . Advertising Injury arising out of . . . Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services . . . ." Exs. 21 at 239-40, 22 at 281-82; 23 at 328 to Montemarano Decl.

The Court disagrees with National Union's assertion that BD did not face liability because of its disparaging conduct. As the Court has already expressed, the RTI Action alleged a business disparagement claim premised on BD publishing false and/or inaccurate information about RTI. *See* Ex. 6 at 58 ¶ 50, 65 ¶¶ 74-77 to Montemarano Decl. Additionally, the parties present differing views of whether the settlement of the RTI Action included the business disparagement claim. *See* Ex. 28 at 68 to Montemarano Decl.; Ex. P at 30 to Bartell Cert. (RTI's March 31, 2006 Form 10-K stating BD had paid "$100 million to settle its lawsuit with [RTI] for anticompetitive practices, business disparagement, and tortious interference"). In the Class Actions, the underlying pleadings reference the RTI Action, *see, e.g.*, Exs. CC ¶¶ 6-7, 75; DD ¶¶ 6, 51-52, 65, 91, 93 to Bartell Cert.,

and BD's advertising campaigns, *see, e.g.*, Exs. CC ¶¶ 48-52, 73; DD ¶¶ 48-50 to Bartell Cert.[18] Furthermore, in its chart produced in supplemental discovery, BD contends several of the documents contained in Exhibits MM through OO were used in the Underlying Actions and evidence alleged disparaging conduct. *See, e.g.*, Exs. 39 at 487, 495, 498, 500-01, 543-44 to Montemarano Decl. Viewing the record in the light most favorable to BD, there is a genuine dispute as to whether BD faced liability in the Underlying Actions because of its disparagement of its competitors. Accordingly, the Court finds National Union has not demonstrated as a matter of law that it is entitled to a declaratory judgment that BD is not entitled to coverage under the "Personal Injury" provisions for the Underlying Actions.

###### D. The Existence of a Genuine Issue of Material Fact Precludes a Finding of Bad Faith

Under New Jersey law, all contracts impose an implied obligation of good faith and fair dealing in their performance and enforcement. *Sears Mortg. Corp. v. Rose*, 634 A.2d 74, 84 (N.J. 1993). "[B]ad faith is established by showing that *no debatable reasons* existed for denial of the benefits." *Pickett v. Lloyd's (A Syndicate of Underwriting Members)*, 621 A.2d 445, 457 (N.J. 1993) (emphasis added). "Neither negligence nor mistake is sufficient to show bad faith—rather, a plaintiff must demonstrate 'that . . . the insurer's conduct is unreasonable[] and . . . the insurer knows that the conduct is unreasonable, or that it recklessly disregards the fact that the conduct is unreasonable.'" *Enright v. Farm Family Cas. Ins. Co.*, No. 03-4850, 2005 WL 3588485, at *8, (D.N.J. Dec. 29, 2005) (quoting *Pickett*, 621 A.2d at 454).

Importantly, "a claimant who could not have established as a matter of law a right to summary judgment on the substantive claim would not be entitled to assert a claim for an insurer's

---

[18] As the Court expressed in its prior opinion, "the materials and arguments underlying [BD's] personal injury claims generally overlap with those underlying its advertising injury claims." D.E. 315 at 16.

bad faith refusal to pay the claim." *Tryko Mgmt. Servs. LLC v. Lloyd's Syndicate 3624*, No. 20-1285, 2023 WL 2706861, at *8 (D.N.J. Mar. 30, 2023).  Thus, BD's success in opposing National Union's summary judgment motion is a double-edged sword.  BD has successfully demonstrated that an issue of fact exists as to whether the Underlying Actions are covered by the 1994, 1997, and 1999 Policies.  But that issue of fact means that BD cannot establish that there was "no debatable reason" for National Union's denial.  Accordingly, the Court will grant summary judgment as to Defendant's bad faith counterclaim (Count III).

## IV.     CONCLUSION

For the reasons above, National Union's motion for summary judgment, D.E. 374, will be **GRANTED** *in part* and **DENED** *in part*.  An appropriate order accompanies this Opinion.

Dated: September 5, 2024

Evelyn Padin, U.S.D.J.